# EXHIBIT 6

<u>MEMBER TARGET - NON-CUSTODIAL INTERROGATION</u>

**STATE OF NEW YORK**
**COUNTY OF ONONDAGA**
**TOWN OF SALINA**                                                      **March 31, 2022**

This Statement is taken from Trooper COREY FIKE at Professional Standards Bureau Central Region Office on March 31, 2022, by Captain PAUL KUROPATWINSKI, commencing at 10:21AM.

The letter "Q" will denote questions asked by Captain KUROPATWINSKI
The letter "W" will denote questions asked by Inspector WHITE
The letter "A" will denote answers provided by Trooper FIKE

Q.  The purpose of this interrogation is to inquire into your activities as a Member of the New York State Police. Specifically, concerning the events surrounding the shooting of JUDSON ALBAHM.

    This interrogation is being conducted pursuant to the Article 16 of the current PBA Collective Bargaining Agreement and the Regulations of the New York State Police, including 8A3 and 8A15.

    You have the right to contact and consult with a union representative or attorney before being interrogated, and to have a union representative or attorney of your choosing present during the interrogation. Do you understand this?

A.  Yes.

Q.  You are not under arrest. However, Article 16 and the applicable Regulations require you to cooperate and answer truthfully questions relating to the allegations. A refusal by you to cooperate or to answer questions, or a failure to answer any questions truthfully, may result in disciplinary action against you, up to and including the termination of your employment. Do you understand this?

A.  Yes.

Q.  You are entitled to all the rights guaranteed by the State and Federal constitutions. As this is an involuntary statement, your responses during this interrogation are automatically cloaked with criminal immunity. Accordingly, neither your statements nor any information or evidence that is gained as a result of, or in reliance upon, this interrogation can be used by a police or prosecutorial entity against you in support of a criminal proceeding. Do you understand this?

A.  Yes.

1

CF00000001

Q. Are you being represented at this time and if so, by whom?

A. Yes, by MARIA MORRIS, my PBA Counsel and Attorney and DOM PEDULLA, my PBA representative.

Q. You were advised on March 28, 2022, of the matter being investigated and that it would be necessary for you to give a statement concerning this matter, is that correct?

A. Yes.

Q. I am Captain PAUL KUROPATWINSKI and as a supervising officer and representative of the Superintendent I am authorized to conduct this interrogation. This interrogation is being recorded mechanically at PSB Central Regional Office. A full transcript will be prepared and you will be provided with a copy of the recording or will be afforded an opportunity to cause a duplicate of this recording to be made for your future use. You will be given the opportunity to view the written transcript from this recording upon completion to ensure its accuracy, and will also be given, also be provided with a full copy of the transcript, subsequent to your signature. Do you understand this?

A. Yes.

Q. Also present in the room is Staff Inspector MICHAEL WHITE and Captain MICHAEL BAUER. Do you understand this?

A. Yes.

Q. The record will note that you are present in response to a direct order. Trooper FIKE, you will now be asked questions relating to the performance of your official duties and you are required to answer these questions. If you decline or refuse to answer any questions, you will be ordered by me to answer. If you then continue in your refusal to answer, disciplinary action will be initiated charging you with disobeying a lawful order. This disciplinary action could result in the termination of your employment with the Division of State Police. You will be permitted during this statement to take breaks when reasonable and appropriate. Having been advised of the above, are you now ready to proceed with this interrogation?

A. Yes.

W. Please keep your voice up.

A. Okay.

Q. Please state your full name and rank.

2

A. COREY ANDREW FIKE, Trooper.

Q. What is your date of entry with the Division of State Police?

A. June 10, 2013.

Q. What is the location of your current assignment?

A. SP Lafayette.

Q. In detail, provide your account of the incident near Apulia Road, Town of Lafayette on March 4, 2021, beginning with being dispatched to the complaint involving JUDSON ALBAHM.

A. Okay, that day while working I responded to a call on Apulia Road, in regards to a person in crisis. I responded to that address and spoke with a complainant, who advised she needed help from the police in locating her son who was having a mental breakdown. From there on out other officers from Onondaga County Sheriff's Office and the DeWitt Police, as well as other State Troopers assisted me in locating that individual, JUDSON ALBAHM. And at one point during our location of him he presented a, what, what appeared to be a weapon and throughout the search and subsequent search from that incident, from him showing the weapon, other officers and I deemed it necessary to fire our weapons upon him, ultimately ending the incident.

Q. Prior to March 4, 2021, were you familiar with JUDSON ALBAHM?

A. Briefly, yes.

Q. And can you explain how?

A. I had pulled him over on a traffic stop, I, I couldn't tell you when but other than a short V&T citation, that was my, I believe my only face to face with him.

W. Anything unusual about the stop?

A. No, not at all.

W. Were there any, was there any conflict during the stop?

A. No.

Q. Do you have any idea, a time frame when that might have occurred?

A. The stop?

3

CF00000003

Q. Yes. I mean are we talking within the previous months or a year or more?

A. Maybe six months prior.

Q. Okay. Aside from that traffic stop, were you familiar with him in any other way from just other Members speaking about him?

A. Yes.

Q. And please explain.

A. I knew he had gone to the barracks, my barracks, and spoken with other Troopers about various, he had various questions about law enforcement, and I knew he had I believe questioned some Manlius Police Officers while they were on duty enough to the point where emails were sent out to be aware of, of his actions. He sometimes would catch police officers off guard or, or come to the barracks and ask questions that weren't, that were somewhat abnormal. That's about it.

W. His approach to the Troopers at Lafayette, was that antagonistic?

A. I can't speak upon their behalf, I wasn't there but he, he came asking questions I believe, he was curious to the, how would you say it, the, if the lobby of the barracks at Lafayette was a public lobby or if he was allowed to video tape something along those lines. I don't believe it was antagonistic but I wasn't there.

W. But it was concerning enough that...

A. Concerning enough...

W. Some kind of message was relayed?

A. Yeah.

MORRIS: Let him ask the question.

A. Sorry. Concerning enough to where that Trooper felt the need to say hey in case he comes back you can expect these questions or this type of attitude I guess.

W. What was the attitude?

A. Very inquisitive and continued to ask questions about being in, being at the barracks or if there were cameras outside or cameras inside, if he could film. I don't, I don't know what his attitude

4

was, but his, that's, that's all I know to that.

W.  Do you know if he was directed to leave the station or did he leave on his own?

A.  I'm not sure.

Q.  Going back to March 4, 2021, what were the weather conditions like that day?

A.  March 4th you said?

Q.  Yes.

A.  I believe there was snow on the ground, it was mildly cold and I believe cloudy.

Q.  What information were you given by dispatch about the complaint and Mr. ALBAHM?

A.  Dispatch advised that he had left the house, the house that I responded to where his mother was at and I believe in, in his actions of leaving the house his car that he left in collided with her car in the driveway, that's what I remember.

W.  If I can just go back to the weather briefly, was there any visibility issues?

A.  No.

Q.  Were you aware that Mr. ALBAHM had threatened suicide by police in the past?

A.  I believe that was, that may have been dispatched, added to the notes of the dispatch call.

Q.  And to your recollection, did dispatch advise you that he may be armed with an airsoft gun?

A.  I don't recall that.

Q.  You initially responded to 4372 Apulia Road, in the town of Dewitt to speak with the complainant, JUDSON ALBAHM'S mother, CARISSA ALBAHM.  Is that correct?

A.  Correct.

Q.  And what did she tell you?

A.  She told me that the day prior or so JUDSON was seen for a mental health evaluation and it was determined that he needed to return on this date and some either social workers or somebody from the hospital had come to advise him of that and assist him with that.  And at that point he had verbally disagreed with the situation and, and became upset enough to where he left the

5

residence.

Q. So just clarify what did Ms. ALBAHM want done regarding her son?

A. She wanted him to seek medical, mental evaluation, medical help from a doctor or, or psychologist.

W. What did she want you to do?

A. She wanted police to help find him as he had left.

W. And take him into custody?

A. Correct and, and assist in transporting him for that mental evaluation.

W. Did she make any mention of an airsoft gun during that conversation?

A. Not during our first conversation, not this one you're referring to, the initial.

W. Okay, you had, you had a...

A. Second conversation.

W. Prior to the shooting you had another conversation with her?

A. Correct.

W. Okay, why don't we talk about that?

A. Okay. That's further down the line, but...

W. Yeah we'll, we'll address it now and then come back to it (inaudible).

A. Sure, eventually I, I returned to the house and asked her if she knew JUDSON to have any weapons and at that point she told me she knew he owned a BB gun or a pellet gun. I forget what she referred to it as, and that he had practiced target shooting in the back yard.

W. What information did she give you about the gun specifically?

A. That was it, she, there was no description other than that, that she knew he owned it.

Q. For the record, when you take someone into custody for a mental health 941 arrest, what would you, where would you take that person?

6

A. There's several options, the main one being CPEP at St. Joseph's Hospital where they also have a, a CPEP like facility at Community General Hospital.

Q. Okay, and then for the record, CPEP, that, that stands for Comprehensive Psychiatric Emergency Program?

A. I believe so.

Q. Okay. Is that what your intentions were to do in this situation then?

A. Yes.

Q. What did Ms. ALBAHM tell you about JUDSON'S mental state?

MORRIS: Just, are you referring to the initial conversation, the second conversation, total, can you clarify please?

Q. Start with the initial conversation.

A. She believed he at that time was either high on or had been taking LSD and that he had been hallucinating or saying odd things that, that were out of, out of the normal for him to say, that he was extremely paranoid I believe.

Q. And did she tell you that he had threatened suicide by police in the past?

A. I don't recall if that was brought up.

Q. And, and just to clarify, during this initial conversation, did she mention anything about him owning a BB gun/pellet gun or airsoft gun?

A. I don't remember.

Q. Were there any other law enforcement officers with you at the house at that time?

A. Not during my initial conversation with her, but they arrived shortly after.

Q. Were there any personnel from CPEP at the residence when you were there?

A. I don't believe so.

W. Trooper FIKE, you were the first officer to respond to her residence?

7

A.   Yes Sir.

W.   Thank you.

Q.   Did you have any discussions with anyone from CPEP?

A.   I don't believe so.

Q.   And were you made aware that Mr. ALBAHM had recently been released, that he was being treated at CPEP and released recently?

A.   Through my initial conversation with his mother, I believe she described that he had been there the day prior, either the day prior or the day before that, I'm not sure.

Q.   Okay. What did you do after speaking with Ms. ALBAHM?

A.   I advised the fellow officers that had just responded, I briefed them on the situation and at that point it was determined that we had to go find him.

Q.   Throughout the incident, were there any other steps taken to coordinate efforts between the law enforcement agencies?

A.   I remember I, I spoke with Trooper DAVIS over the radio to respond to the barracks in case JUDSON was going to the, responding to the barracks himself. And, and that's, that's all I can remember for that.

Q.   Did a person or agency take the lead in coordinating efforts that you're aware of?

A.   I would say I did.

W.   So what instructions did you give to the responding officers?

A.   I advised them as much as I knew of what his mother had told me of where she think he could have gone or, that's, that's about it. Basically it was we need to find him, he's in the area somewhere, we need to find him so.

W.   Was there a specific plan, okay you go here, I'll go over here?

A.   Not initially, no.

W.   Okay, did you share the information about the airsoft gun, or you didn't have it at that point?

8

CF00000008

A.  That that point I didn't have it.

W.  Okay.

A.  Right.

Q.  Where did she think that he might have gone?

A.  I don't think she had any idea where he had gone.

Q.  Okay.  Was there a discussion about specific areas that should be checked?

A.  Other than me telling Trooper DAVIS to respond to the barracks, no, nowhere particular.

Q.  Okay.  Was there any information discussed amongst the responders about JUDSON possibly possessing an airsoft gun?

A.  Not at that time, no.

Q.  At some point later though in the incident there was a discussion or it came up?

A.  Between his mother and I yes, but I don't believe between officers, no.

Q.  Where did you respond after you responded to the ALBAHM residence?

A.  While on scene in the front yard a DOT worker had advised me that he had seen somebody walking on the railroad tracks, which is behind his house, behind the house that I responded to. And at that point I focused my attention towards the railroad tracks and that's when I saw him walking on the railroad tracks.  So if you're asking where I went after that, I then went to the railroad tracks.

Q.  So this is an in person encounter with a DOT worker that you, that you had while you're at the ALBAHM residence?

A.  Just outside of the house, yeah.

Q.  Okay.

A.  Like the end of the driveway, yep.

Q.  And then did you encounter Mr. ALBAHM then when you checked the railroad tracks?

9

A. By encounter only visually, he was far enough away where there was no conversation or so only visually saw him.

Q. Okay.

W. And what did he do?

A. At that point he may have seen me and he left the railroad tracks and headed in a, I guess that would be an easterly direction off the railroad tracks and I lost visual of him.

W. How far away was he?

A. Maybe a 100 feet, 150 feet.

W. Did he just, did he run, did he...

A. Yeah, run as, I guess you could describe it as a run, jogged away.

W. Was it apparent he was trying to evade you?

A. It appeared that way.

W. Did you see anything in his hands, was he holding anything?

A. I, I couldn't see at that time, no.

Q. Were you wearing your soft body armor vest that day?

A. Yes.

Q. Okay, and was your vehicle equipped with a rifle plate vest?

A. Yes.

Q. And at any point did you put that, the rifle plate vest on?

A. No.

W. What were you armed with?

A. Just my Division issued sidearm, Glock.

Q. So after you had observed Mr. ALBAHM on the railroad tracks, what took place next?

10

CF00000010

A. Over the radio I advised the other units that I visually saw him and, and the direction he was heading in. And then I walked towards the railroad tracks to see if I could see where he went or get a better point of view.

Q. Okay.

A. I, I went to the area where I had saw him.

Q. Um-hum, and, and from, and from there what, what took place?

A. Once on the railroad tracks, I looked down the tracks and saw Deputy PACE from the Onondaga County Sheriff's Office, it was further down the tracks and he was motioning that he had seen him and he was pointing in a direction indicating he, which way he had gone. So I linked up with Deputy PACE on foot and we went that direction.

Q. Now at some point do you, responded to the Jamesville DOT?

A. Right, upon linking up with Deputy PACE for, at that point in the rear area of the DOT.

Q. Okay, so following the railroad tracks would take you to the DOT area?

A. The tracks butt up against the parking lot of the DOT.

Q. Okay. Was there an encounter with JUDSON ALBAHM at that location?

A. Eventually, yes.

Q. Okay. Describe that please.

A. We made visual contact with him again at quite a distance and Deputy PACE and I engaged him in conversation.

Q. And describe what was said.

A. That we had tried to calm him down, he seemed agitated and we, we tried to talk with him, speak with him and get him to stop because he continued to walk away from us.

Q. And this is all at the DOT facility?

A. It's the front parking lot now, yes.

Q. Was there any other law enforcement with you at that point?

11

CF00000011

A.  No.

W.  What did ALBAHM say?

A.  At that point he was very resistant to any of our suggestions to stop and to talk to us and he made some odd comments about seeing evil in people and that he sees people for who they truly are and something along the lines of that.

Q.  So is he still walking away from you at this point?

A.  Right, while talking he's, he's back pedaling and then sometimes turning around walking away and we're still walking forward.

W.  Did he verbalize any threats to you or himself at that time?

A.  Not at that time, no.

Q.  Did you see anything in his hands at this point?

A.  At that point I believe he just had his hands in his, his front pockets, his like jacket or hoodie pockets.

Q.  Alright, describe what took place next.

A.  After speaking with him for a short while Deputy PACE and I determined we needed to take him into custody and as we try to close the distance between us he pulled out what appeared to be a pistol and held it at the chest level. And Deputy PACE and I took cover behind the closest car and drew our weapons down on him and, and commanded him to drop the weapon and to put his hands up and so forth.

W.  Describe held it at chest level.

A.  The muzzle facing away from him, holding it kinda like this, just…

MORRIS:  Describe it.

A.  Yeah, holding it up to his stomach level with, with the muzzle pointed off to the side, that's the best I can describe that.

W.  And where were you in orientation to his muzzle direction?

A.  Perpendicular, if that makes any sense, he was, let's say the muzzle was pointed to his right and

12

I'm facing him.

W. So the muzzle wasn't pointed at you at that time?

A. Correct.

Q. Did he verbalize any threats at that point?

A. I believe he may have said something along the lines of like, "Don't make me do it," or something like that, I don't recall specifically.

W. How did, how did you take that comment?

A. Either that he was going to use that firearm against us or against himself.

Q. Besides yourself and you said Deputy PACE?

A. Correct.

Q. Any other law enforcement?

A. Eventually while we were still engaging him other officers showed up. Town of DeWitt police officers showed up to that scene. Officer WICKES specifically then specifically engaged in a conversation as well.

Q. Can you describe what that conversation was like?

A. She, I'm trying to get, tried to go into more detail to calm him down and more of a negotiator style you know crisis intervention, tried to talk to him about other things, about school, about family, stuff like that.

Q. And how did he respond?

A. He, he didn't really respond to it, but he didn't really engage back with her.

W. How far from ALBAHM are you at this point?

A. I would say 30 feet, 40 feet.

W. And at, at this point in the timeline, how much time has elapsed since you first arrived at the mother's?

A. 25 minutes.

13

CF00000013

Q. Describe again what the weapon looked like that he displayed at the DOT.

A. It looked like a black pistol, black handgun.

Q. Were there any markings on the gun that you could see which would indicate it was not a semi-automatic pistol?

A. No not at all.

Q. Was there any orange or red markings on the barrel?

A. Absolutely not.

DOMINICK: Sir?

W. (inaudible).

DOMINICK: No, okay.

Q. What happened next?

A. After Officer WICKS attempted to speak with him, JUDSON continued to walk away and eventually run away through a, an open field. At that point the other officers and I instead of pursuing him on foot, got into vehicles and returned to the direction he was heading I guess you could say.

W. How long were you engaged at the DOT yard with ALBAHM?

A. In all 10 – 15 minutes.

Q. You said that you pursued him, or in your vehicle in a certain direction, could, could you describe what direction that was?

A. Just based on the geography and terrain we had to almost circle back in the vehicles because there was no direct roadway to where he was going, so we had to go all the way back to return to Apulia Road.

Q. Okay.

W. If we can just go back to the, the DOT yard encounter. At any point did ALBAHM express what his intent was, what he wanted?

14

A.  I, I don't believe so.  Not that I can recall, other than to be left alone.

Q.  Later Trooper JAKOB DAVIS and Sergeant BRENT, SCOTT BRENT, also encountered Mr. ALBAHM on Apulia Road, at which time they observed he was armed with the apparent handgun. At that time he refused commands and fled that encounter.  You eventually met up with Trooper DAVIS, Sergeant BRENT and Trooper MICHAEL GREEN.  Is that right?

A.  Correct.

Q.  Was there any discussion between you and Troopers DAVIS, GREEN, and Sergeant BRENT?

A.  I believe I spoke with Sergeant BRENT as he's my direct supervisor and briefed him on the situation.

Q.  Describe what that, what was said during that conversation.

A.  I, I told him the basic complaint from what I received from the complainant and that I witnessed JUDSON with a firearm in his hand and, and that it was, that he had left and the last direction that I saw him in.

Q.  Did Sergeant BRENT give any instructions about continuing to pursue Mr. ALBAHM?

A.  Not particularly, no.

Q.  Did he give any instructions at all that you recall?

A.  I don't recall.

W.  What did he share with you about his encounter with ALBAHM?

A.  I, I don't recall it. I'm not sure.

W.  Did you know that he had an encounter with ALBAHM at that time?

A.  I, I don't know if I spoke with Sergeant BRENT before he had the encounter or after. I can't recall.

Q.  Did you have any discussion with Troopers DAVIS and GREEN at this point in the incident?

A.  Not at this point, no.

Q.  Was there a discussion after this point, are you, because at one point you did call…

A.  Right.

15

CF00000015

Q.  Early on you called...

A.  I called Trooper DAVIS earlier.

Q.  Okay.

A.  To respond to the barracks, but after we made visual of JUDSON there was no need for that.

Q.  Okay.

W.  Was there any efforts from anyone at that point to coordinate your efforts?

A.  At that point there were a lot of responding officers, the county sheriff's office was responding, the Town of DeWitt were responding and other State Troopers were responding.  So as far as coordinating efforts of who goes where, there, there wasn't a direct plan put in place yet.

W.  And, and there was no one indicating that they were taking command of this incident?

A.  No I believe at one point Sergeant BRENT asked me whose call it was, basically meaning who's, who's taking command and I told him it was going to be a State Police call, cuz there was, it occurred within the Town of DeWitt but I was the first officer there so it's our call.

W.  And what was his response?

A.  Just said okay, I believe he needed to know that to pass that along to his supervisors that it was going to be State Police primary call.

Q.  Did Sergeant BRENT advise you or, or the other Troopers on scene not to chase ALBAHM into the woods?

A.  I don't recall that.

Q.  Were you given direction by any supervisor during, during the incident?

A.  No.

Q.  Regardless of agency?

A.  Correct, right.

Q.  Were you ever given any information about a pending mental health pickup order?

CF00000016

A. Yes, I believe Deputy PACE contacted somebody and, and advised that there was a pickup order.

Q. Okay.

W. What was your understanding after your conversation with Sergeant BRENT? What, what were ya, what was your understanding in regards to what, what you were going to do next?

A. Eventually after JUDSON was found it was my understanding that the State Police would then transport him for a mental evaluation.

W. Was it your understanding at that point when you were talking with Sergeant BRENT that the search would continue?

A. Yes.

W. And did he relay that information to you somehow?

A. Not that I can recall, no, I'm not sure.

Q. Were you made aware of any request for a less, less lethal to be dispatched at the scene or personnel with less lethal?

A. No.

Q. Describe what took place after your conversation with Sergeant BRENT.

A. I believe a resident in the area had, had called 911 and advised them that they saw JUDSON, which gave us a somewhat sense of location of where he could be. After that I headed south of that location in case he continued in that direction, south on Apulia Road. While traveling south on Apulia Road I made another, I saw JUDSON again in the woods behind the houses. and that's when I relayed that information back to the 911 Center.

Q. You're traveling in your vehicle at this time on Apulia?

A. Yes.

Q. So after you spot him then behind a house, what took place?

A. Then I get out of my vehicle, several houses down I get out of my vehicle, and I head behind the houses with Trooper GREEN and with Trooper DAVIS up into the woods.

W. Were there any sightings prior to that?

17

CF0000001

A.   Not by me.

W.   That you're aware of by any agency or people?

A.   Other than that homeowner calling and like you said Trooper DAVIS and Sergeant BRENT I believe saw him, I'm not sure.

W.   So that this is roughly the fourth time ALBAHM was seen?

A.   By myself?

W.   In, in general, you know in comprehensively in the encounter?

A.   That sounds about right.

Q.   So as you're now on foot after sighting Mr. ALBAHM, were you able to engage with him verbally at that point in the woods?

A.   Yes.

Q.   And what, what was that, describe that please.

A.   Another engagement of us telling him to drop the weapon and to stop where he is and to show us his hands.

Q.   What was his response?

A.   He didn't respond, I don't believe he said anything, he just would, at any juncture of trying to speak with him he would turn and run in an opposite direction or, or back into the woods.

W.   What were your observations of ALBAHM at that point?

A.   He's running in the woods with that weapon still in his hands.

Q.   So he'll be running away from Apulia Road generally?

A.   He's running in like a circular pattern, it'd be hard to describe if it was away or towards, it was all over the place.

Q.   Okay.

W.   Was it apparent he wanted to separate himself from you?

18

A. He, he wasn't running towards me so I, I guess yes.

Q. Did you see if he had anything in his hand at, at this point?

A. Yeah he had the weapon in his hand.

Q. The black gun that you, you stated earlier?

A. Correct.

Q. Did you feel compelled to pursue him at this point?

A. Yes.

Q. Can you just describe why?

A. Given the location we were at and the density of houses and residence, and, and the nature of the complaint that, that he was, had a weapon in his hand and wasn't thinking clearly and was acting violent while at the house I felt it necessary to apprehend him before he could hurt somebody or himself.

Q. Can you describe the distance between you and Mr. ALBAHM as, as you followed?

A. It, it varied but it was quite a distance at times, 50, 50 feet plus to 100 feet.

Q. Were you joined by any other law enforcement officers at some point?

A. Other than Trooper GREEN and Trooper DAVIS?

Q. Yes.

A. Yes.

Q. Who was that?

A. Town of DeWitt officers and Onondaga County Sheriff, Sheriff's.

Q. Was there any dialogue between those officers and Mr. ALBAHM (inaudible)?

A. I believe, yes the Town of DeWitt was engaging him verbally as well.

W. What was the extent of your coordination with the other agencies at that point?

19

CF00000019

A.  At that point it was communicated to the other agencies of his best known location of where he was in the woods and that's about it. There was no directive given to, for who to go where.

W.  Was there a discussion about the fact that he was, he appeared armed?

A.  Not verbally but that was discussed over the radio so I believe everyone was aware if they were listening to the, to the radio communications.

Q.  Did those officers give Mr. ALBAHM any commands regarding the weapon?

A.  Um-hum, the same commands I gave to drop the weapon and to show his hands.

W.  This communication over the radio, was that from the dispatcher or?

A.  Initially it was from…

MORRIS:  Let him finish the question before you answer.

A.  Oh, sorry.

W.  Or the officers at the scene?

A.  Initially it was from Deputy PACE and I as we were the first ones to engage him. So we were the first ones to relay the message that he appeared to be armed. And then from there I believe 911 Dispatch then relayed to the other responding officers of what we had seen.

Q.  At some point Mr. ALBAHM stopped walking. Is that right?

A.  Um-hum.

Q.  Was there any dialogue between you and the other officers and Mr. ALBAHM at this point?

A.  The other officers and JUDSON, the DeWitt officers and JUDSON, were then engaging in dialogue at that point.

Q.  And describe again what that dialogue entailed.

A.  Telling him to drop the weapon, to show his hands, to, yeah that, that's the extent.

Q.  And did, did you have an exchange, a verbal exchange with Mr., JUDSON as well after he stopped walking?

A.  No.

20

Q. At some point did, did you tell him to drop the gun and, and he told you he would not drop the gun?

A. In the woods at, at some point, right I don't know if it was when he had stopped walking or prior to stop walking, yeah there was commands to drop the weapon.

Q. And he, and he replied to that?

A. I don't remember if he, what he said to that.

Q. Okay. Did he, did he say don't make me do this?

A. I don't recall that.

Q. Okay. So after Mr. ALBAHM stopped walking and there's a conversation or dialogue between him and the DeWitt officers, can you describe what threatening behavior, if any, he displayed at that point?

A. Right, at that point he was, faced the DeWitt officers, who were to the south, and he raised the firearm towards them, pointed it at them.

Q. What were the surroundings at this point where this was taking place?

A. It's in the woods but it'd be like a small clearing within the woods with small brush and trees.

Q. Was, was there any option near you for cover?

A. Not really.

W. Did ALBAHM state anything or make any indication that this was something, that he held something other than a real firearm?

A. No.

Q. After Mr. JUD, ALBAHM raised the weapon, describe what took place next.

A. As he raised it and pointed it at the DeWitt officers the DeWitt officers opened, shot towards JUDSON.

Q. And then what happened?

A. And simultaneously I shot towards JUDSON as well.

21

CF00000021

W. So did one person fire first?

A. One of the, one or both of the DeWitt officers fired first I would say.

Q. And after you fired your weapon, what happened?

A. I fired a few rounds and JUDSON fell to the ground, at which point the firing stopped and then JUDSON sat up on his butt in the snow, grabbed the weapon again and pointed it at the DeWitt officers again while sitting.

Q. When, when you say he grabbed it again, did he, did he…

A. It had either fallen on his lap or in the snow.

W. Why did you fire initially?

A. It appeared that he was going to shoot at those DeWitt officers, like he wanted to harm the DeWitt officers.

W. Were you prompted at all by the fact that they had fired?

A. No.

Q. And when Mr. ALBAHM initially pointed the weapon, can you just describe exactly where he was pointing it?

A. Towards the direction of where the DeWitt officers were in the woods.

Q. Okay. Did, did he fire the weapon?

A. That I don't know.

Q. So, so just to clarify, Mr. ALBAHM initially raises the weapon towards the DeWitt officers, they fire their weapons and you also fire at that point, correct?

A. Correct.

Q. ALBAHM falls to the ground and again sits up and then reaching for the gun and then did you fire again at that point?

A. Not only reaching for the gun, handling the gun and pointing it at the DeWitt officers again.

22

Q. Okay.

A. Yeah.

Q. So there's, there's two sequences that at which point you fired your weapon?

A. Correct.

Q. Do you know how many rounds you fired at each sequence, approximately?

A. Three or four in each sequence I would say.

Q. Do you know if you struck Mr. ALBAHM with any of those rounds?

A. I don't know, no.

W. How far away were you at that point?

A. Maybe 40 feet.

W. Any utterances from Mr. ALBAHM during this exchange?

A. Not that I can remember.

Q. I have a representation of the area where the shooting took place, if you could take a look at this.

A. Okay.

Q. Are you able to orient yourself based on that representation?

A. No.

Q. Okay.

MORRIS: Can I take a quick look at this. Thank you.

Q. Can you describe the position of yourself to Mr. ALBAHM in relation to the other officers?

A. Right, I would say I was in a westerly, I'm sorry, easterly direction as the DeWitt officers appeared to be to the south of him. And a county sheriff was to my left, so same, easterly direction just offset a little bit.

Q. Okay. So you're saying that the Onondaga Sheriff was to your, was to, more to your immediate

23

CF0000002

left and then...

A.  I believe so.

Q.  And in relation to that officer where would be the DeWitt officers?

A.  Further south.

W.  Do you know if anyone else fired before, beside yourself and the DeWitt officers?

A.  The County Sheriff Sergeant did as well.

W.  Do you have any idea when his firing came into play?

A.  She, she I believe fired around the same time that we all did.

Q.  Were you in fear for your life at the moment that you fired your weapon?

A.  Potentially yes I would say.

Q.  And that was from the threat of Mr. ALBAHM (inaudible)...

A.  Right, as he has, as he...

MORRIS:  Let him finish the question before you answer.

A.  Oh I'm sorry, okay.

Q.  You were potentially in fear for your life from the threat of Mr. ALBAHM and the weapon he possessed?

A.  Right, the fact that he had...

MORRIS:  Yes or no.

A.  Yes.

Q.  Were you in fear for the lives of others at that moment?

A.  Certainly.

W.  Did you feel the need to duck and run for cover when he pointed his guns at the deputy, his gun at the deputy?

24

CF00000024

A. At the DeWitt officers…

W. Yes.

A. Or, or before in the parking lot at the deputy and I?

W. No, no the DeWitt officers just prior to the shooting?

A. No.

W. So was your concern at that point, immediately at that point for the DeWitt officers or for yourself?

A. Primarily the DeWitt officers.

Q. Do you believe you were justified in using deadly force against Mr. ALBAHM?

A. Yes.

Q. What happened after you fired?

A. After the firing was over?

Q. Yes.

A. Trooper GREEN and I approached JUDSON as the DeWitt officers provided cover. I took Trooper GREEN with me up to JUDSON'S body and had Trooper GREEN remove the, the weapon from the vicinity of JUDSON. At that point other officers moved in and we began a quick search of him to see if there was any other weapons. After that it was determined there wasn't, we began life saving measures. I ran back to my car to get the medical bag and return to the scene.

Q. And did you believe that he was deceased at that point?

A. Before going to get my bag, I, no I didn't believe he was.

Q. After you returned with your bag?

A. Right, at some point after returning, yeah I did.

Q. Okay.

W. Who fired during that second sequence?

25

A. Myself and I believe the DeWitt officers again and Sergeant BOLENGER of the Sheriff's Office.

W. And JUDSON ALBAHM was immediately stopped?

A. After the second sequence?

W. Yes.

A. It appeared that way.

W. He fell, he fell flat?

A. On his back.

W. On his back, did he still have the handgun?

A. It was, that was hard to tell.

Q. We'll take a recess. The time is 11:15AM.

   We are resuming the interview with Trooper FIKE. Tme is 11:33AM. Trooper FIKE, can you describe in the timeline of events at what point you had your second conversation with Ms. ALBAHM?

A. Okay, my initial conversation with her is when I first responded to the scene, and in the timeline I then visually located JUDSON and approached him and encountered him with the deputy. Had our conversations with him. After he then fled that scene I returned to the house so, returned to the house to have that second conversation with her, that's the timeline.

Q. Okay.

A. As far as minutes and time that went by, I'm not exactly sure.

Q. No, that's fine, but you talk the encounter, you're talking about the encounter at the DOT?

A. Yes.

Q. The first...

A. Yeah, yep.

Q. During this conversation with Ms. ALBAHM, that's when she mentioned that, something about an

26

airsoft gun, is that correct?

A. I questioned her as to do you know JUDSON to own any firearms as I had just seen him with one.

Q. Okay.

A. And that's when she said I know that he owns a BB gun or pellet gun and he shoots it in the back yard.

Q. Did she specifically address whether he had or had the potential to possess a real functioning handgun?

A. I don't recall that, I'm not sure.

W. Did she mention any other access to weapons?

A. Not that I remember.

Q. So after she gave you the information about him having possessed an airsoft gun in the past or BB gun/pellet gun, however she described it, what did you do with that information if anything?

A. Not, nothing.

Q. Okay.

W. Did she describe the gun to you?

A. No.

W. Was she unable to or it didn't come up in conversation?

A. I, I don't believe it came up and I don't recall any description from her.

Q. As, as the events unfolded, did, did you reflect on the possibility that the weapon that you saw him with could possibly be an airsoft gun?

A. Did I reflect like internally?

Q. Did this thought cross your mind?

A. Not particularly.

MORRIS: Just, Captain, you keep referring to it as an airsoft gun, he keeps referring to it as he was

27

CF00000027

told as either a BB or a pellet gun, so just to be clear, he has never used the words airsoft, those are your words.

Q.  Yes.

W.  Do you know what an airsoft gun is?

A.  I believe so, not in detail.

W.  What, what do you think it is?

A.  It shoots airsoft pellets, which are different than a BB or a regular pellet I believe.

W.  Does it, does it fit the description of a firearm?

A.  It can I believe.

Q.  I guess I can, I can rephrase the question then if it makes a difference. Did, did, did you reflect on the possibility that the weapon you saw Mr. ALBAHM with could possibly be a BB gun or a pellet gun?

A.  Not particularly, no.

DOMINICK:  It's not his job to wonder...

W.  Let's stop, are we gonna take a recess or are we going to continue with our questions.

DOMINICK:  Go ahead.

Q.  I'd like to revisit the diagram photo that we. . .

A.  Sure.

Q.  That was presented earlier in the interview. If you look closely at, this was, this was provided by FIU, and if you look closely there are letters on the diagram, there's an "A", there's a "B" and there's a "C" where the casings were recovered from the officers.

A.  Okay.

Q.  So if you can take a look at it again with that in mind, here you can see a "C", "B" and "A", so I just wanted to if you can...

MORRIS:  Is this the same picture we seen before?

28

Q.   It's the same picture, yep.

A.   Okay. Okay.

MORRIS:  May I, may I?

Q.   Yes.

MORRIS:  Can we go off the record for just a second?

Q.   Taking a recess. Time is 11:38.

Okay, we are resuming Time is 11:39AM. So Trooper FIKE, going back to the diagram, the letters "A" "B" and "C" was where casings were recovered from the scene. The FIU report concluded your casings were recovered at the "C" location, the sheriff's were at the "B" and DeWitt was at the "A". Does that, is that consistent with your knowledge of the event?

A.   That seems accurate, yes.

Q.   Okay.

W.   Trooper FIKE, you stated that upon getting that airsoft information you didn't communicate that information elsewhere.

MORRIS:  The BB information?

W.   Okay, airsoft/BB, how about that?

A.   So, that's fine.

W.   You didn't communicate that information with, elsewhere, meaning the other officers at, responding to this incident, why not?

A.   The information that I received was that he owned one, so I felt it unnecessary to provide that information to the other officers. As what I had just seen didn't appear to be an airsoft or BB or pellet gun, it appeared to me to be a real weapon. So I didn't feel like creating any doubt in any other officers heads either.

Q.   I have no further questions, is there, at this time, is there anything further that you, that you would like to add?

29

A.  No.

W.  One second PAUL.  What did you envision when she told you that he had an airsoft/BB gun, what language did she use?

A.  How did she say it?

W.  Yeah.

A.  She told, she told me that she knew him to have owned one.

W.  Owned a what in particular?

A.  I don't know if she said BB gun or pellet gun or airsoft gun, but something along those lines.

W.  Okay, and, and what did you imagine when she told you that, what type of?

A.  I imagined exactly that, either a BB gun or pellet gun or an airsoft gun that he target shoots in the backyard.

W.  And, and what does that look like to you, what did that look like to you at the time?  Apparently it didn't look like a real, you didn't imagine that it looked like a real handgun?

A.  It could have looked like anything, they come in all shapes and sizes, so I don't know if it was a rifle style, pellet/BB or soft gun.  If it was a handgun style, if it, I, I don't know.  I didn't immediately draw a picture of what I thought it could have looked like, I just accepted that information and moved on.

W.  Did it occur to you that that handgun that you observed ALBAHM with could have been a airsoft/BB gun?

A.  After the fact, after I observed it?

W.  No.

A.  Or once I saw it again?

W.  When, when she mentioned it to you?

A.  Not necessarily because it showed no indications of looking like an airsoft or, or BB or pellet gun.

W.  That, well that brings us back to my question, what did that look like, what did you imagine that

CF00000030

gun looked like if it didn't look like...

A.  The speculative, sorry...

W.  Not speculating.

DOMINICK:  Can we go off the record please, can we take a recess, please?

W.  Go ahead PAUL.

Q.  11:44AM.

We are resuming the interview with Trooper FIKE. Time is 12:14PM.  Trooper FIKE, before we took the recess we, you were asked to describe what you envisioned was a pellet gun/BB gun and you said a BB gun could look like any gun, a rifle or a handgun in essence.  Going back to March 4, 2021, at that moment, did you consider the possibility that the weapon you saw Mr. ALBAHM with could have been a pellet gun?

A.  At the time, March 4th, no.

Q.  Okay I have no further questions. Is there anything that you would like to add at this time?

A.  No.

Q.  The interview is now concluded. Time is 12:15PM.

I have read this statement consisting of 30 pages and it is true to the best of my knowledge.  I have placed my initials on the bottom of each page and next to each correction and I have signed it below.

Signed this _____ day of _____, 2022

_____
SIGNATURE

31

CF0000003