# EXHIBIT 7

1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
2    _____

3    ESTATE OF JLA,

4                    Plaintiff,
                                        Case No.:
5         -vs-                          5:22-cv-00287
                                        MAD-ATB
6    THE TOWN OF DEWITT,
     LUCAS BYRON, Individually,
7    MATTHEW MENARD, Individually,
     COUNTY OF ONONDAGA,
8    AMY BOLLINGER, Individually and
     COREY FIKE, Individually,

9
                    Defendants.
10   _____

11                  DEPOSITION
     _____

12

13   WITNESS:         LUCAS BYRON

14   DATE:            Wednesday, January 10, 2024

15   START TIME:      10:03 a.m.
     END TIME:        1:02 p.m.
16
     LOCATION:        Sugarman Law Firm, LLP
17                    211 West Jefferson Street
                      Second Floor
18                    Syracuse, New York 13202

19
     BEFORE:          Elyse M. Addabbo
20                    Court Reporter and Notary Public

21   JOB NUMBER:      22202

22

23

24

25

```
 1    APPEARANCES:

 2      For the Plaintiff:

 3          WEISBERG & ZUKHER, PLLC
            Attorneys at Law
 4          109 South Warren Street
            Suite 711
 5          Syracuse, New York 13202
            BY:  DAVID ZUKHER, ESQ.
 6              davidz@wzlaw.org

 7                  -and-
            KARLA PAVESE
 8          karla@wzlaw.org

 9
        For the Defendants Town of Dewitt; L. Byron; M. Menard:
10
            SUGARMAN LAW FIRM, LLP
11          Attorneys at Law
            211 West Jefferson Street
12          Second Floor
            Syracuse, New York 13202
13          BY:  PAUL MULLIN, ESQ.
                pmullin@sugarmanlaw.com
14

15      For the Defendants County of Onondaga and A. Bollinger:

16          ONONDAGA COUNTY DEPARTMENT OF LAW
            Attorneys at Law
17          John H. Mulroy Civic Center, 10th Floor
            421 Montgomery Street
18          Syracuse, New York 13202
            BY:  JOHN SICKINGER, ESQ.
19              johnsickinger@ongov.net

20
        For the Defendant C. Fike:
21
            BOND, SCHOENECK & KING, PLLC
22          Attorneys at Law
            The Avant Building - Suite 900
23          200 Delaware Avenue
            Buffalo, New York 14202
24          BY:  MITCHELL J. BANAS, JR., ESQ.
                mbanas@bsk.com
25
```

1                I N D E X   O F   T E S T I M O N Y

2

3   EXAMINATION OF                                    PAGE

4      LUCAS BYRON

5          BY MR. ZUKHER                                7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              I N D E X   O F   E X H I B I T S

2                 (retained by Counsel)

3
     EXHIBIT      DESCRIPTION                          PAGE
4

5     1           walkthrough notes                    81

6     2           Manual Order for Critical Incident   85
                  Management
7
      3           memorandum of understanding,         115
8                 Liberty Resources

9     4           investigative report                 124

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X   O F   R E Q U E S T S

 2

 3   1.  Page 24, Line 4:

 4              MR. ZUKHER:  I'm going to make a request
            right now for any and all personnel complaints
 5          that have been filed against this officer.
              MR. MULLIN:  Why don't you make an index,
 6          and then we'll address them, please.  Thank
            you.

 7

 8   2.  Page 25, Line 17:

 9              MR. ZUKHER:  I'm going to make a request
            for those, too, if there's any formal
10          reprimands.  Would you add that to the list,
            please?

11

12   3.  Page 80, Line 11:

13              MR. ZUKHER:  I would make a request,
            specific request, for any and all information
14          pertaining to the removal of this officer from
            duty as a result of this incident, all
15          documents.

16

17

18
      -
19

20

21

22

23

24

25
```

6

```
 1                    FEDERAL STIPULATIONS

 2
              IT IS HEREBY STIPULATED AND AGREED, by and between
 3    the attorneys for the respective parties, that the
      presence of the Referee be waived;
 4
              IT IS FURTHER STIPULATED AND AGREED that the
 5    witness shall read and sign the minutes of the transcript
      within 30 days upon receipt, and that the filing of the
 6    transcript be waived;

 7            IT IS FURTHER STIPULATED AND AGREED that all
      objections, except as to form, are reserved until the
 8    time of trial;

 9            IT IS FURTHER STIPULATED AND AGREED that this
      Deposition may be utilized for all purposes as provided
10    by the Federal Rules of Civil Procedure;

11            AND FURTHER STIPULATED AND AGREED that all rights
      provided to all parties by the Federal Rules of Civil
12    Procedure shall not be deemed waived and the appropriate
      sections of the Federal Rules of Civil Procedure shall be
13    controlling with respect thereto.

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE REPORTER:  For the transcript order,

2         is it a split and provide?

3              MR. MULLIN:  It's a split and provide.

4              MR. ZUKHER:  Yeah.

5              MR. MULLIN:  That's what we usually do.

6              THE REPORTER:  Is that okay with

7         everybody?  Okay.

8              MR. MULLIN:  And one other thing for the

9         record, I think the defendants have agreed

10        that one objection covers everyone's

11        objections.

12             MR. BANAS:  That's fine by me.

13             MR. SICKINGER:  Yeah.

14             MR. ZUKHER:  Fine by me, I have no

15        objection.

16

17   L U C A S   B Y R O N, having been called as a witness,

18   being duly sworn, testified as follows:

19   EXAMINATION

20   BY MR. ZUKHER:

21        Q.   Sergeant Byron, good morning.  My name is

22   Attorney David Zukher.  I represent the estate of JLA in

23   this matter.  I'm going to be asking you some questions

24   today.  None of these questions are meant or designed to

25   trick you in any way or to fool you in any way or to

1    flimflam in any way.  I just want to get to the bottom of

2    what happened on that day.  Okay?

3         A.    Yes.

4         Q.    And why it happened.  A couple of ground

5    rules.  First, you got to keep your answers verbal,

6    because this young lady to my right and maybe your left

7    is taking down everything we're saying.

8         A.    Yes.

9         Q.    Number two, you can take a break at any time.

10   There's only one caveat to that rule.  You have to answer

11   the pending question.  If there's a pending question, you

12   must answer, and then we can take our break.  Okay?

13        A.    Okay.

14        Q.    Besides that, let's start.  Sir, please state

15   your full name for the record.

16        A.    Lucas Byron, L-U-C-A-S, B-Y-R-O-N.

17        Q.    Any middle initial, sir?

18        A.    J.

19        Q.    Okay.  And what's that stand for?

20        A.    James.

21        Q.    Okay.  And, sir, you're currently employed?

22        A.    Yes.

23        Q.    And where do you work?

24        A.    Town of Dewitt Police Department.

25        Q.    Okay.  And how long have you been so employed?

1        A.    I've been employed with Dewitt for, let's see,

2    fifteen years.

3        Q.    And was that your first job out of the police

4    training academy?

5        A.    No.  I worked for the Village of Cazenovia

6    Police Department prior to that.

7        Q.    Okay.  How long did you work there?

8        A.    Three or four years.

9        Q.    And can you tell me the approximate time frame

10   for that?

11       A.    2005 to 2008.

12       Q.    Okay.

13       A.    2009.

14       Q.    And what were your duties and responsibilities

15   with that agency prior to you joining the Dewitt Police?

16       A.    I was a patrol officer.

17       Q.    Okay.  Handing out tickets, things like

18   that --

19       A.    Yeah, responding.

20             MR. MULLIN:  Wait until he finishes the

21             question.

22       Q.    Is it pretty much the same thing you were

23   doing on behalf of the Dewitt Police?

24       A.    Yes, as far as patrol when I first got hired.

25       Q.    Okay.  And then you were promoted, right, you

```
1    were promoted to sergeant?

2         A.    With the Town of Dewitt, I was promoted to

3    investigator and then eventually sergeant.

4         Q.    When were you promoted to investigator, sir?

5         A.    I believe I was promoted in 2015.

6         Q.    And then to sergeant, your second promotion,

7    sir?

8         A.    Sergeant was probably 2019 or 2020.  I think

9    2020.

10        Q.    Okay.  Sir, did you review any documents prior

11   to this deposition?

12        A.    Yes.

13        Q.    Okay.  What did you review, sir?

14        A.    My incident report.

15        Q.    Okay.  And are those the only documents that

16   you reviewed?  Did you make any other notes or any

17   other -- you know, create any other documents based on

18   your review of that document?

19        A.    No, sir.

20        Q.    Okay.  Sir, we talked a little bit about the

21   first place you worked.  I imagine you went to the police

22   academy prior to that?

23        A.    Yes.

24        Q.    Okay.  When did you attend the police academy,

25   sir?
```

```
 1          A.    I forget the dates off the top of my head.

 2          Q.    No problem.  Do you remember how long

 3    approximately it was, how long was the training?

 4          A.    Approximately six months.

 5          Q.    Okay.  And, sir, while you've been employed by

 6    the Dewitt Police or your prior employment -- I think

 7    Cazenovia, you said?

 8          A.    Yes.

 9          Q.    Okay.  Did you receive any specialized

10    training, any specialized training besides your training

11    with the schooling for the police, the police, you know,

12    the eight weeks of training?

13          A.    Yeah, the general --

14          Q.    Right.

15          A.    -- academy?

16          Q.    I can't think of the right word.

17                Besides your training to become a police

18    officer, after you became a police officer, did you have

19    any specialized training after that?

20          A.    Yes.

21          Q.    In what kind of areas?

22          A.    All different kinds of areas.

23          Q.    Let's start and you can tell me all about it.

24    To the best of your recollection, briefly what

25    specialized trainings have you received?
```

```
1          A.    I've gone through schools for weapons of mass

2    destruction through Homeland Security, gone through

3    schools for instructor development, I've gone through

4    schools for a number of different things, annual

5    trainings.  There's firearms instructor, PT instructor.

6          Q.    PT is physical therapy, right?  Nobody likes

7    to do PT.

8          A.    Yeah, physical training.  Yeah.  Just there's

9    a long list of trainings --

10         Q.    A long list?

11         A.    -- that I've gone through.

12         Q.    Would it be fair to say that in your position

13   with the Dewitt Police, you pretty much have to keep up

14   with your training?

15         A.    Yes.

16         Q.    With weapons and other things --

17         A.    Yes.

18         Q.    -- right?  Okay.

19               Sir, did you receive any specialized training

20   with regard to de-escalation techniques?

21         A.    Yes.

22         Q.    Okay.  What training did you receive, sir?

23         A.    There's training in the academy itself.

24         Q.    Okay.

25         A.    Annual training.  There's reality-based
```

1    training that I've gone through.  There's different

2    scenario-based training that I've gone through through

3    the years.

4        Q.    Okay.  So prior to March 4th, 2021, you

5    received some significant training with regard to

6    de-escalation?

7            MR. MULLIN:  Object to the form.  Go

8            ahead, you can answer.

9        Q.    You can answer.

10       A.    Yes.

11       Q.    It's the only objections in these depositions,

12   and so long as you understand my question, you can answer

13   it unless your attorney tells you not to.

14           Sir, have you received any specialized

15   training in Sims, S-I-M-S, less-than-lethal use of force

16   techniques?

17       A.    As far as Sims training with Sims

18   firearms --

19       Q.    Yes.

20       A.    -- Simunition training?

21       Q.    Yes.

22       A.    Yes.

23       Q.    What type of firearm is that, sir?

24       A.    A Simunition is a firearm that's designed to

25   fire a marking round, or actually some of them do

1    non-marking rounds, as well, but it's utilized for less

2    lethal training options as use of force.

3         Q.    If you're going to use force, that's

4    potentially a less lethal use of force?

5         A.    No.

6              MR. MULLIN:  Object to the form of that

7              question.  Go ahead.

8         Q.    Go ahead, sir.

9         A.    No.  Simunitions is a training tool to be used

10   for reality-based training.

11        Q.    Okay.  And so what kind of scenarios are they?

12        A.    They range from any type of scenario that you

13   can encounter as a police officer.

14        Q.    Okay.  And that's supposed to give you

15   practice for when you do encounter the scenario in the

16   field?

17        A.    Yes.

18        Q.    Okay.  And you underwent that training?

19        A.    Yes.

20        Q.    Do you recall when?

21        A.    Numerous times throughout my career.

22        Q.    Sir, how about any specialized training with

23   regard to dealing with mentally ill people, mentally ill

24   individuals, have you received any specialized training

25   with regard to that?

1        A.    Yes.

2        Q.    Can you tell me about that, please?

3        A.    It's, again, through scenario-based training.

4        Q.    Okay.

5        A.    In the academy, we did mental health

6    training --

7        Q.    Okay.

8        A.    -- and annual trainings.

9        Q.    Prior to March 4th, 2021, when was the last

10   time you received any training with regard to dealing

11   with people with mental health issues?

12       A.    I can't recall off the top of my head.

13       Q.    Would it have been more than a year?

14       A.    Unlikely.

15       Q.    Okay.  But it could be as much as a year?

16             MR. MULLIN:  Object to the form.

17       Q.    You can answer, sir.

18       A.    Could be, but again, it's --

19       Q.    Do you recall what the training was about, the

20   last one you received?

21       A.    Not specifically, no.

22       Q.    Thank you, sir.

23             Do you know what a pick-up order is?

24       A.    Yes.

25       Q.    What is a pick-up order, sir?

1        A.    It's an order originating from a doctor or

2    mental health provider indicating that the person is in

3    need of mental health care.

4        Q.    Okay.  And have you ever executed pick-up

5    orders before in your position with the Dewitt Police?

6        A.    Yes, we have.

7        Q.    Okay.  How many times have you participated in

8    that exercise?

9        A.    I can't recall off the top of my head.

10        Q.    And would it be fair to say that once you get

11    a mental health order, that provides some form

12    of -- strike all of that.  I don't know what I want to

13    say.

14            When you get a pick-up order for an

15    individual, a mental health pick-up order, what does that

16    signify to you as a police officer?

17            MR. MULLIN:  Object to the form.

18        A.    When a mental health order is sent to us, I

19    guess it would most likely indicate that the individual

20    needs to see a mental health professional.

21        Q.    Okay.  Would it be fair to say a mental health

22    pick-up order indicates that there's a -- some kind of

23    mental issue going on?

24        A.    Yes.

25        Q.    And that when you receive that pick-up order,

1    you become aware of that, would that be fair to say?

2        A.    Yes.

3        Q.    Okay.  Let me ask you this:  Did you receive

4    any pick-up orders from St. Joseph's Hospital in this

5    case prior to the shooting?

6        A.    Me specifically, no.

7        Q.    Were you aware that they were trying to get

8    one?

9        A.    At the time of the incident, no.

10       Q.    Thank you, sir.

11             Would it be fair to say, sir, that if you had

12   gotten a mental health pick-up order, that would have

13   provided you with some additional information, would that

14   be fair to say?

15             MR. MULLIN:  Object to the form.

16       Q.    You can answer.

17       A.    Possibly, yes.

18       Q.    Okay.  I understand.  What information would

19   you have been provided that you didn't have at the time

20   of the shooting?

21             MR. MULLIN:  Object to the form.

22       Q.    You can answer.

23       A.    I'm not sure.

24       Q.    Okay.  Would it have advised you that the

25   person had mental health issues?

```
 1                    MR. MULLIN:  Object to the form.

 2        A.    A mental health order would advise that there

 3   are mental health issues, yes.

 4        Q.    Okay.  And that's information that you didn't

 5   have at the time of the shooting, would that be fair to

 6   say?

 7        A.    No, that wouldn't be fair to say.

 8        Q.    Okay.  What information did you have at the

 9   time of the shooting that JLA had experienced a mental

10   health crisis?

11                    MR. MULLIN:  Object to the form.

12        Q.    You can answer, sir.

13        A.    I was aware of JLA through prior experiences

14   with him.

15        Q.    Okay.  Were you aware of his medical

16   diagnoses, sir, or that he was under care and observation

17   with St. Joseph's Hospital?

18                    MR. MULLIN:  Object to the form.

19        A.    No.

20        Q.    Okay.  Would it be fair to say that -- you say

21   that you knew JLA had some mental health issues based on

22   your prior interactions with JLA?

23        A.    Yes.

24        Q.    Okay.  But certainly, a mental health pick-up

25   order indicates that there's some mental issue right now,
```

1   right?

2                    MR. MULLIN:  Object to the form.

3        A.    No, not necessarily.

4        Q.    Okay.  What does it indicate to you?

5                    MR. MULLIN:  What, this fictitious order?

6                    MR. ZUKHER:  I haven't asked about any

7            fictitious order.

8                    MR. MULLIN:  Because you told --

9                    MR. ZUKHER:  I'm only asking him what a

10            pick-up order indicates to him in general, not

11            this pick-up order.  What is a pick-up

12            order --

13                    MR. MULLIN:  That's what I understand.

14            Okay.  I'll continue objecting to this.

15   BY MR. ZUKHER:

16        Q.    You can answer.

17        A.    A pick-up order indicates that a medical

18   professional has a reason to observe him or --

19        Q.    Okay.

20        A.    -- or anything along those lines.

21        Q.    So that would have substantiated your belief

22   that he had mental health issues, would it not have?

23                    MR. MULLIN:  Object to the form.

24        A.    I'm trying to understand your question.  Could

25   you rephrase it for me?

1      Q.    I guess here's what I'm asking.  Let me

2    explain to you what I'm asking.  You said you had some

3    prior interactions with JLA, right?

4      A.    Yes.

5      Q.    And based on those interactions, you suspected

6    that he had a mental illness, would that be fair to say?

7      A.    Yes.

8      Q.    But you didn't know that, in fact, it was a

9    clinical condition or anything else, would that be fair

10   to say?

11     A.    No.

12     Q.    So wouldn't, in fact, then, sir, a pick-up

13   order indicate to you now that there is a clinical

14   condition that's in play?

15              MR. MULLIN:  Object to the form.

16     A.    It depends, I guess.

17     Q.    Depends on what, sir?

18     A.    I guess there could be a mental health issue

19   in play.

20     Q.    Okay.

21     A.    As far as they're looking to evaluate him.  I

22   don't know what their diagnosis would be.

23     Q.    And would it be fair to say that would have

24   been helpful here?

25              MR. MULLIN:  Object to the form.

1      Q.    To know more information is better?

2            MR. MULLIN:  Object to the form.

3      Q.    Go ahead, sir.  You can answer.

4      A.    I don't know if it would have been more

5   helpful or not.

6      Q.    I understand.  But it could have been?

7            MR. MULLIN:  Object to the form.  You've

8            already asked that.

9      A.    It may have been.

10     Q.    Thank you, sir.

11           MR. ZUKHER:  No objection asked and

12           answered.  Only objections to form.  I can ask

13           a thousand questions of the same --

14           MR. MULLIN:  No lectures necessary.

15           MR. ZUKHER:  Let's keep the objections to

16           where they're supposed to be.

17           MR. MULLIN:  No lectures, Counselor.

18           MR. ZUKHER:  Thank you.

19   BY MR. ZUKHER:

20     Q.    Sir, do you have some policies and procedures

21   with regard to the Dewitt Police when you respond to a

22   mental health crisis call?

23     A.    Yes.

24     Q.    Have you been trained in any type of

25   negotiation techniques or are you -- do you have any

1  certification to be a negotiator in an emergency

2  situation?

3              MR. MULLIN:  Object to the form.

4      Q.    Go ahead, sir.

5      A.    As far as a specific negotiation

6  certification, no, I do not.

7      Q.    Okay.  Have you received any training in that

8  as part of your prior police training experience?

9      A.    I have received training in interview,

10  interrogation, generally speaking, and interacting with

11  individuals in public, as well.

12     Q.    But you're not in any way certified to do

13  that?

14     A.    I would believe that that would be covered

15  under my police certification.

16     Q.    Have you ever been called upon by your

17  department to act in the role of a negotiator?

18     A.    I guess the argument could be made that I've

19  been called for services --

20     Q.    As far as negotiation.  No, I mean a formal

21  negotiation with a crisis where you have a standoff with

22  somebody?

23              MR. MULLIN:  Object to the form.

24     Q.    For example, a crisis like a standoff with

25  somebody where you need to formally negotiate with that

```
 1    person that's either armed or sometimes they lock

 2    themselves in their home, if at all, in police cases?

 3                    MR. MULLIN:  Object to the form.

 4        Q.   You can answer, sir.

 5        A.   Again, I would argue that any call for service

 6    could turn into that.

 7        Q.   Okay.  Let me ask you this, then:  Do you have

 8    any specific certification hanging on your wall that

 9    you've been certified as a negotiator?

10        A.   I don't hang any certifications on the wall.

11        Q.   Do you have any certificates like that?

12        A.   Like I said, I don't have any specific

13    certification in negotiation.

14        Q.   Thank you, sir.

15             And please, I have to ask:  Have you,

16    yourself, ever received a personnel complaint?

17        A.   Yes.

18        Q.   Okay.  How many times, sir?

19        A.   I couldn't tell you.

20        Q.   More than five times?

21        A.   I can't recall.

22        Q.   Okay.  More than ten times?

23        A.   Again, I don't know.

24        Q.   Couldn't even give me a ballpark figure?

25                    MR. MULLIN:  Object to the form.
```

1         A.    As far as personnel complaints, I don't know

2    if I've been notified every time there has been a

3    personnel complaint, so I couldn't --

4              MR. ZUKHER:  I'm going to make a request

5              right now for any and all personnel complaints

6              that have been filed against this officer.

7              MR. MULLIN:  Why don't you make an index,

8              and then we'll address them, please.  Thank

9              you.

10   BY MR. ZUKHER:

11        Q.    Has a complaint against you ever been founded?

12        A.    Not that I've been aware of, been made aware

13   of.

14        Q.    Okay.  What are the types of complaints that

15   you've received, sir?

16        A.    Typical complaints that have been -- that I've

17   been made aware of are just individuals that have a

18   problem with the way that an interaction has gone.

19        Q.    Okay.  And various parts of that

20   interaction --

21        A.    Yes.

22        Q.    -- whether you took them into custody or maybe

23   use -- some people -- has anybody alleged excessive use

24   of force?

25        A.    I don't recall any instances where anybody's

1  specifically alleged any excessive use of force.

2      Q.    Well, you show up here on somebody's side and

3  somebody else is always upset.

4            MR. MULLIN:  Object to the form.

5      Q.    Have you ever been censured or received any

6  department censure with regard to your duties as a police

7  officer for the Town of Dewitt Police?

8      A.    I'm not sure what you mean by censure.

9      Q.    A censure is a formal reprimand, either a

10  written or a verbal reprimand.

11            MR. MULLIN:  Object to the form.

12      A.    I don't recall.

13      Q.    Don't recall whether you were ever

14  reprimanded?

15      A.    I don't recall if there was any formal

16  reprimand for something --

17            MR. ZUKHER:  I'm going to make a request

18            for those, too, if there's any formal

19            reprimands.  Would you add that to the list,

20            please?

21      Q.    Sir, prior to March 4th, 2021, have you ever

22  been involved in an officer shooting and discharging your

23  weapon?

24            MR. MULLIN:  Object to the form.

25      Q.    Where you either discharged your weapon or an

1    individual or civilian was involved?

2              MR. MULLIN:  Why don't we slow down and

3         ask one question?  You've got three questions

4         there.

5    Q.    Strike all of that.

6         Sir, have you ever discharged your service

7    weapon in the line of duty while you were employed by the

8    Dewitt Police?

9    A.    Yes.

10   Q.    When?

11   A.    Destruction of animals for -- if they were

12   injured or anything along those lines, like deer, dogs,

13   things like that.  As far as discharging it for training

14   purposes, I've done that previously.

15   Q.    I'm sure you've discharged a few rounds for

16   training purposes?

17   A.    Yes.

18   Q.    How about have you ever discharged your weapon

19   at another individual?

20   A.    Only in this incident.

21   Q.    Only in this incident.  Thank you, sir.

22        Now, I have a feeling I know the answer to

23   this question, but have you ever met or spoken with JLA

24   prior to March 4th, 2021?

25   A.    Yes.

```
 1        Q.    Okay.  Can you describe when those

 2   interactions occurred?

 3        A.    I can't recall the exact dates.

 4        Q.    Okay.  Was it -- on how many occasions would

 5   you say you had a chance to interact with JLA?

 6        A.    Off the top of my head, at least two.

 7        Q.    Okay.  Can you describe those incidents for

 8   me?  What were they?  What was your interaction with him

 9   like, and what was the incident about?

10        A.    One incident was he was filming outside of a

11   bank in Jamesville.

12        Q.    Okay.

13        A.    And cover was called in as a suspicious

14   person.

15        Q.    Okay.  And did you make an arrest in that

16   case?

17        A.    No.

18        Q.    Okay.  What was JLA doing?

19        A.    JLA was filming outside of M&T Bank.

20        Q.    Okay.  Did he tell you why?

21        A.    I believe he just said that he was recording

22   and didn't really go any -- into any further detail on

23   that.

24        Q.    And how about the second incident?  You

25   mentioned two incidents.
```

```
 1          A.    The other one that I can recall or that comes

 2    to mind was an incident where he was in our town hall.

 3          Q.    Okay.  And what was he doing then?

 4          A.    Again, he was recording.

 5          Q.    Video recording?

 6          A.    Yeah.

 7          Q.    And how long would you say you interacted with

 8    him during those incidents?

 9          A.    Not very long.

10          Q.    Okay.  Did you have any opportunity to ask him

11    some questions?

12          A.    Yes.

13          Q.    And he gave you some responses?

14          A.    Yes.

15          Q.    And based on those responses, you formulated

16    the opinion that he could have some mental health issues,

17    would that be fair to say?

18                MR. MULLIN:  Object to the form.

19          A.    Yeah, behavioral or mental health issues.

20          Q.    Right.

21          A.    I can't really diagnose what --

22          Q.    But you suspected based on your interaction?

23                MR. MULLIN:  Object to the form.

24          Q.    Correct?

25                MR. MULLIN:  Object to the form.
```

```
 1        Q.    Let me rephrase the question.

 2              Based on the two interactions you had with

 3   JLA, did you suspect that he had mental health issues?

 4                    MR. MULLIN:  Object to the form.

 5        A.    I would say either -- again, I can't diagnose

 6   anybody or anything like that.

 7        Q.    I'm not asking that.

 8                    MR. MULLIN:  That's what you're asking

 9              him to do, is to diagnose.

10                    MR. ZUKHER:  No.  I asked him based on

11              his interactions with JLA, that he himself

12              believed that JLA had some mental health

13              issues.  I'm not asking for a diagnosis at

14              all.

15                    MR. MULLIN:  I'll object --

16                    MR. ZUKHER:  You can note your objection

17              all day long.

18        A.    I would say that he had some -- in my opinion,

19   he had some behavioral issues that may be stemming from

20   mental health issues.

21        Q.    You understand what I'm asking, right, sir?

22                    MR. MULLIN:  Object to the form.  Please

23              don't engage in conversation.

24                    MR. ZUKHER:  I'm not in engaging in

25              conversation.  I asked him if he understood
```

1                what I was asking.

2                        Madam Court Reporter, read it back.

3                        MR. MULLIN:  There's no need to waste

4                time.  Let's go.

5                        MR. ZUKHER:  I asked him a question

6                whether he understood what I was asking.

7                        MR. MULLIN:  That's not what you did.

8                        MR. ZUKHER:  Yeah.

9      BY MR. ZUKHER:

10         Q.    All I'm asking you, sir, is just a general

11     question, which is:  Based on your two interactions you

12     had with JLA where you were called to respond to an area

13     where he was filming, and based on your

14     interactions -- and you said you spoke to JLA, correct?

15         A.    Yes.

16         Q.    Based on those interactions, did you form an

17     opinion yourself -- I'm not asking for a clinical

18     diagnosis and I'm not asking for you to be a doctor, but

19     you do have some personal observations that you make as a

20     police officer, right, and as a normal human being,

21     right?

22         A.    Yes.

23         Q.    Did you -- and you said you made some of

24     those, right, observations?

25         A.    Yes.

1      Q.    Right.  And in those observations, based on

2    your two interactions with JLA, would it be fair to say

3    that, in your own mind, you believed him to have some

4    mental health issues?

5                MR. MULLIN:  Object to the form.

6      A.    As I said, I believed he had some behavioral

7    issues.  I don't know if they're necessarily stemming

8    from mental health.

9      Q.    And did you know whether they were clinical or

10   not?  Did you know whether he had been diagnosed with

11   anything?

12               MR. MULLIN:  Object to the form.

13     Q.    At any point in this?

14               MR. MULLIN:  Object to the form of that

15               question.

16     Q.    During the entirety of your interactions with

17   JLA, you said you had two prior interactions with him and

18   you had the interaction on March 4th, right?

19     A.    Yes.

20     Q.    Three prior interactions with JLA, correct?

21     A.    Between the incident that we're discussing and

22   the other two incidents, yes.

23     Q.    Right.  Is that the totality of your

24   interactions with JLA?

25     A.    As far as my recollection personally dealing

1    with him, yes.

2        Q.    Okay.  Within the time that you interacted

3    with JLA, would it be fair to say that based on your

4    interactions with him prior to March 4th, 2021, you had

5    formed an opinion, not a clinical one or anything else,

6    that he could potentially have some mental health issues?

7                MR. MULLIN:  Object to the form.

8        A.    Potentially, yes.

9        Q.    Thank you, sir.

10               And let me ask you this:  Did you -- on

11   March 4th, did you relay that information to anyone?

12       A.    No, I did not.

13       Q.    Thank you, sir.

14               And when I talk about it -- when I say about

15   information, I mean the information that your belief that

16   he had some mental health issues, did you relay that to

17   anyone?

18       A.    Again, I can't diagnose or --

19       Q.    I'm not asking for that.  I'm not asking for a

20   diagnosis.

21               MR. MULLIN:  Please don't argue with the

22           witness.

23               MR. ZUKHER:  I'm not arguing with the

24           witness.

25       Q.    What I'm asking, sir --

```
 1                    MR. MULLIN:  Excuse me just one second.

 2               Can you keep your voice up?  I have a hearing

 3               issue and I can't hear, and I don't know

 4               how --

 5                    MR. ZUKHER:  Sure.

 6                    MR. BANAS:  I'm a little further away,

 7               and I'm having an issue.  For both of us.

 8                    MR. ZUKHER:  I'm blind in one eye, so I

 9               know about a disability, believe me.

10                    Madam Court Reporter, would you read back

11               my last question?

12                    (Requested portion read back.)

13  BY MR. ZUKHER:

14      Q.   I'm asking you whether you relayed what you

15  believed to anyone, any other police officer on the scene

16  or otherwise on March 4th, 2021?

17                    MR. MULLIN:  Object to the form.

18      A.   No, I did not relay any information regarding

19  my opinion.

20      Q.   Thank you, sir.

21               Sir, on March 4th, 2021, you had been working

22  with the Dewitt Police for a couple years now, right,

23  several years?

24      A.   Yes.

25      Q.   And you're familiar with the area of Apulia
```

```
1    Road --

2         A.    Yes.

3         Q.    -- in Jamesville?

4               Have you ever patrolled that area before?

5         A.    Yes.

6         Q.    As part of your duties with the Dewitt Police?

7         A.    Yes.

8         Q.    Okay.  Are you familiar, sir, that the Town of

9    Dewitt has certain rules and regulations with regard to

10   an emergency incident or a serious incident?

11               MR. MULLIN:  Object to the form.  Again,

12          you're tailing off.  I can't hear you.

13               MR. ZUKHER:  Again, noted.

14        A.    Can you rephrase the question for me, please?

15        Q.    Sir, are you aware that your department has

16   certain rules and regulations regarding what must occur

17   in a serious incident?

18        A.    Yes.

19        Q.    Okay.  Are you familiar with those rules, sir?

20        A.    Yes.  I have a working knowledge of them,

21   yeah.

22        Q.    Did you have a working knowledge of those

23   rules on March 4th, 2021?

24        A.    Yes.

25        Q.    You're, in fact, required by your position to
```

1   know those rules, would that be fair to say?

2       A.    To have a working knowledge of them, yes.

3       Q.    Yes, you're required by your employer to have

4   a working knowledge, correct?

5       A.    Correct.

6       Q.    Okay.  Now, sir, how were you advised of this

7   situation occurring with JLA on March 4th, 2021?  How did

8   you become involved?

9                 MR. MULLIN:  Object to the form.

10      A.    I responded after hearing radio transmissions

11  of an incident involving a number of units.

12      Q.    Okay.  What do you recall from that

13  transmission, sir?  It was a dispatch transmission?

14                MR. MULLIN:  Object to the form.

15      A.    I don't recall when I first picked up on what

16  the transmissions were or whether it was from dispatch or

17  other units that were responding.

18      Q.    Okay.  So you don't recall?

19      A.    Uh-uh.

20      Q.    Okay.  Were you aware, sir, that this was a

21  multi-agency response, that numerous agencies had

22  responded to the scene, including the Onondaga County

23  Sheriff's and the State Police?

24      A.    Yes.

25      Q.    Thank you, sir.

36

1          Would it be fair to say you became aware of

2    that right away?

3                    MR. MULLIN:  Object to the form.

4        Q.    When did you become aware of that, during the

5    beginning of the incident, when you heard the radio

6    transmission, or at some other point?

7        A.    When I became aware of the radio

8    transmissions.

9        Q.    So would it be fair to say right from the

10   beginning, you knew that this was a multi-agency

11   response, would that be fair to say?

12       A.    From the -- from my involvement, I was aware

13   that there were a number of agencies.

14       Q.    Okay.  I'm curious about the timing of that,

15   sir.  Did you know that at the beginning of the call?

16                   MR. MULLIN:  Object to the form.

17       A.    I don't know.

18       Q.    But no question at some point you become aware

19   that there's multiple agencies involved, correct?

20       A.    Yes.

21       Q.    This was prior to the shooting?

22       A.    Yes.

23       Q.    Do you know how long prior to the shooting you

24   were aware that multiple agencies were involved prior to

25   the time that you discharged your weapon at JLA?

```
1        A.    I don't know.

2        Q.    Okay.  Could it have been a half an hour?

3        A.    I could only speculate.

4        Q.    Okay.  Could it have been an hour?

5        A.    Again, I wouldn't feel comfortable giving a

6   time frame.

7        Q.    No question, though, it was prior to the

8   shooting, correct?

9        A.    Yes, I was aware that there were multiple

10  agencies prior to the shooting.

11       Q.    Okay.  And you responded to the scene,

12  correct, on Apulia Road?

13       A.    I responded to Apulia and Coye Road.

14       Q.    Okay.  Did you respond by yourself, sir, were

15  you alone or was there somebody else with you in the

16  vehicle?

17       A.    I was -- I had somebody else with me.

18       Q.    Okay.  Who was that, sir?

19       A.    Investigator Menard.

20       Q.    Okay.  Did the two of you jointly make the

21  decision to respond?

22       A.    Yes.

23       Q.    Okay.  And Investigator Menard, is he senior

24  to you with regard to rank in the department?

25       A.    No.  He's junior to me.
```

```
1        Q.    I'm sorry, sir?

2        A.    He's junior to me.

3        Q.    He's junior.

4        A.    As far as seniority goes.

5        Q.    And this was Lieutenant Fuller, you said?

6              MR. MULLIN:   No.

7        A.    No.

8        Q.    Or I apologize.  Investigator Frederick.

9        A.    No.

10             MS. PAVESE:  Menard.

11       Q.    Oh, Menard.  I apologize.

12             Are you aware, sir, if Investigator Menard

13   responded with you, he was in the same vehicle with you?

14       A.    Yes.

15       Q.    Okay.  Are you aware whether Lieutenant Fuller

16   or Investigator Frederick responded to the scene?

17       A.    Yes.

18       Q.    Both of those individuals did?

19       A.    Yes.

20       Q.    Sir, let me ask you one more time.  I think I

21   asked this already, but you heard the call come over the

22   dispatch, and you and Investigator Menard decided to

23   respond, nobody directed you to respond?

24       A.    I heard radio transmissions.

25       Q.    Okay.
```

```
1         A.    And myself and Investigator Menard responded.

2         Q.    Okay.  So no superior directed you to respond,

3    would that be fair to say?

4         A.    Yes.

5         Q.    Thank you, sir.

6               Now, at the time that you responded to the

7    scene, what information did you have about JLA?

8         A.    I had information that he had fled the scene

9    of a car accident and had what appeared to be a gun on

10   him.

11        Q.    Did you receive any information, sir, that

12   that might be an airsoft gun?

13        A.    No.

14        Q.    So would it be fair to say that the entirety

15   of the time you were on the scene, no individual called

16   you and told you that this was potentially an airsoft

17   gun, no supervisor, no other officer?

18        A.    No supervisor or officer told me that it was

19   potentially an air gun, no.

20        Q.    Did it matter to you?

21              MR. MULLIN:  At what point are you

22              referring to?

23              MR. ZUKHER:  I obviously mean with regard

24              to the shooting.

25        Q.    Would it have mattered to you if you knew that
```

1    this child potentially had a BB gun?

2                    MR. MULLIN:  Object to the form.

3        Q.    Or an airsoft gun?

4        A.    It would depend.

5        Q.    Thank you, sir.  Depend on -- just leave it at

6    that.

7               So you and Investigator Menard responded to

8    the scene?

9        A.    Yes.  We responded to Apulia and Coye.

10       Q.    Okay.  And do you recall what time you arrived

11   at Apulia and Coye?

12       A.    I don't recall, no.

13       Q.    Okay.  Sir, do you recall the approximate time

14   that elapsed between the time that you arrived on the

15   scene and you discharged your weapon at JLA?

16       A.    I don't recall.

17       Q.    Could it have been longer than a half an hour?

18       A.    I don't want to speculate.

19       Q.    Okay.  Could it have been longer than an hour?

20       A.    Again, it would be speculation.

21       Q.    Okay.  Now, when you respond to the location

22   you described as Apulia and Coye, what other officers

23   were on the scene?

24       A.    There were a number of officers there at

25   Apulia and Coye.  I didn't identify every officer there

1    or have a roll call.

2        Q.    I'm not asking for that, sir.  I'm only asking

3    if you recall in particular how many officers were there

4    and if you knew who they were?

5        A.    I can't recall.  I know that there were a few.

6        Q.    Did you recognize that a few of them were from

7    different agencies?

8        A.    Yes.

9        Q.    Thank you, sir.

10            Sir, did you have an understanding, do you

11    know what a lead agency is?

12        A.    Yes.

13        Q.    What's a lead agency?

14        A.    An agency that takes responsibility for a

15    dispatch call or the report of a call.

16        Q.    Okay.  Now, who was the lead agency here?

17            MR. MULLIN:  Objection.

18        A.    I wasn't aware at the time.

19        Q.    So, sir, when you say you weren't aware, were

20    you not aware whether you even knew the lead agency?

21            MR. MULLIN:  Object to the form.

22        A.    Correct.

23        Q.    Prior to the shooting, did anybody advise you

24    who was in charge, who was the lead agency prior to the

25    shooting occurring?

```
 1       A.    No.

 2       Q.    Would it be fair to say you did not know which

 3   officer was in charge of that scene at the time you

 4   discharged your weapon?

 5             MR. MULLIN:  Object to the form.

 6       Q.    Or prior?

 7             MR. MULLIN:  Object to the form of that

 8             question.

 9       Q.    You can answer.

10       A.    I'm sorry.  Can you restate the question?

11       Q.    Sir, would it be fair to say that you did not

12   know who the lead officer in charge was prior to

13   discharging your weapon at JLA on March 4th, 2021?

14             MR. MULLIN:  Object to the form.

15       A.    Yes, that would be fair.

16       Q.    Thank you, sir.

17             Now, when you arrived at the scene, did you

18   report or check in with any other law enforcement officer

19   who is superior to you?

20       A.    I don't recall.

21       Q.    Okay.  Did Lieutenant Fuller provide you with

22   any direction after you arrived on the scene?

23       A.    I don't recall.

24       Q.    Okay.  When you arrived on the scene or

25   anytime thereafter, was there ever established a command
```

1    post that you were aware of?

2        A.    No.

3        Q.    Did you, yourself, inquire of any other police

4    officer or any other superior as to whether a command

5    post was set up?

6        A.    No, I did not.

7        Q.    Did Lieutenant Fuller ask any of those

8    questions with regard to a command post or a staging

9    area?

10        A.    I don't know.

11        Q.    You didn't observe that yourself?

12        A.    Did I observe Lieutenant Fuller requesting

13    information --

14        Q.    Yes.

15        A.    -- about a command post?

16        Q.    Yes.

17        A.    No, I didn't.

18        Q.    Okay.  How about with regard to a staging

19    area?

20        A.    Again, I didn't observe anything.

21        Q.    Okay.  How about yourself, did you ask about a

22    staging area?

23        A.    No.

24        Q.    So did the New York State Police ever provide

25    you with the direction as to -- who did you believe to be

1    the lead agency on the scene?

2              MR. MULLIN:  Objection.

3         Q.   Do you recall?

4              MR. MULLIN:  Object to the form of those

5         two questions.

6         Q.   I believe you didn't know.  You said you

7    didn't know?

8              MR. MULLIN:  Object to the form of the

9         third question.

10             MR. ZUKHER:  Strike both of those

11        questions, ma'am, from the record.

12   BY MR. ZUKHER:

13        Q.   While you were on the scene on March 4th,

14   2021, from the time of your arrival to the time you

15   discharged your weapon, did you receive any direction or

16   commands from any lead agency or any lead police officer

17   on the scene?

18             MR. MULLIN:  Object to the form.

19        A.   I don't know.

20        Q.   Sir, you don't recall whether you received

21   any?

22             MR. MULLIN:  Object to the form.

23        Q.   I didn't hear you.

24        A.   I said I don't know.

25        Q.   As you sit here today, do you recall any such

1    directives?

2                    MR. MULLIN:  Object to the form.

3        A.    I don't recall any directives, no.

4        Q.    Thank you, sir.

5              Were you ever advised that a perimeter was

6    ever established here by anyone?

7        A.    Was I advised --

8        Q.    By anyone if there was a perimeter?

9        A.    I was not advised.  I was aware that there

10   hadn't been a perimeter established.

11       Q.    Okay.  You were aware of that.  Did you ask

12   anybody, are we going to establish a perimeter for this

13   thing?

14       A.    Did I ask anybody if we were going to

15   establish a perimeter?

16       Q.    Yes.

17       A.    No.

18       Q.    Did you question why a perimeter had not been

19   established?

20       A.    No.

21       Q.    Thank you, sir.

22              Sir, from the time that you arrived to the

23   scene to the time you discharged your weapon at JLA, what

24   information were you provided by anyone?

25                    MR. MULLIN:  I'm sorry.  I could not hear

1                    the remaining part of that question.

2          Q.    What information were you provided by anyone

3    with regard to JLA?

4          A.    Information that I was provided was JLA was

5    fleeing on foot.  He was last seen with a gun, that there

6    was information from individuals at residences that he

7    was in backyards of people's residences with a gun, and

8    that he was traveling in a southerly -- south -- southern

9    direction.

10         Q.    Okay.  Is that the totality of what you were

11   told?

12         A.    No, that's not the totality of what was told.

13         Q.    Okay.

14         A.    I obviously can't remember everything that

15   was --

16         Q.    Okay.  In sum and substance, that's what you

17   remember, correct?

18         A.    Yes.

19         Q.    Sir, that information, did you obtain that

20   from dispatch?  Who provided you with this information?

21         A.    The information I obtained was from a number

22   of sources.  It was from dispatch.  It was from other

23   responding units.

24         Q.    Okay.  Were you, yourself, sir, during the

25   time on the scene, were you provided with any updated

1    information?

2                    MR. MULLIN:  Object to the form.

3        Q.    From what you received when you first arrived?

4        A.    I'm not sure what you mean by updated.

5        Q.    Did you get any additional -- from the time

6    that you arrived on the scene, you had in your mind

7    certain information, correct, that you were provided?

8        A.    There was a constant flow of information.

9    There was radio dispatch.  There was information where

10   people were indicating direction of travel where --

11       Q.    Okay.

12       A.    -- JLA was last seen.

13       Q.    How about anything personal about JLA and his

14   mental health condition, were you provided with any of

15   that information?

16       A.    Not that I recall.

17       Q.    Thank you, sir.

18             I'm going to ask this so I don't forget.  Did

19   you ever reach -- did you ever speak with or are you

20   aware that anybody spoke on the scene with St. Joseph's

21   Mobile Crisis Unit?

22       A.    Did I speak with St. Joseph's Mobile Crisis

23   Unit, no.

24       Q.    Okay.  Are you aware that anybody on the scene

25   did?

1        A.     I'm aware now, yes.

2        Q.     Okay.  Who do you believe that the Mobile

3    Crisis Unit spoke to?

4        A.     I'm not sure.

5        Q.     Not sure.  Okay.  You don't have a name for

6    me?

7        A.     No.

8        Q.     Okay.  Don't have any documents showing that

9    they were on the scene or anything like that?

10       A.     No, I don't have any documents.

11       Q.     Okay.  Okay.  So my question, sir -- strike

12   that.

13              Sir, what directions were you given by any

14   superior officer or any lead officer with regard to what

15   you were supposed to do at that scene?

16              MR. MULLIN:  Object to the form to those

17              questions.

18       Q.     You can answer.

19       A.     I'm not sure.

20       Q.     As you sit here today, do you recall any

21   specific command given to you by any superior officer on

22   March 4th, 2021 as it pertained to the incident with JLA?

23       A.     Again, I'm not sure.

24       Q.     Very good.  Who would those directions have

25   been given by, sir, if they were given?

```
 1                    MR. BANAS:  Objection.

 2       Q.    Strike the question.

 3             Sir, were you ever advised that this call

 4    involved a mental health situation, anybody formally

 5    advise, any superior advise you of that?

 6                    MR. MULLIN:  Object to those questions.

 7       Q.    Go ahead, sir.  You can answer.

 8       A.    Was I formally advised that there was --

 9       Q.    Yeah.

10       A.    No.

11       Q.    Thank you, sir.

12             No superior or other officer formally advised

13    you that JLA was experiencing a mental health crisis?

14                    MR. MULLIN:  Object to the form.

15       A.    Nobody specifically addressed that with me.

16       Q.    Thank you, sir.

17             You said that -- do you recall, sir, hearing

18    from dispatch that JLA's mother reported that he had a BB

19    gun, do you recall that --

20                    MR. MULLIN:  Object to the form.

21       Q.    -- information or were you ever advised of

22    that information?

23                    MR. MULLIN:  Object to the form of that

24             question.

25       A.    I'm sorry.  Can you re-ask?
```

```
 1         Q.    Let me rephrase it.

 2               Did anybody tell you during this incident that

 3    JLA's mother, Carissa Albahm, reported to Trooper Fike

 4    that her son had a BB gun?

 5                    MR. MULLIN:  Object to the form.

 6         Q.    Anybody ever tell you that?

 7                    MR. MULLIN:  Object to the form.

 8         A.    Prior to my response?

 9         Q.    Correct, or during your response.

10         A.    As far as telling Trooper Fike that he had a

11    pellet gun --

12         Q.    Yes.

13         A.    -- or a BB gun?

14         Q.    Yes.

15         A.    No, nobody ever told me that she told him that

16    definitively he had a BB gun.

17         Q.    I'm not asking about definitively.  It was

18    potentially.

19                    MR. MULLIN:  Please don't argue with the

20               witness' answer.

21                    MR. ZUKHER:  I'm not arguing with the

22               witness.

23         Q.    I'm not asking you potentially.  I'm asking

24    prior to you discharging that weapon, did you know that

25    information?
```

1              MR. MULLIN:  Object to the form.  What

2         information?

3              MR. ZUKHER:  The information that

4         Mrs. Albahm told Trooper Fike that JLA had a

5         BB gun.

6              MR. MULLIN:  Object to the form.

7      A.    I'm not aware of her telling Trooper Fike that

8  he had a BB gun.

9      Q.    Would that have made a difference to you?

10             MR. MULLIN:  Object to the form.

11     Q.    In your decision to discharge your weapon?

12     A.    Hypothetically, if somebody told me that he

13  definitely had a BB gun, that would affect my decision,

14  yes.

15     Q.    Okay.  In your two prior interactions with

16  JLA, did you find him to be carrying any weapons, besides

17  the phone, of course?

18     A.    No.

19     Q.    Thank you.

20             When were you first advised on March 4th of

21  April 2021 (sic) that JLA was carrying a weapon, who

22  advised you of that?

23             MR. BANAS:  I'm sorry.  When or who?

24             MR. MULLIN:  Object to the form.

25     Q.    It's two separate questions.  I'll break it

1    up.

2              Sir, when were you first advised on March 4th,

3    2021 that JLA was carrying a weapon?

4         A.    I don't recall when I was first advised.

5         Q.    Okay.  Do you recall who advised you of that?

6         A.    I do not.

7         Q.    Thank you, sir.

8              When you were advised that JLA had a weapon,

9    did that individual, whoever that was, did they describe

10   the weapon?

11        A.    I don't recall if there was a description

12   given.

13        Q.    Thank you, sir.

14             When were you advised that JLA had a weapon,

15   in the beginning of this incident, towards the end,

16   towards the middle, when were you so advised?

17        A.    I don't recall exactly when I was advised.

18        Q.    Thank you, sir.

19             At the time that you were pursuing JLA, did

20   you believe that he committed any crime?

21             MR. MULLIN:  Object to the form.

22        A.    Yes.

23        Q.    Okay.  What crime was that, sir?

24        A.    Well, there were a number.  At least one of

25   leaving the scene of an accident.

```
 1        Q.     Okay.

 2        A.     Another would be criminal possession of a

 3    weapon.

 4        Q.     Potentially, right?

 5               MR. MULLIN:  Object to the form.

 6        Q.     Potentially, right, because you didn't know?

 7               MR. MULLIN:  Object to the form.  Don't

 8          argue with the witness.

 9               MR. ZUKHER:  I'm not arguing.

10               MR. MULLIN:  Well, let him answer, then.

11               MR. ZUKHER:  Okay.

12        A.     Did I believe that he was committing a crime?

13    Yes.  If I'm receiving information that he has a gun or

14    that he has a -- that he has left the scene of an

15    accident, yes, I believe he did.

16        Q.     On that date, would it be fair to say you

17    pursued JLA?

18        A.     Yes.

19        Q.     Okay.  Anybody give you any directions with

20    regard to that pursuit or how that pursuit was supposed

21    to go?

22               MR. MULLIN:  Object to the form.

23        A.     No, nobody gave me direction.

24        Q.     Okay.  Sir, were you advised to use a specific

25    channel for communications?
```

```
 1        A.    Not that I recall.

 2        Q.    Were you aware, sir, that the responders on

 3  the scene were all using different channels, were you

 4  aware of that?

 5        A.    I was aware of at least three different

 6  channels being utilized, yes.

 7        Q.    Okay.  And you can't monitor three channels at

 8  the same time, can you?

 9        A.    Yes, you can.

10        Q.    In pursuit, is that what you were doing?

11        A.    Myself and Investigator Menard were monitoring

12  multiple channels, yes.

13        Q.    Multiple channels.  I understand.  Anybody

14  ever direct you to use a specific channel or frequency

15  during any portion of this incident?

16        A.    I don't recall specifically.

17        Q.    But, in fact, as you sit here today, you do

18  recall that three channels were being used throughout the

19  incident, correct?

20        A.    Yes.

21        Q.    Let me ask you this:  Did you, yourself, ever

22  switch channels to one channel that contained all of the

23  agencies that were responding, was there one channel that

24  you were aware of that --

25                    MR. MULLIN:  Object to the multiple
```

```
 1              questions.

 2      Q.      Strike all of those.

 3              Were you aware or do you -- were you directed

 4   to use a single channel?

 5                   MR. MULLIN:  Object to the multiple

 6              questions.

 7      A.      Can you rephrase that?

 8      Q.      Of course.

 9              When you respond to the scene, the Dewitt

10   Police uses one channel, right?

11                   MR. MULLIN:  Object to the form.

12      Q.      Or is it certain channels?  That may be

13   different than the channels used by the New York State

14   Police, it may be different than the channels used by the

15   Onondaga County Sheriff's, correct?

16                   MR. MULLIN:  Object to the form.

17      Q.      You can answer my question, sir.

18                   MR. ZUKHER:  It's not objectionable.

19      A.      It's correct they may be different channels,

20   yes.

21      Q.      Thank you, sir.

22              During the incident on March 4th, 2021, was

23   there ever a time where everybody was on the same

24   channel?

25      A.      It would depend.
```

```
1          Q.    I understand.  Were you, yourself, ever
2    advised by any superior and directed to a particular
3    channel over which you must communicate?
4          A.    I don't recall.
5          Q.    Thank you, sir.
6                Sir, was it ever communicated to you when you
7    responded to the scene, did you have any
8    less-than-lethals with you?
9          A.    When I respond, yes.
10         Q.    But you did not take those with you when you
11   pursued JLA?
12               MR. MULLIN:  Object to the form.
13         A.    I did.
14         Q.    Okay.  But you decided to discharge your
15   service weapon instead; is that correct?
16         A.    I wouldn't say -- yes.
17         Q.    Okay.  What less-than-lethals did you have
18   with you at the time you discharged your service firearm
19   at JLA?
20         A.    I had a Taser with me.
21         Q.    Okay.
22         A.    And a baton.
23         Q.    Okay.  And neither one of those were used or
24   deployed?
25         A.    No.
```

1        Q.    Did anybody tell you or suggest to you to use

2   or deploy those, any superior?

3                    MR. MULLIN:  I'm sorry.  I couldn't hear

4            the last word you said.

5        Q.    Did any superior tell you to use or deploy the

6   less-than-lethals?

7        A.    No.

8        Q.    Thank you.

9              Were you aware that other officers on the

10  scene had less-than-lethals?

11                   MR. MULLIN:  Object to the form.

12       A.    Yes.

13       Q.    Thank you.

14             Did you see any of those officers use their

15  less-than-lethal weapons?

16       A.    No.

17       Q.    Sir, are you aware that there was no command

18  post set up in this incident, are you aware of that now?

19       A.    Yes.

20       Q.    Are you aware that the lead agency here was

21  the State Police, they were the first responders, are you

22  aware of that?

23                   MR. MULLIN:  Object to the form.

24       Q.    Or were you aware of that?

25       A.    No.

1      Q.    Are you aware of that now?

2      A.    I don't know who was --

3      Q.    Let me ask you, sir:  Assuming that Trooper

4  Fike was the first responding trooper and he's a

5  New York State trooper, would he then ergo be the lead

6  agency on the scene?

7                MR. MULLIN:  Object to the form.

8                MR. BANAS:  Objection.

9      Q.    Which would be the New York State Police?

10                MR. MULLIN:  Object to the form.

11      A.    It depends.

12      Q.    Very good.

13            Did you know who the lead agency was at the

14  scene at the time you discharged your weapon at JLA?

15                MR. MULLIN:  Object to the form.

16      A.    No.

17      Q.    Did you know who was in charge at the time you

18  discharged your weapon at JLA?

19                MR. MULLIN:  Object to the form.

20      A.    Did I know who was in charge?

21      Q.    Right.  Who was in charge of the scene?

22                MR. MULLIN:  Object to the form.

23      A.    I guess I don't understand that.

24      Q.    Were you aware that there was any individual

25  that took charge of the scene and issued directives to

```
1    the police officers and investigators and others who were

2    in pursuit?

3         A.    I'm sorry.  Can you say that --

4                  MR. ZUKHER:  Ma'am, can you read that

5         back?

6                  (Requested portion read back.)

7         A.    No.

8         Q.    Thank you, sir.

9                  MR. ZUKHER:  We're going to take a

10        five-minute break.

11                  (Off record:  11:00 a.m. to 11:11 a.m.)

12    BY MR. ZUKHER:

13        Q.    Sir, I'm going to take you back a little bit.

14    Would it be fair to say that from the time the original

15    call came in until the time that you discharged your

16    weapon at JLA, about an hour had elapsed, would that be

17    fair to say?

18                  MR. MULLIN:  Object to the form.

19        A.    I'm not sure.

20        Q.    Okay.  Do you have any reason to dispute that

21    an hour elapsed or more?

22                  MR. MULLIN:  Object to the form.  From

23        when to when?

24        Q.    Do you have any reason to dispute that more

25    than an hour elapsed from the time that the first call
```

1    came in and you discharged your service weapon at JLA?

2        A.    I don't know when the call first came in, so I

3    wouldn't --

4        Q.    Right.  I'm asking if you have any reason to

5    dispute what I'm saying?

6        A.    No.

7                MR. MULLIN:  He's answered he doesn't

8            know.

9                MR. ZUKHER:  I understand.  Now he just

10           answered.  Thank you.

11       Q.    Sir, within that hour of time that elapsed

12   between when the first call came in and when JLA was

13   shot, what did you do to try and determine whether the

14   child had a BB gun?

15               MR. MULLIN:  Object to --

16       Q.    Did you do anything?

17               MR. MULLIN:  Object to the form of those

18           questions.

19       Q.    You can answer.

20       A.    I'm sorry.  Can you ask it again?

21       Q.    Did you, yourself, within the hour between the

22   call coming in and JLA had fled his residence and struck

23   the car in the driveway and the time that you discharged

24   your service weapon at JLA, did you, yourself, do

25   anything to determine whether the child was carrying a BB

1    gun as opposed to a real gun?

2              MR. MULLIN:  Object to the form.

3    A.    I'm sorry.  One more time, please?

4    Q.    Strike that.

5          At some point you and Investigator Menard

6    enter the woods, correct --

7    A.    Yes.

8    Q.    -- to pursue JLA?

9          And did anybody direct you to do that, sir, or

10   did you make that decision on your own?

11   A.    I made --

12   Q.    To enter the woods to pursue JLA.

13   A.    I made that decision on my own.

14   Q.    Thank you, sir.

15         Was Lieutenant Fuller with you?

16   A.    No.

17   Q.    Did Lieutenant Fuller also go into the woods?

18   A.    I don't know.

19   Q.    Did you communicate with Lieutenant Fuller

20   after you went into the woods?

21   A.    I communicated with -- over the radio with all

22   the other units that were responding.

23   Q.    Okay.  When did you make those communications,

24   sir?

25   A.    When I observed JLA going -- JLA in the woods.

1      Q.    And what was the sum and substance of the

2  conversations that you had?

3      A.    I relayed his location and his direction of

4  travel.

5      Q.    Okay.  And what was relayed back to you?

6      A.    I don't recall.

7      Q.    Thank you, sir.

8            Now, prior to entering the woods, did you see

9  JLA?

10     A.    Yes.

11     Q.    Prior to entering the woods, did you speak

12  with JLA?

13     A.    No.

14     Q.    Are you aware, sir, that there were other

15  people in the Dewitt Police Department who had spoken to

16  JLA before, are you aware of that?

17     A.    No.

18     Q.    Did anybody from the Dewitt Police who had

19  prior communications with JLA communicate anything to you

20  about him that day?

21     A.    I'm sorry.  Can you repeat that?

22            MR. ZUKHER:  Ma'am, I don't think I can.

23            Could you?

24            (Requested portion read back.)

25     Q.    Prior to the shooting.

1        A.    I'm not sure.

2        Q.    Did anybody from the Onondaga County Sheriff's

3    Department communicate with you that day prior to the

4    shooting?

5              MR. SICKINGER:  Object to the form.

6        Q.    Did any member of the Onondaga County

7    Sheriff's Department or anybody connected with that

8    agency have any conversations with you or give you any

9    direction or information on March 4th, 2021?

10             MR. SICKINGER:  Same objection.

11             MR. MULLIN:  Same objection.

12       Q.    Go ahead.  You can answer.

13       A.    I was receiving all kinds of information

14   through dispatch and through radio transmissions.

15       Q.    Do you know where that information originated

16   from?

17       A.    Various different sources.

18       Q.    Did you, yourself, communicate with anybody

19   from the Onondaga County Sheriff's Department that day?

20             MR. SICKINGER:  Object to the form.

21       A.    Again, radio transmissions.

22       Q.    I'm sorry, sir?

23       A.    I said, again, it would be radio

24   transmissions, that everybody who was monitoring radio

25   traffic would have heard my transmission, so I

1    can't --

2        Q.    Did you actually have any conversation or any

3    discussion with anyone from the Onondaga County Sheriff's

4    Department?

5              MR. SICKINGER:  Object to the form.

6        Q.    Either a police officer or otherwise?

7              MR. SICKINGER:  Same objection.

8        Q.    That day?

9        A.    I'm sorry.  Can you repeat the question?

10       Q.    Do you recall speaking with anyone from the

11   Onondaga County Sheriff's Department, whether that be a

12   deputy or anyone else, on March 4th, 2021 about JLA?

13             MR. SICKINGER:  Object to the form.

14             MR. ZUKHER:  How is that objectionable?

15             MS. PAVESE:  Dave.

16       Q.    Go ahead, sir.  You can answer.

17       A.    I don't recall.

18       Q.    How about anybody from the New York State

19   Police, any officer of the New York State Police or any

20   other agent or person involved with the New York State

21   Police, do you recall having any conversation with them

22   on March 4th, 2021?

23             MR. BANAS:  You mean a one-on-one

24         conversation?

25             MR. ZUKHER:  Right.

```
 1                    MR. BANAS:  Thank you.

 2                    MR. ZUKHER:  A conversation.

 3        A.    Again, I don't recall.

 4        Q.    Thank you, sir.

 5              And you don't recall whether you had the

 6   communication, so you certainly wouldn't remember the sum

 7   and substance of anything that was said?

 8                    MR. MULLIN:  Object to the form of those

 9              questions.

10        Q.    Strike that.

11              Am I -- I'm just trying to get this straight.

12   You didn't talk with anyone, all you did was listen to

13   radio transmissions, would that be fair to say?

14                    MR. MULLIN:  Object to the form.

15        A.    Again, I don't know exactly what you're

16   asking.

17        Q.    What I'm asking, sir, is:  After you arrived

18   on the scene on March 4th, 2021, did you speak with

19   anybody from the New York State Police about JLA prior to

20   discharging your service weapon at him?

21        A.    I don't recall.

22        Q.    Same question for the Onondaga County

23   Sheriff's Department?

24        A.    I don't recall.

25        Q.    Okay.  Now, at what point did you first see
```

1    JLA on March 4, 2021, did you first take visual

2    observation of him?

3        A.    When I radioed in that I observed him in the

4    woods.

5        Q.    Okay.  How quickly thereafter did you

6    discharge your service weapon?

7                MR. MULLIN:  Object to the form.

8        A.    I couldn't tell you.

9        Q.    Twenty minutes, thirty minutes, closer to

10    twenty or closer to thirty?

11        A.    I don't know.  I don't want to speculate.

12        Q.    I understand.  Did you, yourself, have any

13    conversations with JLA, did you attempt to speak with him

14    or communicate with him in any way?

15                MR. MULLIN:  Object to the form.

16        A.    Yes.

17        Q.    Prior to the shooting?

18        A.    Yes.

19        Q.    Okay.  What did you do, sir?

20        A.    I called out to him.  I told him to drop the

21    gun.

22        Q.    And at that point had you received any

23    information that it could potentially be a BB gun at that

24    point, had you received that information?

25                MR. MULLIN:  Object to those questions.

1      Q.    You can answer both of those questions.

2      A.    No, I didn't.

3      Q.    Thank you, sir.

4            Now, at some point, you discharge your service

5      weapon at JLA, correct?

6      A.    Yes.

7      Q.    Can you describe to me, please, how that

8      occurred?

9      A.    I told JLA to drop the gun several times, told

10     him not to raise the gun.  He raised the gun.  I

11     perceived an imminent threat and fired my weapon.

12     Q.    How many times did you fire your weapon at

13     JLA, sir?

14     A.    I discharged my firearm until I expended the

15     magazine, so that would be eleven rounds.

16     Q.    Okay.  Did you reload and fire again or were

17     only eleven rounds discharged by you?

18     A.    Only eleven rounds were discharged by me.

19     Q.    Do you know whether any of those rounds struck

20     JLA?

21     A.    At the time of the incident, no.

22     Q.    Okay.  How about subsequent to the incident?

23     A.    Subsequent to the incident, I was made aware

24     of some rounds impacting him.

25     Q.    Okay.  Did you, yourself, observe any of your

1    rounds impact him?

2        A.    No.

3        Q.    Were you the first to fire, sir?

4            MR. MULLIN:  Object to the form.

5        Q.    Were you the first officer to discharge your

6    weapon on March 4th, 2021?

7            MR. MULLIN:  Object to the form.

8        A.    I don't know.

9        Q.    Sir, at the time you discharged your service

10   weapon at JLA, can you describe the surrounding area for

11   me?  How densely or sparsely populated was it?  Where was

12   the nearest civilian?

13       A.    I'm sorry.  There were a couple questions

14   there.  What --

15       Q.    Sure.  I'm asking about the area where JLA was

16   shot was in the woods, correct?

17       A.    Yes.

18       Q.    Where was the nearest civilian or threat to

19   any nearest civilian from JLA at the time he was shot?

20       A.    I don't know.

21       Q.    Where was the nearest house to the area where

22   you discharged your service weapon?

23       A.    I don't know.

24       Q.    Were there people in the way of you

25   discharging your service weapon?

```
 1        A.    Not that I recall, no.

 2        Q.    Okay.  Do you believe you put anybody in

 3   harm's way besides JLA when you discharged your service

 4   weapon eleven times in the area where JLA was shot?

 5                    MR. MULLIN:  Object to the form of the

 6              questions.

 7        A.    I'm sorry.  Can you repeat the question?

 8                    MR. ZUKHER:  Madam Court Reporter?

 9                    (Requested portion read back.)

10        A.    I don't believe so.

11        Q.    Would it be fair to say that there were no

12   civilians in the line of fire where JLA was, would that

13   be fair to say?

14        A.    There were no civilians between me and JLA,

15   yes.

16        Q.    How about in the surrounding area?

17        A.    I don't --

18        Q.    Your shots travel, right, gunshots travel

19   quite a distance, right?  You discharged eleven of them,

20   right?

21        A.    Yes.

22        Q.    Okay.  Did you believe you were putting

23   anybody else in danger by discharging eleven rounds in

24   the area where JLA was shot?

25        A.    No.
```

1      Q.    That's because there weren't anybody around in

2   that area, would that be fair to say?

3      A.    No.

4      Q.    Okay.  Where was the nearest civilian to where

5   JLA was shot?

6      A.    I don't know.

7      Q.    Did that factor into your decision to shoot?

8      A.    I'm sorry?

9      Q.    That there were no civilians around, you were

10  in the woods, did that factor into your decision to

11  shoot?

12     A.    That there were no civilians in the woods?

13     Q.    Correct.

14     A.    No.

15     Q.    Were there any homes or residences in the line

16  of fire where JLA was shot?

17     A.    I don't know.

18     Q.    Thank you, sir.

19           Now, there were two separate rounds of volleys

20  fired, correct?  Did you know that?

21     A.    Yes.

22     Q.    Okay.  The eleven shots that you discharged,

23  were those in the first -- was that the first round of

24  volley?

25     A.    I believe so.

1        Q.    Okay.  Would it be fair to say that you did

2   not discharge your service weapon during the second round

3   of volley that occurred?

4              MR. MULLIN:  Object to the form.

5        A.    I did not expend any rounds after I expended

6   my magazine.

7        Q.    Okay.  As you sit here today, would it be fair

8   to say that there was two rounds of volleys fired?

9        A.    I recall two rounds of volleys.

10       Q.    Thank you, sir.

11             Do you recall discharging your service weapon

12  at all during the second round of volley?

13       A.    Again, I don't know.

14       Q.    Thank you, sir.

15             After the second round of volley, did you

16  attempt to provide any aid to JLA?

17       A.    No.

18       Q.    After the shooting, did you speak with any

19  other officers on the scene?

20       A.    I did.  I don't recall the substance of it.

21       Q.    Subsequently did you debrief or give any

22  statement about this incident to anyone?

23             MR. MULLIN:  Object to the form of the

24             questions.

25       A.    I provided a report regarding my -- or the

1    incident and my involvement.

2         Q.    Thank you.

3               Who was that report provided to, sir?

4         A.    To the Town of Dewitt Police Department.

5         Q.    Okay.  Were you ever asked to debrief or give

6    a statement by the District Attorney's Office of Onondaga

7    County with regard to this incident?

8         A.    What's your -- I guess what's your definition

9    of debrief?

10        Q.    Let me ask it plainly.  Did Bill Fitzpatrick

11   ask you to give an interview in this incident?

12        A.    No.  I didn't give an interview.

13        Q.    Did Bill Fitzpatrick ask you to?

14        A.    No.

15        Q.    And did you ever give a statement to the

16   District Attorney's Office about what happened here?

17        A.    Again, it would depend on statements.

18        Q.    Let me ask you this, sir:  Did you ever refuse

19   a request from the District Attorney's Office to give a

20   debrief about the incident of what occurred on

21   March 4th, 2021 with regard to JLA?

22        A.    I don't recall.

23        Q.    Do you recall speaking to the District

24   Attorney's Office about this incident?

25        A.    No.

```
1          Q.    I want to make sure I get this crystal clear.

2    As you sit here today, you do not recall whether Bill

3    Fitzpatrick ever asked you to give a debrief about what

4    happened in this incident, is that your testimony?

5          A.    With your definition as far as did he

6    interview me, no, he did not.

7          Q.    I am asking if he made a request for an

8    interview, not whether he interviewed you.  I know he

9    didn't interview you.  I'm asking whether that request

10   was made to you of you by the District Attorney's Office

11   or of the Dewitt Police, that you're aware of, by the

12   District Attorney's Office?

13                MR. MULLIN:  There's multiple questions

14           there.

15                MR. ZUKHER:  He knows what I'm asking.

16                MR. MULLIN:  I know, but I'm just

17           following the rules.

18                MR. ZUKHER:  Right.  I understand.

19                MR. MULLIN:  Break it down.  He's

20           answered Bill Fitzpatrick didn't, so I don't

21           know what else you want to know.

22                MR. ZUKHER:  I'm going to ask it again

23           just to make sure.

24                MR. MULLIN:  Your pleasure.

25                MR. ZUKHER:  Yes, it is.
```

1   BY MR. ZUKHER:

2       Q.    So I'm going to ask you again, sir, just to

3   make sure.  Do you recall whether or not Bill Fitzpatrick

4   ever asked you to do a debrief with regard to the

5   shooting that occurred in this case?

6       A.    Again, I would have to ask your definition of

7   a debrief was saying that --

8       Q.    What occurred.

9       A.    -- an interview.

10      Q.    Right.

11      A.    I did not have an interview with Bill

12  Fitzpatrick.

13      Q.    I'm asking whether you were ever asked for

14  one?

15      A.    I don't recall being asked to sit down with

16  Bill --

17      Q.    Did you ever discuss whether or not you'd give

18  testimony to Bill Fitzpatrick with anyone?

19              MR. MULLIN:  Well, object to that.  That

20          violates --

21      Q.    Obviously, besides your attorneys who told you

22  not to do it.

23              MR. MULLIN:  Object to that

24          characterization.

25      Q.    Did you ever discuss with anyone except for

1    Counsel -- obviously I'm not interested in any Counsel

2    questions.  Did you ever discuss with anyone except for

3    Counsel about whether or not to give an interview to Bill

4    Fitzpatrick about what occurred in this case?

5        A.    I don't recall.

6        Q.    Thank you, sir.

7              Where did you go when you left the scene?

8        A.    We went to, I believe, St. Joe's

9    or -- St. Joe's or -- what hospital is that?  I don't

10   recall.  I don't recall which hospital.

11       Q.    For what purpose did you go to the hospital,

12   sir?

13       A.    Medical evaluation.

14       Q.    For you discharging your service weapon?  Were

15   you hurt in this incident?

16             MR. MULLIN:  Object to the questions.

17       Q.    Strike both of those.

18             Were you hurt in this incident?

19       A.    I mean --

20             MR. MULLIN:  I'll note an objection.

21             We're not placing his physical condition at

22             issue in this case.

23             MR. ZUKHER:  He testified -- first of

24             all, that is not a valid objection in this

25             deposition.

```
1              MR. MULLIN:  Well, it's a frivolous

2         question, because it's not an issue.

3              MR. ZUKHER:  It is absolutely not.  He

4         testified that after the incident, he went to

5         the hospital.  I have every right to know

6         whether he was injured or claims that he was

7         injured during this incident.  How is that in

8         any way an improper question?

9              MR. MULLIN:  That's different than what

10         you're asking.

11              MR. ZUKHER:  That's what I'm asking.

12    BY MR. ZUKHER:

13      Q.    Were you injured in this incident?

14              MR. ZUKHER:  I believe the transcript

15         will have three of those questions.

16      Q.    Were you injured in this incident?

17              MR. MULLIN:  Now it's four.

18      Q.    For the fifth time.

19              MR. MULLIN:  Now it's six.

20              MR. ZUKHER:  For the fifth time, correct,

21         thanks to you.

22      A.    Technically, yes.

23      Q.    Okay.  What do you mean by technically, yes?

24    How were you injured?

25              MR. MULLIN:  I'll note an objection to
```

```
 1            this line of questioning.

 2                 MR. ZUKHER:  Very good.

 3                 MR. MULLIN:  I'll let him answer a little

 4            bit, then we'll stop it.

 5                 MR. ZUKHER:  Ridiculous.

 6                 MR. MULLIN:  Excuse me, Counselor?  No

 7            swearing in the room.

 8                 MR. ZUKHER:  I said ridiculous.

 9                 MR. MULLIN:  Go ahead.

10                 MR. ZUKHER:  I don't believe ridiculous

11            is a swear word.

12   BY MR. ZUKHER:

13       Q.    I'm not trying to trick you in any way.

14                 MR. MULLIN:  Let him answer the question

15            without your speech.

16                 MR. ZUKHER:  I can make all the speeches

17            I want.  That's not a valid objection during

18            this deposition.  If you don't stop, I'm going

19            to call the judge and we can continue the

20            deposition in front of the judge.  We can stop

21            all of your complete nonsensical objections.

22                 MR. MULLIN:  Thank you for the speech.

23                 MR. ZUKHER:  You're welcome.

24                 MR. MULLIN:  Can I have the

25            question -- could you read back the question
```

1              that was pending before the speech?

2                   MR. ZUKHER:  For the seventh time.

3                   (Requested portion read back.)

4                   THE WITNESS:  I had a scratch on my hand.

5    BY MR. ZUKHER:

6         Q.    Okay.  Where on your hand, sir?

7         A.    On the back of my hand.

8         Q.    Okay.  Can you describe the scratch for me?

9         A.    It was a small scratch probably from going

10   through brush or whatnot.

11        Q.    Okay.  How many inches was this scratch,

12   approximately?

13        A.    I couldn't tell you.

14        Q.    Okay.  What medical treatment did you receive

15   at the hospital for this scratch?

16                   MR. MULLIN:  Note an objection.

17        A.    A tetanus shot.

18        Q.    Did you scratch yourself on something metal?

19        A.    No, not that I know of.

20        Q.    Okay.  Sir, following the shooting, did you

21   have any mental health evaluations or did you see any

22   therapists or psychiatrist with regard to what occurred?

23                   MR. MULLIN:  I'm not going to allow that

24              question.

25                   MR. ZUKHER:  Very good.

1      Q.    Sir, did you give any statements or interviews

2   following the shooting about the shooting itself?

3      A.    Other than my report, no.

4      Q.    Okay.  So the only statement about your

5   shooting is contained within your report of what

6   occurred, correct?  Do you recall that to be a one-page

7   document, sir?

8      A.    Yes.

9      Q.    Thank you.

10          Were you relieved from duty in any way

11   following the incident?

12              MR. BANAS:  I'm sorry?  I didn't hear the

13              beginning of the question.

14      Q.    Were you relieved from duty in any way

15   following this incident as a result of this incident?

16              MR. MULLIN:  Note an objection to this

17              line.  Go ahead.

18      A.    Yes.

19      Q.    Okay.  Can you tell me about that period of

20   time, how long were you relieved from duties, and who

21   made that decision?

22      A.    I don't recall how long it was.

23      Q.    Two months, three months?

24      A.    I don't recall.

25      Q.    Was it longer than three months?

1                        MR. MULLIN:  Object to the form.

2           A.    I'd have to speculate, and I don't want to

3     speculate.

4           Q.    Who made the decision to remove you from duty?

5           A.    I would say at the end of the day, it would

6     have been the chief of police.

7           Q.    Okay.  Were you provided with any written

8     documentation pertaining to that removal or your removal

9     from duties temporarily?

10          A.    I don't recall.

11                       MR. ZUKHER:  I would make a request,

12                specific request, for any and all information

13                pertaining to the removal of this officer from

14                duty as a result of this incident, all

15                documents.

16          Q.    When do you recall returning to duty?

17          A.    I don't know the time frame.  I subsequently

18    returned to duty.

19          Q.    Was it a year later that you returned to duty

20    or --

21          A.    No.

22          Q.    -- was it before that?

23          A.    It was before a year.

24          Q.    Okay.  Was it six months or was it longer than

25    six months?

```
 1        A.    I'm not sure.  I can tell you it was less than

 2   a year.

 3        Q.    Less than a year.  I understand.

 4              Did you notify your union rep of this -- did

 5   you have a union with the Dewitt Police, are you

 6   represented by a union?

 7        A.    Yes, we do.

 8        Q.    Okay.  Did you notify your union rep of this

 9   incident?

10        A.    Did I notify him?  No.  He was aware of it.

11        Q.    Okay.  Did you, yourself, seek legal counsel

12   following this incident?

13        A.    Yes.  I reached -- well, it was union-provided

14   counsel.

15        Q.    Thank you.

16              Sir, I'm going to turn your attention to --

17              MR. ZUKHER:  Let's have this marked as

18              Exhibit 1.

19                   (Exhibit 1 marked for identification.)

20                   (Off record:  11:36 a.m. to 11:42 a.m.)

21   BY MR. ZUKHER:

22        Q.    Sir, I'm going to show you what's been marked

23   by the Court Reporter as Exhibit 1.  If you can take a

24   look at that document.  Let me know if you know what that

25   is?
```

1       A.    Yes, it looks like they're notes from a

2   walkthrough.

3       Q.    And who was this document prepared by, do you

4   know?

5       A.    I'm not sure.

6       Q.    Okay.  Who provided the information for this

7   document?

8       A.    I believe myself and Investigator Menard.

9       Q.    Okay.  And, sir, I'm going to draw your

10  attention to the document.  Do you see anywhere in this

11  document where you refer to any mental health issues from

12  JLA?

13      A.    I'm sorry.  What was the question, again?

14            MR. ZUKHER:  Madam Court Reporter?

15            (Requested portion read back.)

16      A.    There are no references to mental health

17  issues.

18      Q.    Are there any references in that document,

19  sir, is there any direction or instruction that you

20  received from anyone during this incident, is that

21  contained within that document, sir?

22      A.    I would say yes, radio transmissions that the

23  suspect was heading south, so that would be direction.

24      Q.    Okay.  Besides the radio transmission,

25  anything else?  By the way, the radio transmissions,

1    they're not specifically directed to you, are they?

2              MR. MULLIN:  Object to the form.

3      A.    Radio transmissions are directions as far

4    as --

5      Q.    I understand.  They're directions for

6    everyone, right?

7      A.    Yes.

8      Q.    Everybody hears them.  I'm asking about any

9    specific directions that were given to you by any

10   superior or supervising officer?

11     A.    No, there's no indication of any directive.

12     Q.    Sir, is there any information within that

13   document about the use of an incident command system?

14     A.    No.

15     Q.    Any information on that document about

16   establishing -- that a command post was established?

17     A.    No.

18     Q.    How about a staging area, same question for a

19   staging area?

20     A.    No, there's nothing in there.

21     Q.    Does that document, sir, contain the channels

22   you used to communicate during this incident?

23     A.    No.

24     Q.    Does that document, sir, indicate who your

25   superior officer was or what directions you received from

1    him in this incident?

2         A.    No.

3         Q.    Does that document indicate, sir, who is the

4    lead agency in this incident?

5         A.    It does not.

6         Q.    Thank you, sir.

7               Sir, are you familiar with those words

8    "incident command system"?

9         A.    Yes.

10        Q.    Okay.  Can you tell me what that is?

11        A.    Incident command system refers to something

12   along the lines of IDC, where you create an incident

13   command structure for a large-scale event.

14        Q.    A serious incident, right?

15              MR. MULLIN:  Object to the form.

16        Q.    Sir, are you aware that your department has a

17   manual with regard to critical incident management?

18        A.    Yes.

19        Q.    Are you aware of the policies and procedures

20   stated in that manual?

21        A.    Yes, I have a working knowledge.

22        Q.    Okay.  And, in fact, you have to have that

23   working knowledge as part of your job duties, would that

24   be fair to say?

25        A.    Yes.

1        Q.    Okay.  Sir, what steps did you take to

2    implement an ICS or similar procedure during this

3    incident?

4        A.    I'm sorry.  Say that again?

5        Q.    This incident, the shooting of JLA, what steps

6    did you take to implement ICS?

7        A.    I worked on attempting to contain JLA.

8        Q.    Okay.  Sir, are you aware that your department

9    has policies with regard to ICS?

10       A.    Yes.

11       Q.    Okay.  And that those policies are, in

12   fact -- I'm going to show you what's been marked

13   as --

14              MR. ZUKHER:  Let me mark this as

15          Plaintiff's Exhibit 2.

16              (Exhibit 2 marked for identification.)

17   BY MR. ZUKHER:

18       Q.    Sir, I'm going to show you what's been marked

19   as Plaintiff's Exhibit Number 2.  Could you take a look

20   at that document, please?

21       A.    Yes.

22       Q.    Tell me if you know what that is?

23       A.    That appears to be our manual order for

24   critical incident management.

25       Q.    And does that appear to be a complete, good

1    reproduction of that document, sir?

2        A.    It appears to be.

3        Q.    Okay.  Sir, let's go to the Section Number 1

4    that says Purpose.  Would it be fair to say that the

5    purpose of this document is for successful resolution of

6    critical incidents, would that be fair to say?

7                MR. MULLIN:  Object to the form.

8        A.    It says that the purpose is to provide a

9    organizational framework for the successful resolution of

10   incidents.

11       Q.    Incidents.  What I said, right?

12               MR. MULLIN:  Object to the form.

13       Q.    Sir, I'm going to bring you to Paragraph

14   Number 2 where it says Policy.  Do you see the sentence

15   that says:  When needed, a Unified Commercial

16   Structure -- a Unified Command Structure will be utilized

17   for managing incidents involving multiple jurisdictions,

18   a single jurisdiction with multiple agencies sharing

19   responsibility, and multiple jurisdictions with

20   multi-agency involvement.  Would it be fair to say that

21   that says that?

22       A.    Yes.

23       Q.    And then under Definitions, in G, it says:

24   Incident Command System - The standardized system used

25   for on-scene commanding, controlling, and coordinating

1    the efforts of the individual agencies as they work

2    toward the common goal of stabilizing an emergency in an

3    effort to protect life, property and management (sic).

4    Do you see where it says that?

5        A.    Yes.

6        Q.    Did you, sir, institute the ICS system in this

7    case?  Did you have -- strike that.

8             After receiving the --

9             MR. MULLIN:  Let me note an objection.

10            You didn't read the entire section.

11            MR. ZUKHER:  Fine.  You can make your

12            objection.

13       Q.    Sir, did you upon arriving to the scene

14    implement ICS in any way, you, yourself?

15       A.    We didn't reach the point of implementing it.

16       Q.    Okay.  You were on the scene for almost an

17    hour, sir, you didn't reach the point of implementing

18    ICS?

19            MR. MULLIN:  Don't answer that question.

20            MR. ZUKHER:  Very good.  Even better.

21       Q.    Sir, I'm going to take you to --

22            MR. MULLIN:  Why don't you rephrase it?

23            MR. ZUKHER:  I have what I need.

24       Q.    I'm going to take you to Part 4, where it says

25    Procedure --

```
 1                    MR. ZUKHER:  You're refusing to let him

 2           answer?

 3                    MR. MULLIN:  No.  No.  I'll let him

 4           answer --

 5                    MR. ZUKHER:  Even better.

 6                    MR. MULLIN:  -- I'm asking you to

 7           rephrase it because of the characterization

 8           of --

 9                    MR. ZUKHER:  It's my deposition.

10                    MR. MULLIN:  -- sitting here for an hour

11           is inappropriate.

12                    MR. ZUKHER:  Thank you for helping your

13           client.

14   BY MR. ZUKHER:

15       Q.   Sir, do you see where it says Procedure?

16       A.   Yes.

17       Q.   It says:  Incident Command System Activation,

18   do you see where it says under A?

19       A.   Yes.

20       Q.   It says:  The Incident Command System

21   described shall be activated when.  Do you see that?

22       A.   Yes.

23       Q.   Would it be fair to say, sir, that the word

24   "shall" is mandatory, you must implement?

25                    MR. MULLIN:  Object to the form of the
```

```
1                    questions.

2        Q.    Would that be fair to say?

3        A.    I would say not necessarily.

4        Q.    You dispute words, sir, that the word "shall"

5    is mandatory, as you sit here today?

6        A.    It infers on the other portions of the

7    document as far as where it indicates --

8        Q.    It says --

9              MR. MULLIN:  Let him finish the answer,

10             please.  You're interrupting him.

11       A.    As far as the other portions of the document

12   indicating what the definition of this is and -- or

13   earlier on, it says "may".  So being that that follows

14   "may", then I would say it wouldn't be mandatory.

15       Q.    Sir, do you see the word "shall" in this

16   sentence?  The Incident Command System, open paren, ICS,

17   described in this order shall be activated when.  My

18   question was:  Do you believe that shall is mandatory,

19   not discretionary?

20             MR. MULLIN:  Let him answer the question.

21       A.    Again, it depends, because it follows with the

22   policy where it says:  When needed, the Unified Command

23   Structure will be utilized.

24       Q.    Right.  But down here where it says Procedure,

25   it says:  ICS shall be activated when.  I'm going to take
```

1    you right to B:  Multiple agencies or disciplines are

2    involved in the emergency response.  Would that be fair

3    to say, sir, that's what it says?

4        A.    Again, like I said, the mandatory portion I

5    don't agree with, because it says earlier on --

6        Q.    All I'm asking is --

7              MR. MULLIN:  Let him finish.  You're

8              interrupting him.  Go ahead, sir.

9        A.    I said again, I don't agree with the

10   assumption that it is mandatory if it says shall, because

11   earlier on in the document it indicates that it may be

12   utilized for an incident command system, so there isn't

13   any mandatory portion of it.

14       Q.    Sir, my question to you was much simpler than

15   this.  Do you believe that the word "shall" is mandatory

16   or discretionary?

17       A.    In this context, I'm saying no.

18       Q.    Very good.  Do you see where it says:

19   Multiple agencies or disciplines are involved in the

20   emergency response, under Subsection B?

21       A.    I'm sorry.  Where are you?

22             MS. PAVESE:  On Page 2.

23       Q.    Page 2, almost to the bottom.

24             MS. PAVESE:  Section 4.

25       Q.    Section 4, Subsection 1-B.

```
 1          A.    Yeah, it says:  Incident command described in

 2    this order shall be activated when multiple agencies or

 3    disciplines --

 4          Q.    Okay.  And, in fact, sir, when you arrived to

 5    the scene, you observed multiple agencies present,

 6    wouldn't that be fair to say?

 7          A.    When I responded to the scene, I did observe

 8    multiple agencies, yes.

 9          Q.    Yeah.  Did you take any steps to implement ICS

10    yourself?  ICSA, well, it's abbreviated as ICS.

11          A.    When I responded, the primary purpose or the

12    initial response was such that we were looking to

13    establish a control of the scene, yes.

14          Q.    Sir, what steps did you, yourself, take to

15    implement ICS?

16                MR. MULLIN:  Object to the form.

17          A.    I worked to contain the suspect --

18          Q.    Okay.

19          A.    -- in an established area.

20          Q.    Is that what you did to establish ICS?  What

21    steps did Lieutenant Fuller take to establish ICS, are

22    you aware of any?

23                MR. MULLIN:  Object to the form.

24          A.    I don't know what Lieutenant Fuller was doing.

25          Q.    Okay.  Sir, this says:  If applicable,
```

1    activate under the duties of the first officer --

2                    MR. MULLIN:  Where are you reading from,

3            Counselor, please?

4                    MR. ZUKHER:  Page 3, right from the top,

5            Duties of the First Officer on the Scene.

6        Q.    You weren't the first officer on the scene,

7    correct?

8        A.    No.

9        Q.    And were you a supervising officer here?

10       A.    No.

11       Q.    Okay.  So would it be fair to say that the

12   duties of the first officer on the scene wouldn't apply

13   to you, you weren't the first officer on the scene?

14                   MR. MULLIN:  Object to the form.

15       A.    It would depend, I would say.

16       Q.    So your testimony here today is that you

17   looked to contain the situation, that's what you did to

18   implement ICS; is that right?

19                   MR. MULLIN:  Object to the form.

20       A.    Yes, we were looking to contain.

21       Q.    Now, did you ever have on scene any duties of

22   a supervising officer?  Did you ever take charge of the

23   scene yourself?

24       A.    I'm not sure exactly what you're asking there.

25       Q.    Sir, I'm saying whether at any point during

1    this incident you considered yourself to be the

2    supervising officer or the officer in charge of the

3    scene?

4        A.    Did I consider myself to be the supervising

5    officer, no.

6        Q.    Okay.  How about the officer in charge of the

7    scene?

8        A.    I believe that that was fluid and evolving at

9    the time.

10       Q.    Sir, did you at any point believe that you

11   were the supervising officer or the person in charge of

12   the scene?

13       A.    Again, it depends on what your definition of

14   that would be.

15       Q.    I'm asking what was in your mind, sir.  Did

16   you ever consider yourself to be on March 4th, 2021

17   during this incident either a supervising officer or the

18   officer in charge or either the first -- either the first

19   officer on the scene or the supervising officer?

20              MR. MULLIN:  Object to the form of the

21              questions.

22       A.    I'm sorry.  Can you ask the question again?

23              MR. ZUKHER:  Madam?

24              (Requested portion read back.)

25       A.    I would consider myself, when I was in contact

```
 1   with the suspect, I was in charge of that specific scene.

 2        Q.    Okay.  Did you -- we already asked this.

 3   Would it be fair to say that you were one of the initial

 4   responding officers?

 5        A.    I was not one of the initial responding

 6   officers.

 7        Q.    Okay.  Sir, did you ever request yourself a

 8   dedicated radio channel for this incident during the time

 9   that you were -- at that point in time when you

10   considered yourself to be that officer, did you ever take

11   steps to implement ICS?

12        A.    I'm sorry.  There are a couple questions

13   there.

14        Q.    You said that at one point you did believe

15   that during the portion of this, you were the supervising

16   officer because you were the one that was directly in

17   touch with JLA, right?

18                 MR. MULLIN:  Object to the form.

19                 MR. ZUKHER:  Madam, would you read back

20        his response?

21                 (Requested portion read back.)

22   BY MR. ZUKHER:

23        Q.    Did you at that time implement ICS?

24        A.    At that time, yes, we were working towards

25   implementing ICS.
```

```
 1          Q.    Did you at that time request additional

 2    personnel, agencies, or resources -- any information from

 3    additional personnel or other people or other resources

 4    at that time?

 5          A.    When I had an armed suspect in front of me?

 6          Q.    Yeah.

 7          A.    I was -- no.  I identified the direction of

 8    travel and the suspect.

 9          Q.    Just a yes or no question I'm asking.

10                MR. MULLIN:  No, that wasn't a yes or no.

11                MR. ZUKHER:  Okay.  Very good.

12          Q.    Sir, did you request -- at that time, did you

13    request any additional personnel, agencies, or resources

14    for this incident?

15          A.    Yes.

16                MR. MULLIN:  At what --

17          Q.    Okay.  Who did you request?

18          A.    I advised other units responding of his

19    location.

20          Q.    What additional personnel did you request?

21          A.    That would be the personnel that were not

22    directly at that scene, personnel that were moving south

23    towards my location.

24          Q.    And what agencies or resources did you engage?

25          A.    The Onondaga County Sheriff's Department, the
```

1    State Police, and other units from --

2        Q.    And what did you say --

3            MR. MULLIN:  Let him finish the question,

4        please, Counsel.

5        A.    I just said the State Police, Onondaga County

6    Sheriff's Department, and other Dewitt units.

7        Q.    Sir, with regard to your summary of this event

8    that occurred that we had marked as Plaintiff's

9    Exhibit 1, is -- are the words "ICS" contained within

10   that document?

11       A.    In that document?

12       Q.    Yeah.

13       A.    No.

14       Q.    Does it say anywhere in that document you

15   tried to gather additional resources or request

16   additional personnel, agencies, or resources, does it say

17   anything like that at all?

18       A.    Not specifically.

19       Q.    Thank you, sir.  Does it say anywhere in there

20   that you requested a dedicated radio channel for this

21   incident?

22       A.    No, but one was already established.

23       Q.    What was the dedicated radio channel here?

24   You said there were multiple channels being used.

25            MR. MULLIN:  Object to the form of the

```
 1              question.

 2      A.    The dedicated channel was Channel 1.  There

 3 were multiple channels being used as other units were

 4 adding themselves to the call.

 5      Q.    Okay.  Did you ever make a request for a

 6 dedicated channel yourself?

 7      A.    No.  That had already been established.

 8      Q.    Okay.  All I'm asking is if you ever made that

 9 request yourself.

10              Now, the point at -- did you at any point that

11 you believed to be the -- did you at any point transfer

12 your command to anyone during this incident?

13              MR. MULLIN:  Object to the form.

14      Q.    Any command either perceived or actual, did

15 you at any point transfer your command to anyone?

16              MR. MULLIN:  Object to the form.

17      A.    Yes, command for the scene was transferred to

18 other individuals on scene when myself and Officer

19 Menard, or Investigator Menard, were transferred to the

20 hospital.

21      Q.    When you were transported to the hospital, at

22 that point you transferred command, that's the point,

23 after JLA was dead?

24      A.    Yes.

25      Q.    Thank you, sir.
```

```
1                  No other point in time did you transfer

2    command to anyone?

3         A.    No.

4         Q.    Who would have made the decision about a

5    command post, about establishing a command post, who

6    would have made that decision?

7                  MR. MULLIN:  Object to the form.

8         A.    It would depend.

9         Q.    Depend on what, sir?

10        A.    Depend on the situation.

11        Q.    Okay.  In this situation, who should have made

12   this decision?

13                 MR. MULLIN:  Object to the form.

14        A.    Again, that's conjecture.  It depends on --

15        Q.    You were one of the -- one of the responding

16   officers.  You had direct contact with JLA.  You said at

17   one point you had command.

18                 MR. MULLIN:  Object to the form.  You're

19            arguing --

20                 MR. ZUKHER:  I haven't even finished

21            asking my question.

22                 MR. MULLIN:  My apologies.

23                 MR. ZUKHER:  Thank you.  Now I don't even

24            know what I was going to ask.  Thanks, man.

25
```

1    BY MR. ZUKHER:

2        Q.    Whose decision would that have been here, to

3    establish a command post --

4                  MR. MULLIN:  Object to the form.

5        Q.    -- if not yours?

6                  MR. ZUKHER:  I haven't even finished my

7              question.

8        A.    It depends.

9        Q.    Depends on what?

10       A.    Depends on a myriad of different --

11       Q.    Whose decision would that have been in this

12   case?

13                 MR. MULLIN:  Object to the form.

14       A.    It would be -- it would depend on who

15   establishes command.

16       Q.    And who established command here?  You said at

17   one point you believe you had command, so I'm asking you:

18   Who made the decision to establish or not establish a

19   command post, who was responsible for that decision?

20                 MR. MULLIN:  Object to the form.

21       A.    At the point where I was the contact officer,

22   I did not have the opportunity to establish a command

23   post, and it was irrelevant to the situation.

24       Q.    Did you even try?

25       A.    Did I try to establish a --

1        Q.    Did you try to establish a command post, yes.

2        A.    -- command post when somebody was aiming a gun

3    at me?  No.

4        Q.    No, sir.  The minute you arrived on the scene,

5    somebody aimed a gun at you?

6                    MR. MULLIN:  Object to the form.  Let's

7             take a break for a minute.  This is getting

8             off the rails.

9                    MR. ZUKHER:  There's a pending question.

10                   MR. MULLIN:  Answer the question.  Let

11            him answer it.

12                   (Requested portion read back.)

13                   MR. MULLIN:  Answer that question.

14                   THE WITNESS:  No.

15                   MR. ZUKHER:  Thank you.

16                   MR. MULLIN:  Thank you.

17                   (Off record:  12:11 p.m. to 12:18 p.m.)

18   BY MR. ZUKHER:

19       Q.    Sir, what was your understanding as to who the

20   lead agency was in this incident?

21       A.    I didn't know.

22       Q.    Did you ever come to know?

23       A.    I think you told me that it was the State

24   Police in the end.

25       Q.    Would that have been the first person that

1    arrived, the first officer that arrives is typically the

2    lead agency?

3        A.    Typically.

4        Q.    Okay.  And it would have been so in this case,

5    correct?

6        A.    It depends.

7        Q.    Depends on what?

8        A.    Depends on who assumes control, who decides to

9    take the --

10        Q.    But ultimately, as you sit here, at the time

11    that this was going on, you had no idea who the lead

12    agency was?

13        A.    No.

14        Q.    Or who the supervising officer in charge was?

15        A.    No.

16        Q.    At no time during this incident where you

17    pursued JLA over the course of close to an hour, did you

18    ever make a call to determine who the supervising officer

19    was?

20                MR. MULLIN:  Object to the form of the

21            question.

22        A.    I'm sorry.  You said?

23        Q.    Did you, yourself, throughout the duration of

24    this incident ever make a call and say, hey, who's in

25    charge here?

1          A.     Did I make a telephone call, no.

2          Q.     Or a dispatch call or anything?  Police

3     officers, I guess, do use their cell phones but everybody

4     uses the radio.  So did you ever use the radio or any

5     other means of communication to contact any other person

6     to say, hey, who's in charge here?

7          A.     No, I did not.

8          Q.     Okay.  Are you aware whether the individual

9     that was with you -- who was that, that was --

10                MS. PAVESE:  Matt Menard.

11         Q.     Mr. Menard, whether he ever made a call to

12    determine who was in charge?

13         A.     I don't believe he did, no.

14         Q.     What steps did you, yourself, sir, take to

15    establish or to implement ICS?

16         A.     I moved to contain the suspect, helped to

17    prevent any threats to the public or the suspect or other

18    parties.

19         Q.     Did you, yourself, make any additional request

20    for additional personnel, agencies, or resources?

21         A.     Again, in the aspect of when I considered

22    myself in control, when I was in the presence of the

23    suspect, yes, I did request -- I did tell other units our

24    location, to request units respond to that location.

25         Q.     Okay.  What other resources did you request?

1        A.      Other officers.

2        Q.      Is that contained within your narrative, that

3    you requested additional resources from other officers?

4                    MR. MULLIN:  Object to the form.

5        A.      No, not specifically.

6        Q.      Thank you, sir.

7                Did you, yourself, request that a dedicated

8    channel be used?

9        A.      I did not, because one had already been

10   established.

11       Q.      Okay.  All I asked was:  Did you make that

12   request?  Okay.

13               Does it say in your narrative anything about

14   requesting that one channel, one channel be used?

15       A.      No, because it was already established.

16       Q.      Sir, all I said was --

17                    MR. MULLIN:  Please don't argue with the

18                    witness.  He's answered --

19                    MR. ZUKHER:  Instruct your witness to

20                    answer my questions.  All I asked was is it

21                    contained in his narrative, not why it's not

22                    contained in his narrative.

23                    MR. MULLIN:  Thank you.

24                    MR. ZUKHER:  You're welcome, sir.

25

```
 1   BY MR. ZUKHER:

 2       Q.    Sir, did you ever formally transfer command to

 3   any supervisor or commanding officer to take charge of

 4   the scene?

 5       A.    What is formally -- what do you mean by

 6   formally transfer command?

 7       Q.    One of your duties when you implement ICS is

 8   under Subsection L, it says:  Transfer incident command

 9   to a supervisor or command officer who will be taking

10   charge of the scene.  I'm asking you if you did that?

11       A.    Control of the scene was transferred to

12   another party after I left the scene, yes.

13       Q.    Does it say that in your narrative, sir, that

14   you ever transfer command here?

15       A.    No.

16       Q.    What was your plan, what was your action plan

17   that you developed?

18       A.    The action plan was to contain the suspect and

19   develop communication.

20       Q.    Does it say that in your narrative, sir?

21       A.    Yes, it says that we both entered the woods

22   near the northwest corner of the residence --

23       Q.    No.

24             MR. MULLIN:  Let him finish the answer,

25             sir.
```

1        A.     Observed JLA in the clearing to the west.  We

2    began verbal commands to drop the gun.  So yes, it was us

3    trying to open up dialogue and we radioed for other

4    units.

5        Q.     Did you, yourself, sir, reach out to any

6    mental health professionals or mobile crisis units with

7    regard to this incident?

8        A.     No.

9        Q.     Under Number 6 of Duties of Supervising

10   Officer, it says:  Organize and brief subordinate

11   personnel about the incident and their duties.  Did you

12   debrief --

13              MR. MULLIN:  Objection.

14       Q.     -- anybody here about -- did you give

15   instructions to --

16              MR. ZUKHER:  I haven't even finished my

17              question.  The fourth time it's happened.

18              MR. MULLIN:  My apologies.  When you

19              stop, I assume you're done.

20              MR. ZUKHER:  All right.  Well, wait for

21              me to stop.

22              MR. MULLIN:  That's a great idea.  Thank

23              you.

24   BY MR. ZUKHER:

25       Q.     Sir, did you ever give any directions to any

1    subordinate personnel with regard to this incident?

2         A.    I would say telling individuals what the

3    location was, was giving direction.

4         Q.    Does it say that, that you give any specific

5    directions besides those in your narrative?

6         A.    Yes.  Where it says that I explained that he

7    was traveling in the wooded area.

8         Q.    I understand.  That was your brief to your

9    subordinate personnel, is that your testimony here today,

10   that you told them he was in a wooded area, is that your

11   testimony here today?

12               MR. MULLIN:  Object to the form.

13        Q.    That your briefing of this was that JLA was in

14   a wooded area, is that your position, sir?

15               MR. MULLIN:  Object to the form.

16        A.    In a dynamic situation and what I had the

17   ability to convey for information and brief individuals,

18   yes.  I'm not going to be -- call people into a group

19   of -- I don't have the time to say, hey, let's huddle up

20   and figure out what's going on.

21        Q.    You had almost an hour here, sir.

22               MR. MULLIN:  Object to the form.

23        Q.    Almost an hour.  You didn't have the time to

24   do that?

25               MR. MULLIN:  Object to the form.

1         A.    The point where you're indicating -- or that

2    I'm indicating that I felt that I was in charge was a

3    matter of minutes, it was not within an hour.

4         Q.    Okay.  So what did you do during those

5    minutes?  Did you do any of these things that it says in

6    your manual?

7         A.    I think I just walked through those with you.

8         Q.    This manual is designed for a successful

9    resolution.  Do you believe this incident had a

10   successful resolution?

11              MR. MULLIN:  Object to the form.

12        A.    That would depend on what the situation was.

13        Q.    Sir, I'm asking you whether you feel that this

14   incident achieved a successful resolution as set forth in

15   your manual?

16              MR. MULLIN:  Well, object to the form.

17        Q.    That your manual calls for --

18              MR. MULLIN:  Object to the form.

19        Q.    -- that's set forth in your manual?

20              MR. ZUKHER:  I haven't even finished my

21         question --

22              MR. MULLIN:  You keep stopping.

23              MR. ZUKHER:  -- for the fifth time.

24   BY MR. ZUKHER:

25        Q.    Do you believe that it was a successful

1    resolution in this case?

2                    MR. MULLIN:  Object to the form.

3        A.    It doesn't define what a successful resolution

4    is.

5        Q.    I'm asking how you feel.  I'm not asking what

6    it defines.  I'm asking whether you feel this case was

7    brought to a successful resolution?

8                    MR. MULLIN:  Object to the form.

9        A.    Again, it's -- I'm -- I don't understand

10   how --

11       Q.    You don't know what a successful resolution

12   is, sir?

13       A.    How do you define a successful resolution?

14       Q.    It's defined within your guidelines.  You're

15   supposed to be familiar with those guidelines.  They are

16   applicable --

17       A.    It does not define successful

18   resolution --

19       Q.    Do you feel that this was a successful

20   resolution?

21                   MR. MULLIN:  Object to the form.

22       A.    What's your definition of a successful

23   resolution?

24       Q.    Do you feel you did good police work in this

25   case?  That's successful resolution.

1        A.    I feel I did appropriate police work.

2        Q.    Do you feel you did good police work in this

3   case where you feel like there was good communication

4   between the parties here?

5                  MR. MULLIN:  Object to the form of the

6             question.

7        A.    I believe there was adequate communication

8   among officers, yes.

9        Q.    Okay.  Sir, are you aware of whether any

10  agency on the scene or your agency had access to drones

11  or other type devices like that?

12       A.    I believe State Police has access to drones.

13       Q.    Are you aware whether that was -- whether that

14  device was employed in this incident?

15       A.    I'm not aware.

16       Q.    Did you ever see a drone yourself?

17       A.    I did not see a drone.

18       Q.    Okay.  Did you ever inquire about a drone or a

19  drone operator?

20       A.    I did not.

21       Q.    Was there a negotiator that was there, a

22  formal negotiator that was put in place here to talk to

23  JLA?

24       A.    There was a negotiator on scene, yes.

25       Q.    Okay.  Do you know whether he talked to JLA?

```
 1                    MR. MULLIN:  Object to the form.

 2         A.    At the time, I did not.

 3         Q.    At the time of the shooting, you had no idea

 4    whether or not the negotiator had even spoken to JLA or

 5    what the results of those negotiations may have been or

 6    not been?

 7         A.    Correct.

 8         Q.    Who was the -- strike that.

 9               Who was the negotiator in this case?

10         A.    I don't know if she was assigned as a

11    negotiator, but I know that Officer Wickes was.

12         Q.    Do you know the full name of that officer,

13    sir?

14         A.    Officer Stacey Wickes.  Again, I don't know if

15    she was assigned as a negotiator, but I do know that she

16    has negotiating training.

17         Q.    Okay.  At the time that you discharged your

18    service weapon at JLA, had you even talked to Stacey

19    Wickes about JLA?

20         A.    I did not.

21         Q.    Did you know what the status was or was not of

22    any negotiations that had taken place at that time?

23         A.    I knew that nobody was in contact with him,

24    and that he was traveling southbound, and he posed a

25    threat.
```

1      Q.    How did you know that, sir, how did you know

2    that nobody had talked to him?

3      A.    I didn't say nobody talked to him.

4      Q.    You said nobody had been in contact with him,

5    so did you --

6      A.    I said that nobody was in contact with him,

7    because he was traveling southbound.

8      Q.    Okay.

9      A.    Nobody had eyes on him.  His last location was

10   behind a residence on Apulia Road.

11     Q.    Did you know at any point that you arrived to

12   the scene and pursued him, did you know whether anybody

13   had talked to JLA?

14     A.    I didn't know.

15     Q.    Including Ms. Wickes?

16     A.    I did not know.

17     Q.    Did you ask yourself, did you say, hey, is

18   there a negotiator, has anybody talked to this kid; did

19   you say that?

20     A.    No.

21     Q.    Didn't get any of that information prior to

22   shooting?

23     A.    No.  My concern was containment first.

24     Q.    I didn't ask you what your concern was.  I

25   asked if you obtained the information or not.

1              MR. MULLIN:  Please don't argue with the

2         witness.

3              MR. ZUKHER:  Please instruct your witness

4         to answer my questions and I won't have to

5         argue with him.

6              MR. MULLIN:  The question allowed him to

7         answer.

8              MR. ZUKHER:  Clearly nonresponsive.

9    BY MR. ZUKHER:

10        Q.    Did you, yourself, sir, either speak with any

11   mental health crisis individual or any doctor prior to

12   the shooting?

13        A.    No.

14        Q.    Were you aware, sir, that prior to -- this

15   incident commenced with St. Joseph's Mobile Crisis Team

16   Unit being on the scene.  Were you aware that they were

17   involved in this incident?

18        A.    Not specifically, no.

19        Q.    At the time of the shooting, were you aware

20   that the Mobile Crisis Unit had been on scene and, in

21   fact, was looking for a pick-up order for JLA, was trying

22   to get a pick-up order out for JLA, were you aware of

23   that prior to your shooting?

24              MR. MULLIN:  Multiple questions.

25         Objection.

1          Q.    If you don't understand what I'm asking, you

2     can answer.

3          A.    I don't recall.

4          Q.    Don't recall whether you ever spoke to anyone

5     from MCO?

6          A.    I didn't speak to anybody.  I was answering

7     the other questions you asked whether I was aware.  I

8     don't recall if I was aware.

9          Q.    Okay.  So you definitely didn't speak to

10    anybody from MCO, right?  Are you aware whether

11    any -- anybody that you were aware of on the scene that

12    you had contact with that day, whether they spoke to

13    anybody from MCO?

14         A.    I don't know.

15         Q.    Did you observe anybody speaking to MCO?

16         A.    No.

17         Q.    Did you, yourself -- you had two prior

18    interactions with JLA, correct?

19         A.    Yes.

20         Q.    And you said that based on those interactions,

21    you believe that he had a mental illness?

22         A.    No, I didn't say that.

23         Q.    Or that there were some mental issue with him,

24    right?

25                    MR. MULLIN:  Object to the form.

1       A.      No, I didn't.

2       Q.      Did you at any point stop and say, hey, I

3    haven't heard from a supervising officer, maybe I should

4    make a call, did you ever do that?

5       A.      No.

6       Q.      Did you ever say, hey, nobody's giving me

7    directions on anything on this thing, maybe I need to get

8    some information, did you do that?

9       A.      No.

10      Q.      Did you ever even inquire whether there was

11   some negotiations going on, or whether Ms. Wickes had a

12   chance to speak with JLA, or whether there was some other

13   possibilities that things could continue without the use

14   of deadly force, did you ever make that call during the

15   entirety of the time that you were on the scene?

16      A.      I'm sorry.  What was the question?

17      Q.      Strike the question.

18              You never made a call for a crisis negotiator

19   and never spoke to Ms. Wickes prior to discharging your

20   weapon?

21      A.      No.

22      Q.      And didn't speak with any other mental health

23   providers prior to discharging your weapon?

24      A.      No.

25      Q.      And didn't even know that MCO was on scene and

```
 1   that's how this incident commenced?

 2                  MR. MULLIN:  Object to the form.

 3        A.    Again, I don't recall.

 4        Q.    Okay.  And don't recall ever finding out

 5   anything about JLA before you shot him, that he had

 6   mental health issues?  Did anybody advise you that this

 7   child was mentally ill prior to the time that you

 8   discharged your weapon?

 9        A.    Did anybody --

10        Q.    Advise you that this child had serious mental

11   health issues and had threatened suicide by cop before,

12   did anybody advise you of that, sir, prior to you

13   discharging your service weapon?

14                  MR. MULLIN:  Object to the form.

15        A.    There were a couple questions there.

16        Q.    No.  It's all the same question.

17                  MR. ZUKHER:  Read it back, Madam.

18                  (Requested portion read back.)

19        A.    I don't recall.

20                  MR. ZUKHER:  Can I have this marked as

21             Exhibit 3?

22                  (Exhibit 3 marked for identification.)

23                  (Off record:  12:35 p.m. to 12:41 p.m.)

24   BY MR. ZUKHER:

25        Q.    Sir, I'm going to show you what's been marked
```

1    as Plaintiff's Exhibit 3.  Can you take a look at that

2    document, please, for me?

3        A.    Yes.

4        Q.    Let me know when you're ready.

5        A.    Okay.

6        Q.    Sir, have you ever seen this document before?

7        A.    I don't recall seeing it before.

8        Q.    Okay.  Did you know that it existed?

9        A.    The document itself, no.  I know that there

10   was an understanding between Liberty Resources and --

11       Q.    Prior to you discharging your weapon on

12   March 4th, 2021, were you aware of this memorandum of

13   understanding as part of the policies and procedures of

14   the Dewitt Police Department?

15            MR. MULLIN:  Object to the form of the

16            question.

17       A.    I was aware of an agreement between liberty

18   Resources and the Town of Dewitt.

19       Q.    And you were aware of what the basis of that

20   agreement was?

21       A.    Yes.

22       Q.    Okay.  Did you at any point during the

23   incident of March 4th, 2021 contact Liberty Resources as

24   per your protocols here?

25            MR. MULLIN:  Object to the form.

1      A.    I wouldn't say as per my protocols.  No, I did

2  not make any contact with them.

3      Q.    Sir, do you see Exhibit 3 that you're holding

4  in your hand, do you see almost down towards the bottom

5  of the page, it says:  The undersigned agree to adhere to

6  the following policies, practices and protocols?

7              MR. MULLIN:  That is not what it says.

8      Q.    It says:  The undersigned agree to adhere to

9  the following practices and protocols.

10             MR. MULLIN:  That's more correct.  Thank

11        you.

12             MR. ZUKHER:  Thank you.

13     Q.    Do you see where it says that, sir?

14     A.    Yes.

15     Q.    Were you aware of this policy and protocol on

16  March 4th, 2021?

17             MR. MULLIN:  Object to the form.

18     A.    Again, I was aware of the existence of it and

19  the working knowledge of working with Liberty Resources.

20     Q.    Did you call Liberty Resources during the

21  incident of March 4th, 2021?

22     A.    I did not.

23     Q.    Are you aware that anybody else did that was a

24  member of the Dewitt Police or your agency?

25     A.    I'm not aware.

1      Q.    Were you trained with regard to this

2   memorandum, sir?  Did you receive special training, or

3   did you receive this memorandum?  How were you aware of

4   this memorandum?

5                MR. MULLIN:  Object to the four

6           questions.

7      Q.    Strike all four.

8           How were you aware of this memorandum?

9      A.    I was aware that Liberty Resources was a tool

10   that could be utilized by us.

11     Q.    But you did not utilize that tool?

12     A.    I didn't call Liberty Resources, no.

13     Q.    And nobody that you're aware of from the

14   Dewitt Police did, either, correct?

15     A.    I don't know.

16     Q.    Thank you, sir.

17          And I think I already asked you, sir, whether

18   you were aware that this incident commenced -- that when

19   this incident started at Ms. Albahm's residence, that the

20   Mobile Crisis Unit had been dispatched to that location.

21   Were you aware of that?

22     A.    I don't recall.

23     Q.    Okay.  And you don't recall speaking to

24   anybody from the Mobile Crisis Unit from St. Joseph's?

25     A.    I did not, no.

1        Q.    Did anybody from the Mobile Crisis Unit at St.

2   Joseph's provide you with any information about JLA?

3        A.    No.

4        Q.    Are you aware of whether anybody from the

5   Mobile Crisis Unit at St. Joseph's provided either you or

6   anyone else with information about JLA throughout the

7   entirety of this incident?

8        A.    I don't know.

9        Q.    Thank you, sir.

10            Did you ever, yourself, prior to the shoot on

11  March 4th, 2021 ever see a pick-up order for JLA?

12       A.    Did I specifically see a pick-up order, no.

13       Q.    Okay.  And I apologize.  I might have asked

14  you, but it's getting late in the day.  Did you,

15  yourself, reach out to either MCO or Liberty Resources?

16  When I refer to MCO, I mean that's St. Joe's.

17       A.    No, I did not.

18       Q.    Okay.  Sir, were you aware whether on

19  March 4th, 2021 any K-9s were available either from the

20  Dewitt Police or any other responding agency?

21       A.    I don't know.

22       Q.    Did you ever inquire as to the availability of

23  a K-9 as a less lethal means to effectuate the result

24  that occurred here?

25       A.    No, I did not.

```
 1        Q.    Was there any air support available that could

 2   have observed JLA and given information to the police,

 3   such as a helicopter?

 4        A.    I don't know.

 5        Q.    Did you, yourself, ever call for air support?

 6        A.    I did not.

 7        Q.    Did you inquire during this incident whether

 8   air support was present and available?

 9        A.    I did not.

10        Q.    Did you inquire to anyone as to what

11   negotiations were had with JLA?

12        A.    I did not.

13        Q.    Would it be fair to say, sir, you didn't

14   activate -- you, yourself, did not activate ICS or

15   implement ICS?

16        A.    Again, if we're talking the point where I came

17   in contact with JLA, yes, it was implemented to a degree

18   and that we went through, notified personnel to come,

19   tried to establish communication.

20        Q.    I understand.  You, yourself, made -- you,

21   yourself, had a nonlethal on you at the time of the

22   shoot, correct?

23        A.    I did.

24        Q.    And other individuals on the scene, other law

25   enforcement on the scene, had non-lethals, as well,
```

1    correct?

2        A.    They did.

3        Q.    And you did not inquire or request

4    non-lethals, that somebody else bring some -- that

5    somebody else bring another non-lethal?

6        A.    Yes, they did.

7        Q.    Did you ask them to bring it?  Did you ask

8    them to use those things?

9        A.    I asked where they were.

10       Q.    Okay.  What else did you do besides asking

11   where they were?

12       A.    I made contact with the suspect, worked

13   towards containment --

14       Q.    No.  I'm asking about --

15             MR. MULLIN:  Object to the form.  Let him

16        finish the answer.

17             MR. ZUKHER:  It's nonresponsive.

18             MR. MULLIN:  In your opinion.

19             MR. ZUKHER:  Right, and the only way to

20        look at that.

21   BY MR. ZUKHER:

22       Q.    Sir, I'm asking you whether you, yourself,

23   called anybody else to request additional non-lethals?

24       A.    I worked towards containment so that less

25   lethal could be utilized, or in the event that less

1    lethal could be utilized.

2        Q.    Carefully listen to my question.  Did you,

3    yourself, call anyone to request additional non-lethals?

4        A.    I called and identified the location of the

5    individual.  I knew that non-lethal was present and I

6    told them directly travel in our location.

7        Q.    Did you ask them to bring the non-lethal?

8        A.    I asked where the non-lethal was, and that's

9    an implication of bring the non-lethal.

10       Q.    I understand.  You didn't use your own

11   non-lethal, correct?

12       A.    I did not.

13       Q.    Even though it was on your person and

14   available to you, correct?

15               MR. MULLIN:  Object to the two questions.

16       Q.    It was on your person, correct?

17       A.    Yes.

18       Q.    And it was available -- therefore, available

19   to you for use, correct?

20       A.    It would not have been an effective tool.

21       Q.    Okay.  You just chose a different tool, but it

22   was available for you to use, correct?

23       A.    It was available for me to use if it --

24       Q.    Thank you.

25               MR. MULLIN:  Go ahead, finish answering

1            the question.

2       A.    It was available to use if the opportunity to

3  utilize less lethal was present or presented itself.

4       Q.    I understand.  Didn't call for a K-9, didn't

5  ask about a K-9 unit or inquire about a K-9 unit?

6       A.    I did not.  It was a rapidly-evolving

7  situation.

8       Q.    The situation from the first phone call that

9  was made for the police was made around 12:25.  Were you

10  aware of that, sir?

11            MR. MULLIN:  Object to the form.

12      A.    No, I'm not aware of when.

13      Q.    There was police presence on the scene from

14  about 12:25 to about 1:15, when JLA was killed.  The

15  police were on the scene for longer than an hour and a

16  half, did you know that?

17      A.    I did not.

18      Q.    And you, yourself, don't recall how long you

19  were there for, right?

20      A.    No.

21      Q.    Of course not.

22            MR. MULLIN:  Please don't do the

23            commentaries.

24      Q.    And you didn't ask anything about air support?

25      A.    I did not.

1          Q.    So would it be fair to say, sir, that you

2     arrived to the scene, pursued JLA into the woods and shot

3     him?

4                    MR. MULLIN:  Object to the form.

5          Q.    Would that be fair to say?

6          A.    No, it wouldn't be fair to say.

7          Q.    Thank you, sir.

8                    MR. ZUKHER:  I have no further questions.

9                    Let me talk to my paralegal.  I have no

10                   further questions.

11                        (Brief discussion off the record.)

12                        (Exhibit 4 marked for identification.)

13    BY MR. ZUKHER:

14         Q.    I'm going to show you, sir, what's been

15    previously marked by the Court Reporter as Exhibit

16    Number 4.  You can tear off that cover sheet.

17         A.    (Witness complies.)

18         Q.    I'm going to ask you to take a look at that

19    document and ask you if you've ever seen this document

20    before?

21         A.    Yes, I have seen it briefly.

22         Q.    Have you read and reviewed that document?

23         A.    I briefly skimmed it when it first came out.

24         Q.    Did you, yourself, make any objections to this

25    document formally?

1               MR. MULLIN:  Object to the form.

2       Q.    Did you make any formal objections to anyone,

3   including anyone at the Dewitt Police or anybody at the

4   State Police, with regard to any objection to what's

5   contained within this document?

6               MR. MULLIN:  Object to the form.

7       A.    I didn't make any formal objections, no.

8       Q.    Thank you, sir.

9             I'm going to ask you to flip right to the

10  back, and I'm going to ask you to --

11              MR. MULLIN:  Last page?

12              MR. ZUKHER:  Mm-hmm, Page 27 and 28.

13      Q.    I'm going to ask you -- go right to the

14  paragraph that starts:  In each county, NYSP and other

15  law enforcement agencies should establish a protocol to

16  improve coordination during multi-agency calls.  Do you

17  see where it says that?

18      A.    Yes.

19      Q.    Would you read that paragraph for me and look

20  up when you're done?

21      A.    (Witness complies.)

22              MR. MULLIN:  Where are you, Dave?  I

23              don't know where you are.

24      Q.    Just read the rest to the end and look up when

25  you're done.

1      A.    Read it to you?

2      Q.    No.  No, sir, to yourself.

3      A.    Okay.

4      Q.    Sir, I'm going to start with the paragraph,

5  first paragraph -- let me ask you this in general.  Do

6  you dispute anything that's in there?

7               MR. MULLIN:  In where?

8               MR. ZUKHER:  In that section that starts

9           with Each County.

10              MR. MULLIN:  The paragraph you just asked

11          him to read?

12              MR. ZUKHER:  I asked him to read from in

13          each county all the way to the end.

14              THE WITNESS:  Oh, all the way to the end?

15          I just read that paragraph.

16              MR. MULLIN:  He was just reading the

17          paragraph.  Read the whole report.

18              MR. ZUKHER:  No, no, not the whole

19          report.

20              MR. MULLIN:  I mean the page.  Relax,

21          relax, relax.  You want the whole second page

22          read, too?

23              MR. ZUKHER:  Please.

24              MR. MULLIN:  Okay.

25              MR. ZUKHER:  Two paragraphs, three

1          paragraphs.

2                    THE WITNESS:  Okay.

3    BY MR. ZUKHER:

4          Q.    Sir, do you disagree with any of those

5    statements contained within what you just read?

6                    MR. MULLIN:  Object to the form.

7          A.    Yes.

8          Q.    Tell me which statements you disagree with,

9    sir?

10                    MR. MULLIN:  I'll continue the objection

11              to this, but go ahead.

12          A.    I would say that there was a decent amount of

13    interagency coordination or communication.

14          Q.    Let me stop you right there, sir.  You

15    testified here today you did not know who was in command

16    of this incident.  Do you believe that that's good

17    communication?

18          A.    Yes, there was communication as far as where

19    people were located, what the last -- what the

20    description of the suspect was, what his direction of

21    travel was, the threat that he posed to the public, the

22    fact that he had what appeared to be a handgun in his

23    possession.

24          Q.    How about the fact that the mom told Trooper

25    Fike and, in fact, dispatch said it, too, you said you

1    listened to the dispatch, that he had an airsoft gun?

2              MR. MULLIN:  Object to the form.

3              MR. BANAS:  Objection.

4        Q.    How was that communicated?

5        A.    They did not say that he had an airsoft gun.

6        Q.    Okay.  So you believe that communications here

7    were good, and that you were -- at one point, you claimed

8    to assume operational control of this situation for a

9    period of time, yet you did not know who the lead officer

10   in charge here was --

11             MR. MULLIN:  Object to the form.

12       Q.    -- and you didn't know who the first responder

13   was, and you didn't know whether MCO had arrived, you

14   believe that those are good communications, sir?

15             MR. MULLIN:  Object to the five

16             questions.

17       A.    Pertinent information was relayed in a

18   rapidly-evolving situation where we were working to

19   contain a suspect.

20       Q.    The situation was over an hour --

21       A.    And it was rapid --

22       Q.    -- there's nothing rapid about it.

23       A.    It was rapidly evolving throughout that hour.

24       Q.    I understand.  Over the course of an hour.  I

25   understand.

1              What else do you disagree there with, sir?

2                   MR. MULLIN:  Just a continuing objection

3              to his agreement or disagreement with --

4                   MR. ZUKHER:  -- lodge a general objection

5              to the whole deposition.

6                   MR. MULLIN:  No, I wouldn't do that.  I

7              wouldn't do that.

8                   MR. ZUKHER:  That's what's been happening

9              every time.

10     A.    I believe that it kind of has a simplified

11     view of the situation in that we were still working on

12     containment of the suspect, and at that point in time,

13     like, as far as safety concerns for the public and others

14     involved, we were not at the point where we could

15     establish a perimeter.  We needed to contain the suspect

16     prior to establishing a perimeter and developing a

17     command structure if that was appropriate.

18                  MR. ZUKHER:  Thank you, sir.  I have no

19             further questions.

20                  MR. MULLIN:  Gentleman?

21                  MR. BANAS:  I have nothing.

22                  MR. ZUKHER:  See you tomorrow.

23                  MR. SICKINGER:  No questions.

24                  MS. PAVESE:  Dave, they may have

25             questions.

1                    MR. ZUKHER:  Oh, geez.

2                    MR. MULLIN:  They said no while you were

3           getting up.  Off the record.

4                    (Proceedings concluded at 1:02 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3           I, ELYSE M. ADDABBO, Court Reporter and

4    Notary Public, certify:

5           That the foregoing proceedings were taken before me

6    at the time and place therein set forth, at which time

7    the witness was put under oath by me;

8           That the testimony of the witness and all

9    objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12          That the foregoing is a true and correct transcript

13   of my shorthand notes so taken;

14          I further certify that I am not a relative or

15   employee of any attorney or of any of the parties nor

16   financially interested in the action.

17

18

19                    _Elyse M addabbo_

20

                      ELYSE M. ADDABBO, Court Reporter
21                    Notary Public

22

23

24

25

1                    A C K N O W L E D G M E N T

2

3

4

5         I hereby certify that having been first duly sworn

6    to testify to the truth, I gave the above testimony on

7    January 10, 2024.

8

9         I FURTHER CERTIFY that the foregoing transcript is

10   a true and correct transcript of the testimony given by

11   me at the time and place specified.

12

13

14

15                         _____

16                         LUCAS BYRON

17

18

19   Subscribed and sworn to before me

20   this _____ day of _____, 20___.

21

22   _____

23   Notary Public

24

25

```
 1              E R R A T A   S H E E T

 2   Deponent: LUCAS BYRON

 3   Deposition Date: January 10, 2024

 4   PAGE    LINE CHANGE FROM/TO        REASON FOR CHANGE

 5   ____    ____ _____    _____

 6   ____    ____ _____    _____

 7   ____    ____ _____    _____

 8   ____    ____ _____    _____

 9   ____    ____ _____    _____

10   ____    ____ _____    _____

11   ____    ____ _____    _____

12   ____    ____ _____    _____

13   ____    ____ _____    _____

14   ____    ____ _____    _____

15   ____    ____ _____    _____

16   ____    ____ _____    _____

17   ____    ____ _____    _____

18   Under penalties of perjury, I declare that I have read
     the foregoing deposition and hereby affix my signature
19   that same is true and correct, except as noted above.

20   _____        _____
                LUCAS BYRON                       DATE
21

22   Subscribed and sworn to before me
     this _____ day of _____, 20___.
23
     _____
24   Notary Public

25
```

**WORD**
**INDEX**

**< 1 >**
**1**    4:5
  5:3
  81:18,
  19, 23
  86:3
  96:9
  97:2
**1:02**
  1:15
  130:4
**1:15**
  123:14
**10**    1:14
  132:7
  133:3
**10:03**
  1:15
**109**    2:4
**10th**
  2:17
**11**    5:12
**11:00**
  59:11
**11:11**
  59:11
**11:36**
  81:20
**11:42**
  81:20
**115**    4:6
**12:11**
  100:17
**12:18**
  100:17
**12:25**
  123:9, 14
**12:35**
  115:23

**12:41**
  115:23
**124**    4:9
**13202**
  1:18
  2:5, 12,
  18
**14202**
  2:23
**17**    5:8
**1-B**
  90:25

**< 2 >**
**2**    4:6
  5:8
  85:15,
  16, 19
  86:14
  90:22, 23
**20**
  132:20
  133:22
**200**    2:23
**2005**
  9:11
**2008**
  9:11
**2009**
  9:13
**2015**
  10:5
**2019**
  10:8
**2020**
  10:8, 9
**2021**
  13:4
  15:9
  25:21
  26:24
  32:4
  33:16,

*21*
  *34:23*
  35:7
  42:13
  44:14
  48:22
  51:21
  52:3
  55:22
  63:9
  64:12,
  *22*
  65:18
  66:1
  68:6
  72:21
  93:16
  116:12,
  *23*
  117:16,
  *21*
  119:11,
  *19*
**2024**
  1:14
  132:7
  133:3
**211**
  1:17
  2:11
**22202**
  1:21
**24**    5:3
**25**    5:8
**27**
  125:12
**28**
  125:12

**< 3 >**
**3**    4:6
  5:12
  92:4

  115:21,
  *22*
  116:1
  117:3
**30**    6:5

**< 4 >**
**4**    4:9
  5:3
  66:1
  87:24
  90:24,
  *25*
  124:12,
  *16*
**421**    2:17
**4th**
  13:4
  15:9
  25:21
  26:24
  31:18
  32:4, 11
  33:16,
  *21*
  34:23
  35:7
  42:13
  44:13
  48:22
  51:20
  52:2
  55:22
  63:9
  64:12,
  *22*
  65:18
  68:6
  72:21
  93:16
  116:12,
  *23*
  117:16,

*21*
  119:11,
  *19*

**< 5 >**
**5:22-cv-**
**00287**
  1:5

**< 6 >**
**6**    105:9

**< 7 >**
**7**    3:5
**711**    2:4

**< 8 >**
**80**    5:12
**81**    4:5
**85**    4:6

**< 9 >**
**900**    2:22

**< A >**
**a.m**
  1:15
  59:11
  81:20
**abbreviate**
**d**    91:10
**ability**
  106:17

**absolutely**
  76:3
**academy**
  9:4
  10:22,
  *24*
  11:15
  12:23
  15:5

access
  109:10,
  12
accident
  39:9
  52:25
  53:15
achieved
  107:14
act
  22:17
action
  104:16,
  18
  131:16
activate
  92:1
  120:14
activated
  88:21
  89:17,
  25   91:2

Activation
  88:17
actual
  97:14
add
  5:10
  25:19
Addabbo
  1:18
  131:3, 16
adding
  97:4

additional
  17:13
  47:5
  95:1, 3,
  13, 20
  96:15,
  16

102:19,
20
  103:3
  121:23
  122:3
address
  5:6
  24:8
addressed
  49:15
adequate
  109:7
adhere
  117:5, 8
advise
  18:2
  41:23
  49:5
  115:6,
  10, 12
advised
  17:24
  35:6
  45:5, 7,
  9   49:3,
  8, 12, 21
  51:20,
  22   52:2,
  4, 5, 8,
  14, 16,
  17
  53:24
  56:2
  95:18
affect
  51:13
affix
  133:18
agencies
  35:21
  36:13,
  19, 24
  37:10

41:7
  54:23
  86:18
  87:1
  90:1, 19
  91:2, 5,
  8  95:2,
  13, 24
  96:16
  102:20
  125:15
agency
  9:15
  41:11,
  13, 14,
  16, 20,
  24  44:1,
  16
  57:20
  58:6, 13
  63:8
  84:4
  100:20
  101:2,
  12
  109:10
  117:24
  119:20
agent
  64:20
agree
  90:5, 9
  117:5, 8
AGREED
  6:1, 3,
  7, 9, 11
  7:9
agreement
  116:17,
  20  129:3
ahead
  13:8
  14:7, 8

21:3
  22:4
  49:7
  63:12
  64:16
  77:9
  79:17
  90:8
  122:25
  127:11
aid
  71:16
aimed
  100:5
aiming
  100:2
air
  39:19
  120:1, 5,
  8  123:24
airsoft
  39:12,
  16   40:3
  128:1, 5
Albahm
  50:3
  51:4
Albahm's
  118:19
alleged
  24:23
  25:1
allow
  78:23
allowed
  112:6
amount
  127:12
AMY   1:8
animals
  26:11

annual
  12:4, 25
  15:8
answer
  8:10, 12
  13:8, 9,
  12
  15:17
  17:16,
  22
  18:12
  19:16
  21:3
  23:4
  26:22
  42:9
  48:18
  49:7
  50:20
  53:10
  55:17
  60:19
  63:12
  64:16
  67:1
  77:3, 14
  87:19
  88:2, 4
  89:9, 20
  100:10,
  11, 13
  103:20
  104:24
  112:4, 7
  113:2
  121:16
answered
  21:12
  60:7, 10
  73:20
  103:18

answering
113:6
122:25
answers
8:5
anybody
24:23
29:6
41:23
45:12,
14
47:20,
24    49:4
50:2, 6
53:19
54:13
57:1
61:9
62:18
63:2, 7,
18
64:18
65:19
69:2, 23
70:1
105:14
111:12,
18
113:6,
10, 11,
13, 15
115:6, 9,
12
117:23
118:24
119:1, 4
121:23
125:3
anybody's
24:25
anytime
42:25

apologies
98:22
105:18
apologize
38:8, 11
119:13
appear
85:25
APPEARANCE
S    2:1
appeared
39:9
127:22
appears
85:23
86:2

applicable
91:25
108:16
apply
92:12
appropriat
e    6:12
109:1
129:17
approximat
e    9:9
40:13
approximat
ely
11:3, 4
78:12
April
51:21
Apulia
33:25
37:12,
13    40:9,
11, 22,
25
111:10

area
30:12
33:25
34:4
43:9, 19,
22
68:10,
15, 21
69:4, 16,
24    70:2
83:18,
19
91:19
106:7,
10, 14
areas
11:21, 22
argue
23:5
32:21
50:19
53:8
103:17
112:1, 5
arguing
32:23
50:21
53:9
98:19
argument
22:18
armed
23:1
95:5
arrest
27:15
arrival
44:14
arrived
40:10,
14
42:17,
22, 24

45:22
47:3, 6
65:17
91:4
100:4
101:1
111:11
124:2
128:13
arrives
101:1
arriving
87:13
asked
19:6
21:8, 11
29:10,
25    30:5
38:21
72:5
73:3
74:4, 13,
15    94:2
103:11,
20
111:25
113:7
118:17
119:13
121:9
122:8
126:10,
12
asking
7:23
19:9
20:1, 2
29:7, 8,
13, 21
30:1, 6,
10, 17,
18
32:19,

25
33:14
41:2
50:17,
23    60:4
65:16,
17
68:15
73:7, 9,
15
74:13
76:10,
11    83:8
88:6
90:6
92:24
93:15
95:9
97:8
98:21
99:17
104:10
107:13
108:5, 6
113:1
121:10,
14, 22
aspect
102:21
assigned
110:10,
15
assume
105:19
128:8
assumes
101:8
Assuming
58:3

assumption
90:10

attempt
66:13
71:16

attempting
85:7
attend
10:24
attention
81:16
82:10
Attorney
7:22
13:13
131:15
Attorneys
2:3, 11,
16, 22
6:3
74:21

Attorney's
72:6, 16,
19, 24
73:10, 12
availabili
ty
119:22
available
119:19
120:1, 8
122:14,
18, 22,
23    123:2
Avant
2:22
Avenue
2:23
aware
17:1, 7
18:13,
15
24:12,

17
34:15
35:20
36:1, 4,
7, 12, 18,
24    37:9
38:12,
15
41:18,
19, 20
43:1
45:9, 11
47:20,
24    48:1
51:7
54:2, 4,
5, 24
55:3
57:9, 17,
18, 20,
22, 24
58:1, 24
62:14,
16
67:23
73:11
81:10
84:16,
19    85:8
91:22
102:8
109:9,
13, 15
112:14,
16, 19,
22
113:7, 8,
10, 11
116:12,
17, 19
117:15,
18, 23,
25

118:3, 8,
9, 13, 18,
21
119:4,
18
123:10,
12

< B >
back
30:2
33:10,
12    59:5,
6, 13
62:5, 24
69:9
77:25
78:3, 7
82:15
93:24
94:19,
21
100:12
115:17,
18
125:10
backyards
46:7
ballpark
23:24
BANAS
2:24
7:12
33:6
49:1
51:23
58:8
64:23
65:1
79:12
128:3
129:21

bank
27:11, 19
based
10:17
18:21
20:5
28:15,
22    29:2,
10
30:11,
13, 16
31:1
32:3
113:20
basis
116:19
baton
56:22
BB    40:1
49:18
50:4, 13,
16    51:5,
8, 13
60:14,
25    66:23
began
105:2
beginning
36:5, 10,
15
52:15
79:13
behalf
9:23

behavioral
28:19
29:19
31:6
belief
19:21
32:15

believe
10:5
22:14
27:21
33:9
43:25
44:6
48:2
52:20
53:12,
15    69:2,
10, 22
70:25
75:8
76:14
77:10
82:8
89:18
90:15
93:8, 10
94:14
99:17
102:13
107:9,
25
109:7,
12
113:21
127:16
128:6,
14
129:10
believed
29:12
31:3, 6
33:15
97:11
best
11:24
better
21:1
87:20
88:5

Bill
  72:10,
13    73:2,
20    74:3,
11, 16,
18    75:3
bit
  10:20
  59:13
  77:4
blind
  33:8
BOLLINGER
  1:8
  2:15
BOND
  2:19
bottom
  8:1
  90:23
  117:4
break
  8:9, 12
  51:25
  59:10
  73:19
  100:7
brief
  105:10
  106:8,
17
  124:11
briefing
  106:13
briefly
  11:24
  124:21,
23
bring
  86:13
  121:4, 5,
7    122:7,
9

brought
  108:7
brush
  78:10
Buffalo
  2:23
Building
  2:22
BYRON
  1:6, 13
  2:8
  3:4
  7:21
  8:16
  132:16
  133:2, 20
B-Y-R-O-N
  8:16

< C >
call
  21:22
  23:5
  36:15
  38:21
  41:1, 15
  49:3
  59:15,
25    60:2,
12, 22
  77:19
  97:4
  101:18,
24
  102:1, 2,
11
  106:18
  114:4,
14, 18
  117:20
  118:12
  120:5

  122:3
  123:4, 8
called
  7:17
  22:16,
19
  27:13
  30:12
  39:15
  66:20
  121:23
  122:4
calls
  107:17
  125:16
car
  39:9
  60:23
care
  16:3
  18:16
career
  14:21
Carefully
  122:2
Carissa
  50:3
carrying
  51:16,
21    52:3
  60:25
Case
  1:4
  17:5
  27:16
  74:5
  75:4, 22
  87:7
  99:12
  101:4
  108:1, 6,
25

  109:3
  110:9
cases
  23:2
caveat
  8:10
Cazenovia
  9:5
  11:7
cell
  102:3
censure
  25:6, 8,
9
censured
  25:5
Center
  2:17
certain
  34:9, 16
  47:7
  55:12
certainly
  18:24
  65:6
CERTIFICAT
E    131:1
certificat
es    23:11
certificat
ion
  22:1, 6,
15    23:8,
13
certificat
ions
  23:10
certified
  22:12
  23:9
certify
  131:4,

  14
  132:5, 9
chance
  27:5
  114:12
CHANGE
  133:4
channel
  53:25
  54:14,
22, 23
  55:4, 10,
24    56:3
  94:8
  96:20,
23    97:2,
6    103:8,
14
channels
  54:3, 6,
7, 12, 13,
18, 22
  55:12,
13, 14,
19
  83:21
  96:24
  97:3
characteri
zation
  74:24
  88:7
charge
  41:24
  42:3, 12
  58:17,
20, 21,
25
  92:22
  93:2, 6,
11, 18
  94:1
  101:14,

*25*
  102:*6*,
*12*
  104:*3*,
*10*
  107:*2*
  128:*10*
**check**
  42:*18*
**chief**
  80:*6*
**child**
  40:*1*
  60:*14*,
*25*
  115:*7*, *10*
**chose**
  122:*21*
**Civic**
  2:*17*
**Civil**
  6:*10*, *11*,
*12*
**civilian**
  26:*1*
  68:*12*,
*18*, *19*
  70:*4*
**civilians**
  69:*12*,
*14*    70:*9*,
*12*
**claimed**
  128:*7*
**claims**
  76:*6*
**clear**
  73:*1*
**clearing**
  105:*1*
**Clearly**
  112:*8*

**client**
  88:*13*
**clinical**
  20:*9*, *13*
  30:*17*
  31:*9*
  32:*5*
**close**
  101:*17*
**closer**
  66:*9*, *10*
**come**
  38:*21*
  100:*22*
  120:*18*
**comes**
  28:*1*
**comfortabl**
**e**  37:*5*
**coming**
  60:*22*
**command**
  42:*25*
  43:*4*, *8*,
*15*
  48:*21*
  57:*17*
  83:*13*,
*16*    84:*8*,
*11*, *13*
  86:*16*,
*24*
  88:*17*,
*20*
  89:*16*,
*22*
  90:*12*
  91:*1*
  97:*12*,
*14*, *15*,
*17*, *22*
  98:*2*, *5*,
*17*    99:*3*,

*15*, *16*,
*17*, *19*,
*22*
  100:*1*, *2*
  104:*2*, *6*,
*8*, *9*, *14*
  127:*15*
  129:*17*

**commanding**
  86:*25*
  104:*3*
**commands**
  44:*16*
  105:*2*
**commenced**
  112:*15*
  115:*1*
  118:*18*
**commentari**
**es**
  123:*23*

**Commercial**
  86:*15*
**committed**
  52:*20*

**committing**
  53:*12*
**common**
  87:*2*
**communicat**
**e**  56:*3*
  61:*19*
  62:*19*
  63:*3*, *18*
  66:*14*
  83:*22*
**communicat**
**ed**  56:*6*
  61:*21*
  128:*4*

**communicat**
**ion**
  65:*6*
  102:*5*
  104:*19*
  109:*3*, *7*
  120:*19*
  127:*13*,
*17*, *18*
**communicat**
**ions**
  53:*25*
  61:*23*
  62:*19*
  128:*6*, *14*
**complaint**
  23:*16*
  24:*3*, *11*
**complaints**
  5:*4*
  24:*1*, *5*,
*14*, *16*
**complete**
  77:*21*
  85:*25*
**complies**
  124:*17*
  125:*21*
**concern**
  111:*23*,
*24*
**concerns**
  129:*13*
**concluded**
  130:*4*
**condition**
  20:*9*, *14*
  47:*14*
  75:*21*

**conjecture**
  98:*14*

**connected**
  63:*7*
**consider**
  93:*4*, *16*,
*25*

**considered**
  93:*1*
  94:*10*
  102:*21*
**constant**
  47:*8*
**contact**
  93:*25*
  98:*16*
  99:*21*
  102:*5*
  110:*23*
  111:*4*, *6*
  113:*12*
  116:*23*
  117:*2*
  120:*17*
  121:*12*
**contain**
  83:*21*
  85:*7*
  91:*17*
  92:*17*,
*20*
  102:*16*
  104:*18*
  128:*19*
  129:*15*
**contained**
  54:*22*
  79:*5*
  82:*21*
  96:*9*
  103:*2*,
*21*, *22*
  125:*5*
  127:*5*

containment
 111:23
 121:13,
 24
 129:12
context
 90:17
continue
 19:14
 77:19
 114:13
 127:10

continuing
 129:2
control
 91:13
 101:8
 102:22
 104:11
 128:8
controllin
g    6:13
 86:25
conversati
on
 29:23,
 25    64:2,
 21, 24
 65:2
conversati
ons
 62:2
 63:8
 66:13
convey
 106:17
coordinati
ng    86:25
coordinati
on

125:16
127:13
cop
 115:11
COREY
 1:8
corner
 104:22
Correct
 28:24
 30:14
 31:20
 35:4, 5
 36:19
 37:8, 12
 41:22
 46:17
 47:7
 50:9
 54:19
 55:15,
 19
 56:15
 61:6
 67:5
 68:16
 70:13,
 20
 76:20
 79:6
 92:7
 101:5
 110:7
 113:18
 117:10
 118:14
 120:22
 121:1
 122:11,
 14, 16,
 19, 22
 131:12

132:10
133:19
Counsel
 4:2
 75:1, 3
 81:11,
 14    96:4
Counselor
 21:17
 77:6
 92:3
COUNTY
 1:7
 2:15, 16
 35:22
 55:15
 63:2, 6,
 19    64:3,
 11
 65:22
 72:7
 95:25
 96:5
 125:14
 126:9, 13
couple
 8:4
 33:22
 68:13
 94:12
 115:15
course
 51:17
 55:8
 101:17
 123:21
 128:24
COURT
 1:1, 20
 30:2
 33:10
 69:8
 81:23

82:14
124:15
131:3, 16
cover
 27:13
 124:16
covered
 22:14
covers
 7:10
Coye
 37:13
 40:9, 11,
 22, 25
create
 10:17
 84:12
crime
 52:20,
 23    53:12
criminal
 53:2
crisis
 18:10
 21:22
 22:21,
 24
 47:21,
 22    48:3
 49:13
 105:6
 112:11,
 15, 20
 114:18
 118:20,
 24
 119:1, 5
Critical
 4:6
 84:17
 85:24
 86:6

crystal
 73:1
curious
 36:14
currently
 8:21
custody
 24:22

< D >
danger
 69:23
DATE
 1:14
 53:16
 133:3, 20
dates
 11:1
 27:3
Dave
 64:15
 125:22
 129:24
DAVID
 2:5
 7:22
davidz@wzl
aw.org
 2:6
day    8:2
 29:17
 62:20
 63:3, 19
 64:8
 80:5
 113:12
 119:14
 132:20
 133:22
days    6:5
dead
 97:23

deadly
  114:14
dealing
  14:23
  15:10
  31:25
debrief
  71:21
  72:5, 9,
  20    73:3
  74:4, 7
  105:12
decent
  127:12
decided
  38:22
  56:14
decides
  101:8
decision
  37:21
  51:11,
  13
  61:10,
  13    70:7,
  10
  79:21
  80:4
  98:4, 6,
  12    99:2,
  11, 18, 19
declare
  133:18
dedicated
  94:8
  96:20,
  23    97:2,
  6    103:7
deemed
  6:12
deer
  26:12

de-
  escalation
  12:20
  13:6
Defendant
  2:19

Defendants
  1:8
  2:8, 15
  7:9
define
  108:3,
  13, 17
defined
  108:14
defines
  108:6

definitely
  51:13
  113:9

definition
  72:8
  73:5
  74:6
  89:12
  93:13
  108:22
Definition
s    86:23
definitive
ly
  50:16, 17
degree
  120:17
Delaware
  2:23
densely
  68:11

DEPARTMENT

2:16
8:24
9:6
22:17
25:6
34:15
37:24
62:15
63:3, 7,
19    64:4,
11
65:23
72:4
84:16
85:8
95:25
96:6
116:14
depend
  40:4, 5
  55:25
  72:17
  92:15
  98:8, 9,
  10
  99:14
  107:12
depends
  20:16,
  17
  58:11
  89:21
  93:13
  98:14
  99:8, 9,
  10
  101:6, 7,
  8
deploy
  57:2, 5
deployed
  56:24

Deponent
  133:2

DEPOSITION
  1:11
  6:9
  10:11
  75:25
  77:18,
  20    88:9
  129:5
  133:3, 18
deposition
s    13:11
deputy
  64:12
describe
  27:1, 7
  52:9
  67:7
  68:10
  78:8
described
  40:22
  88:21
  89:17
  91:1
DESCRIPTIO
N    4:2
  52:11
  127:20
designed
  7:24
  13:24
  107:8
destructio
n    12:2
  26:11
detail
  27:22
determine
  60:13,
  25

101:18
102:12
develop
  104:19
developed
  104:17

developing
  129:16
developmen
t    12:3
device
  109:14
devices
  109:11
DEWITT
  1:6
  2:8
  8:24
  9:1, 15,
  23    10:2
  11:6
  12:13
  16:5
  21:21
  25:7
  26:8
  33:22
  34:6, 9
  55:9
  62:15,
  18    72:4
  73:11
  81:5
  96:6
  116:14,
  18
  117:24
  118:14
  119:20
  125:3
diagnose
  28:21

29:5, 9
32:18
diagnosed
31:10
diagnoses
18:16
diagnosis
20:22
29:13
30:18
32:20
dialogue
105:3

difference
51:9
different
11:22
12:4
13:1
41:7
54:3, 5
55:13,
14, 19
63:17
76:9
99:10
122:21
direct
54:14
61:9
98:16
directed
38:23
39:2
55:3
56:2
83:1
direction
42:22
43:25
44:15
46:9

47:10
53:23
62:3
63:9
82:19,
23    95:7
106:3
127:20

directions
48:13,
24
53:19
83:3, 5,
9, 25
105:25
106:5
114:7
directive
83:11

directives
45:1, 3
58:25
directly
94:16
95:22
122:6

disability
33:9
disagree
127:4, 8
129:1
disagreeme
nt    129:3
discharge
51:11
56:14
66:6
67:4
68:5
71:2

discharged
25:25
26:6, 15,
18
36:25
40:15
42:4
44:15
45:23
56:18
58:14,
18
59:15
60:1, 23
67:14,
17, 18
68:9, 22
69:3, 19
70:22
110:17
115:8
dischargin
g    25:22
26:13
42:13
50:24
65:20
68:25
69:23
71:11
75:14
114:19,
23
115:13
116:11
discipline
s    90:1,
19    91:3
discretion
ary
89:19
90:16

discuss
74:17,
25    75:2

discussing
31:21

discussion
64:3
124:11
dispatch
35:13,
16
38:22
41:15
46:20,
22    47:9
49:18
63:14
102:2
127:25
128:1

dispatched
118:20
dispute
59:20,
24    60:5
89:4
126:6
distance
69:19
DISTRICT
1:1
72:6, 16,
19, 23
73:10, 12
doctor
16:1
30:18
112:11
document
10:18

79:7
81:24
82:3, 7,
10, 11,
18, 21
83:13,
15, 21,
24    84:3
85:20
86:1, 5
89:7, 11
90:11
96:10,
11, 14
116:2, 6,
9
124:19,
22, 25
125:5
documentat
ion    80:8
documents
5:15
10:10,
15, 17
48:8, 10
80:15
dogs
26:12
doing
9:23
27:18
28:3
54:10
91:24
draw
82:9
driveway
60:23
drone
109:16,
17, 18, 19

drones
 109:10,
12
drop
 66:20
 67:9
 105:2
duly
 7:18
 132:5
duration
 101:23
duties
 9:14
 25:6
 34:6
 79:20
 80:9
 84:23
 92:1, 5,
12, 21
 104:7
 105:9, 11
duty
 5:14
 26:7
 79:10,
14    80:4,
14, 16,
18, 19
dynamic
 106:16

< E >
earlier
 89:13
 90:5, 11
effective
 122:20

effectuate
 119:23

effort
 87:3
efforts
 87:1
eight
 11:12
either
 23:1
 25:9, 25
 29:5
 64:6
 93:17,
18
 97:14
 112:10
 118:14
 119:5,
15, 19
elapsed
 40:14
 59:16,
21, 25
 60:11
eleven
 67:15,
17, 18
 69:4, 19,
23    70:22
Elyse
 1:18
 131:3, 16
emergency
 22:1
 34:10
 87:2
 90:2, 20
employed
 8:21, 25
 9:1
 11:5
 26:7
 109:14

employee
 131:15
employer
 35:3

employment
 11:6
encounter
 14:13, 15
enforcemen
t    42:18
 120:25
 125:15
engage
 29:23
 95:24
engaging
 29:24
enter
 61:6, 12
entered
 104:21
entering
 62:8, 11
entire
 87:10
entirety
 31:16
 39:14
 114:15
 119:7
ergo
 58:5
ESQ    2:5,
13, 18, 24
establish
 45:12,
15
 91:13,
20, 21
 99:3, 18,
22, 25
 100:1

102:15
 120:19
 125:15
 129:15
establishe
d    42:25
 45:6, 10,
19
 83:16
 91:19
 96:22
 97:7
 99:16
 103:10,
15
establishe
s    99:15
establishi
ng
 83:16
 98:5
 129:16
ESTATE
 1:3
 7:22
evaluate
 20:21

evaluation
 75:13
evaluation
s    78:21
event
 84:13
 96:7
 121:25

eventually
 10:3
everybody
 7:7
 55:23
 63:24

83:8
 102:3

everyone's
 7:10
evolving
 93:8
 128:23
exact
 27:3
exactly
 52:17
 65:15
 92:24
EXAMINATIO
N    3:3
 7:19
 131:9
example
 22:24
excessive
 24:23
 25:1
Excuse
 33:1
 77:6
executed
 16:4
exercise
 16:8
EXHIBIT
 4:2
 81:18,
19, 23
 85:15,
16, 19
 96:9
 115:21,
22
 116:1
 117:3
 124:12,
15

existed
  116:8
existence
  117:18
expend
  71:5
expended
  67:14
  71:5

experience
  22:8
experienced  18:9
experiences  18:13
experiencing  49:13
explain
  20:2
explained
  106:6
eye    33:8
eyes
  111:9

< F >
fact
  20:8, 12
  34:25
  54:17
  84:22
  85:12
  91:4
  112:21
  127:22,
  24, 25
factor
  70:7, 10
fair
  12:12
  16:10,
  21    17:1,

11, 14
  18:5, 7,
  20    20:6,
  9, 23
  28:17
  31:2
  32:3
  35:1
  36:1, 9,
  11    39:3,
  14    42:2,
  11, 15
  53:16
  59:14,
  17
  65:13
  69:11,
  13    70:2
  71:1, 7
  84:24
  86:4, 6,
  20
  88:23
  89:2
  90:2
  91:6
  92:11
  94:3
  120:13
  124:1, 5,
  6
familiar
  33:25
  34:8, 19
  84:7
  108:15
far
  9:24
  13:17
  20:21
  22:5, 20
  24:1
  26:13

31:25
  38:4
  50:10
  73:5
  83:3
  89:7, 11
  127:18
  129:13
FEDERAL
  6:1, 10,
  11, 12
feel
  37:5
  107:13
  108:5, 6,
  19, 24
  109:1, 2,
  3
feeling
  26:22
felt
  107:2

fictitious
  19:5, 7
field
  14:16
fifteen
  9:2
fifth
  76:18,
  20
  107:23
figure
  23:24
  106:20
FIKE
  1:8
  2:19
  50:3, 10
  51:4, 7
  58:4
  127:25

filed
  5:5
  24:6
filing
  6:5
filming
  27:10,
  19    30:13
financially    131:16
find
  51:16
finding
  115:4
fine
  7:12, 14
  87:11
finish
  89:9
  90:7
  96:3
  104:24
  121:16
  122:25
finished
  98:20
  99:6
  105:16
  107:20
finishes
  9:20
fire
  13:25
  67:12,
  16    68:3
  69:12
  70:16
firearm
  13:23,
  24
  56:18
  67:14

firearms
  12:5
  13:18
fired
  67:11
  70:20
  71:8
Firm
  1:15
  2:8
First
  8:5
  9:3, 24
  10:21
  35:15
  47:3
  51:20
  52:2, 4
  57:21
  58:4
  59:25
  60:2, 12
  65:25
  66:1
  68:3, 5
  70:23
  75:23
  92:1, 5,
  6, 12, 13
  93:18
  100:25
  101:1
  111:23
  123:8
  124:23
  126:5
  128:12
  132:5
Fitzpatrick    72:10,
  13    73:3,
  20    74:3,

12, 18
75:4
**five**
23:20
128:15
**five-**
**minute**
59:10
**fled**
39:8
60:22
**fleeing**
46:5
**flimflam**
8:1
**flip**
125:9
**Floor**
1:17
2:12, 17
**flow**
47:8
**fluid**
93:8
**following**
73:17
78:20
79:2, 11,
15
81:12
117:6, 9
**follows**
7:18
89:13, 21
**fool**
7:25
**foot**
46:5
**force**
13:15
14:2, 3,
4    24:24

25:1
114:14
**foregoing**
131:5,
12
132:9
133:18
**forget**
11:1
47:18
**form**
6:7
13:7
14:6
15:16
16:11,
17
17:15,
21    18:1,
11, 18
19:2, 23
20:15,
25    21:2,
7, 12
22:3, 23
23:3, 25
25:4, 11,
24
28:18,
23, 25
29:4, 22
30:16
31:5, 12,
14    32:7
33:17
34:11
35:9, 14
36:3, 16
40:2
41:21
42:5, 7,
14    44:4,
8, 18, 22

45:2
47:2
48:16
49:14,
20, 23
50:5, 7
51:1, 6,
10, 24
52:21
53:5, 7,
22
55:11,
16
56:12
57:11,
23    58:7,
10, 15,
19, 22
59:18,
22
60:17
61:2
63:5, 20
64:5, 13
65:8, 14
66:7, 15
68:4, 7
69:5
71:4, 23
80:1
83:2
84:15
86:7, 12
88:25
91:16,
23
92:14,
19
93:20
94:18
96:25
97:13,
16    98:7,

13, 18
99:4, 13,
20
100:6
101:20
103:4
106:12,
15, 22,
25
107:11,
16, 18
108:2, 8,
21
109:5
110:1
113:25
115:2,
14
116:15,
25
117:17
121:15
123:11
124:4
125:1, 6
127:6
128:2, 11
**formal**
5:9
22:20
25:9, 15,
18
109:22
125:2, 7
**formally**
22:25
49:4, 8,
12
104:2, 5,
6    124:25
**formed**
32:5

**formulated**
28:15
**forth**
107:14,
19    131:6
**founded**
24:11
**four**
9:8
76:17
118:5, 7
**fourth**
105:17
**frame**
9:9
37:6
80:17
**framework**
86:9
**Frederick**
38:8, 16
**frequency**
54:14
**frivolous**
76:1
**FROM/TO**
133:4
**front**
77:20
95:5
**full**
8:15
110:12
**Fuller**
38:5, 15
42:21
43:7, 12
61:15,
17, 19
91:21, 24
**FURTHER**
6:3, 7,

9, 11
27:22
33:6
124:8,
10
129:19
131:14
132:9

< G >
gather
96:15
geez
130:1
general
11:13
19:10
30:10
126:5
129:4
generally
22:10
Gentleman
129:20
getting
100:7
119:14
130:3
give
14:14
23:24
53:19
63:8
71:21
72:5, 11,
12, 15,
19   73:3
74:17
75:3
79:1
105:14,
25   106:4

given
48:13,
21, 25
52:12
83:9
120:2
132:10
giving
37:5
106:3
114:6
Go   13:7
14:7, 8
21:3
22:4
27:22
30:4
49:7
53:21
61:17
63:12
64:16
75:7, 11
77:9
79:17
86:3
90:8
122:25
125:13
127:11
goal
87:2
goes
38:4
going
5:4, 9
7:23
14:3
16:23
24:4
25:17
45:12,
14

47:18
59:9, 13
61:25
73:22
74:2
77:18
78:9, 23
81:16,
22   82:9
85:12,
18
86:13
87:21,
24
89:25
98:24
101:11
106:18,
20
114:11
115:25
124:14,
18
125:9,
10, 13
126:4
good
7:21
48:24
58:12
77:2
78:25
85:25
87:20
90:18
95:11
108:24
109:2, 3
127:16
128:7, 14
gotten
17:12

great
105:22
ground
8:4
group
106:18
guess
16:19
20:1, 16,
18
22:18
58:23
72:8
102:3

guidelines
108:14,
15
gun
39:9, 12,
17, 19
40:1, 3
46:5, 7
49:19
50:4, 11,
13, 16
51:5, 8,
13
53:13
60:14
61:1
66:21,
23   67:9,
10
100:2, 5
105:2
128:1, 5
gunshots
69:18

< H >
half
37:2

40:17
123:16
hall
28:2
hand
78:4, 6,
7   117:4
handgun
127:22
Handing
9:17
hang
23:10
hanging
23:8
happened
8:2, 4
72:16
73:4
105:17
happening
129:8
harm's
69:3
head
11:1
15:12
16:9
27:6
heading
82:23
health
15:5, 11
16:2, 3,
11, 15,
18, 20,
21
17:12,
25   18:2,
3, 10, 21,
24
19:22
20:18

21:*22*
28:*16*,
*19*    29:*3*,
*12*, *20*
31:*4*, *8*
32:*6*, *16*
47:*14*
49:*4*, *13*
78:*21*
82:*11*,
*16*
105:*6*
112:*11*
114:*22*
115:*6*, *11*
**hear**
33:*3*
34:*12*
44:*23*
45:*25*
57:*3*
79:*12*
**heard**
36:*5*
38:*21*,
*24*
63:*25*
114:*3*
**hearing**
33:*2*
35:*10*
49:*17*
**hears**
83:*8*

**helicopter**
120:*3*
**helped**
102:*16*
**helpful**
20:*24*
21:*5*

**helping**
88:*12*
**hey**
101:*24*
102:*6*
106:*19*
111:*17*
114:*2*, *6*
**hired**
9:*24*
**holding**
117:*3*
**home**
23:*2*
**Homeland**
12:*2*
**homes**
70:*15*
**Hospital**
17:*4*
18:*17*
75:*9*, *10*,
*11*   76:*5*
78:*15*
97:*20*, *21*
**hour**
37:*2*, *4*
40:*17*,
*19*
59:*16*,
*21*, *25*
60:*11*,
*21*
87:*17*
88:*10*
101:*17*
106:*21*,
*23*
107:*3*
123:*15*
128:*20*,
*23*, *24*

**house**
68:*21*
**huddle**
106:*19*
**human**
30:*20*
**hurt**
75:*15*, *18*
**Hypothetic
ally**
51:*12*

**< I >**
**ICS**
85:*2*, *6*,
*9*   87:*6*,
*14*, *18*
89:*16*,
*25*   91:*9*,
*10*, *15*,
*20*, *21*
92:*18*
94:*11*,
*23*, *25*
96:*9*
102:*15*
104:*7*
120:*14*,
*15*
**ICSA**
91:*10*
**IDC**
84:*12*
**idea**
101:*11*
105:*22*
110:*3*
**identifica
tion**
81:*19*
85:*16*
115:*22*
124:*12*

**identified**
95:*7*
122:*4*
**identify**
40:*25*
**ill**
14:*23*
115:*7*
**illness**
20:*6*
113:*21*
**imagine**
10:*21*
**imminent**
67:*11*
**impact**
68:*1*
**impacting**
67:*24*
**implement**
85:*2*, *6*
87:*14*
88:*24*
91:*9*, *15*
92:*18*
94:*11*,
*23*
102:*15*
104:*7*
120:*15*
**implemente
d**   120:*17*
**implementi
ng**
87:*15*,
*17*   94:*25*
**implicatio
n**   122:*9*
**improper**
76:*8*
**improve**
125:*16*

**inappropri
ate**
88:*11*
**inches**
78:*11*
**Incident**
4:*6*
5:*14*
10:*14*
17:*9*
26:*20*,
*21*   27:*9*,
*10*, *24*
28:*2*
31:*21*
34:*10*,
*17*
35:*11*
36:*5*
48:*22*
50:*2*
52:*15*
54:*15*,
*19*
55:*22*
57:*18*
67:*21*,
*22*, *23*
71:*22*
72:*1*, *7*,
*11*, *20*,
*24*   73:*4*
75:*15*,
*18*   76:*4*,
*7*, *13*, *16*
79:*11*,
*15*
80:*14*
81:*9*, *12*
82:*20*
83:*13*,
*22*   84:*1*,
*4*, *8*, *11*,

12, 14,
17    85:3,
5, 24
  86:24
  88:17,
20
  89:16
  90:12
  91:1
  93:1, 17
  94:8
  95:14
  96:21
  97:12
  100:20
  101:16,
24
  104:8
  105:7,
11
  106:1
  107:9,
14
  109:14
  112:15,
17
  115:1
  116:23
  117:21
  118:18,
19
  119:7
  120:7
  127:16
incidents
  27:7, 25
  28:8
  31:22
  86:6, 10,
11, 17
including
  35:22

111:15
125:3
index
  5:5
  24:7
indicate
  16:19
  19:4
  20:13
  83:24
  84:3
indicates
  16:22
  18:25
  19:10,
17    89:7
  90:11

indicating
  16:2
  47:10
  89:12
  107:1, 2

indication
  83:11

individual
  16:15,
19    26:1,
19
  39:15
  52:9
  58:24
  87:1
  102:8
  112:11
  122:5
Individual
ly    1:6,
7, 8
individual
s    14:24

22:11
24:17
38:18
46:6
97:18
  106:2,
17
  120:24
infers
  89:6
informatio
n    5:13
  17:13,
18    18:4,
8    21:1
  32:11,
15
  33:18
  39:7, 8,
11
  43:13
  45:24
  46:2, 4,
6, 19, 20,
21    47:1,
7, 8, 9,
15
  49:21,
22
  50:25
  51:2, 3
  53:13
  63:9, 13,
15
  66:23,
24
  80:12
  82:6
  83:12,
15    95:2
  106:17
  111:21,
25

114:8
119:2, 6
120:2
128:17
initial
  8:17
  91:12
  94:3, 5
injured
  26:12
  76:6, 7,
13, 16, 24
inquire
  43:3
  109:18
  114:10
  119:22
  120:7,
10
  121:3
  123:5
instances
  24:25
institute
  87:6
Instruct
  103:19
  112:3
instructio
n    82:19
instructio
ns
  105:15

instructor
  12:3, 5
interact
  27:5

interacted
  28:7
  32:2

interactin
g    22:10
interactio
n    24:18,
20    27:8
  28:22
  31:18
interactio
ns
  18:22
  20:3, 5
  27:2
  29:2, 11
  30:11,
14, 16
  31:2, 16,
17, 20,
24    32:4
  51:15
  113:18,
20
interagenc
y    127:13

interested
  75:1
  131:16
interrogat
ion
  22:10
interrupti
ng
  89:10
  90:8
interview
  22:9
  72:11,
12    73:6,
8, 9
  74:9, 11
  75:3
interviewe
d    73:8

interviews
  79:1
investigat
ive    4:9
investigat
or    10:3,
4    37:19,
23    38:8,
12, 16,
22    39:1
  40:7
  54:11
  61:5
  82:8
  97:19
investigat
ors    59:1
involved
  25:22
  26:1
  35:8
  36:19,
24    49:4
  64:20
  90:2, 19
  112:17
  129:14
involvemen
t    36:12
  72:1
  86:20
involving
  35:11
  86:17

irrelevant
  99:23
issue
  16:23
  18:25
  20:18
  33:3, 7

75:22
76:2
113:23
issued
  58:25
issues
  15:11
  17:25
  18:3, 21
  19:22
  28:16,
19    29:3,
13, 19,
20    31:4,
7    32:6,
16
  82:11,
17
  115:6, 11

< J >
James
  8:20

Jamesville
  27:11
  34:3
January
  1:14
  132:7
  133:3
Jefferson
  1:17
  2:11
JLA    1:3
  7:22
  18:9, 13,
21, 22
  20:3
  26:23
  27:5, 18,
19    29:3,
11, 12

30:12,
14    31:2,
17, 20,
24    32:3
  35:7
  36:25
  39:7
  40:15
  42:13
  45:23
  46:3, 4
  47:12,
13
  48:22
  49:13
  51:4, 16,
21    52:3,
8, 14, 19
  53:17
  56:11,
19
  58:14,
18
  59:16
  60:1, 12,
22, 24
  61:8, 12,
25    62:9,
12, 16,
19
  64:12
  65:19
  66:1, 13
  67:5, 9,
13, 20
  68:10,
15, 19
  69:3, 4,
12, 14,
24    70:5,
16
  71:16
  72:21

82:12
85:5, 7
94:17
97:23
98:16
101:17
105:1
106:13
109:23,
25
110:4,
18, 19
111:13
112:21,
22
113:18
114:12
115:5
119:2, 6,
11
120:2,
11, 17
123:14
124:2
JLA's
  49:18
  50:3
JOB
  1:21
  9:3
  84:23
Joe's
  75:8, 9
  119:16
John
  2:17, 18
johnsickin
ger@ongov.
net    2:19
joining
  9:15
jointly
  37:20

Joseph's
  17:4
  18:17
  47:20,
22
  112:15
  118:24
  119:2, 5
JR    2:24
judge
  77:19, 20
junior
  37:25
  38:2, 3
jurisdicti
on    86:18
jurisdicti
ons
  86:17, 19

< K >
K-9
  119:23
  123:4, 5
K-9s
  119:19
KARLA
  2:7
karla@wzla
w.org
  2:8
keep
  8:5
  12:13
  21:15
  33:2
  107:22
kid
  111:18
killed
  123:14
kind
  11:21

14:11
16:22
129:10
kinds
11:22
63:13
KING
2:19
knew
18:21
36:10
39:25
41:4, 20
110:23
122:5
know
10:17
11:11
15:23
16:12
20:8, 22
21:1, 4
23:23
24:1
26:22
31:7, 9,
10    33:3,
9    35:1
36:15,
17, 23
37:1
41:5, 11
42:2, 12
43:10
44:6, 7,
19, 24
50:24
53:6
58:2, 13,
17, 20
60:2, 8
61:18
63:15

65:15
66:11
67:19
68:8, 20,
23    70:6,
17, 20
71:13
73:8, 16,
21    76:5
78:19
80:17
81:24
82:4
85:22
91:24
98:24
100:21,
22
108:11
109:25
110:10,
11, 12,
14, 15,
21
111:1,
11, 12,
14, 16
113:14
114:25
116:4, 8,
9
118:15
119:8,
21
120:4
123:16
125:23
127:15
128:9,
12, 13
knowledge
34:20,
22    35:2,

4    84:21,
23
117:19
knows
73:15

< L >
lady    8:6
large-
scale
84:13
late
119:14
Law
1:15
2:3, 8,
11, 16,
22
42:18
120:24
125:15
lead
41:11,
13, 16,
20, 24
42:12
44:1, 16
48:14
57:20
58:5, 13
84:4
100:20
101:2,
11    128:9
leave
40:5
leaving
52:25
lectures
21:14, 17
left
8:6
53:14

75:7
104:12
legal
81:11
less-than-
lethal
13:15
57:15
less-than-
lethals
56:8, 17
57:6, 10
lethal
14:2, 4
119:23
121:25
122:1
123:3
Liberty
4:8
116:10,
17, 23
117:19,
20
118:9,
12
119:15

Lieutenant
38:5, 15
42:21
43:7, 12
61:15,
17, 19
91:21, 24
life
87:3
likes
12:6
Line
5:3, 8,
12    26:7
69:12

70:15
77:1
79:17
133:4
lines
19:20
26:12
84:12
list
5:10
12:9, 10
25:19
listen
65:12
122:2
listened
128:1
little
10:20
33:6
59:13
77:3
LLP
1:15
2:8
located
127:19
LOCATION
1:15
40:21
62:3
95:19,
23
102:24
106:3
111:9
118:20
122:4, 6
lock
23:1
lodge
129:4

long
  8:25
  9:7
  11:2, 3
  12:9, 10
  13:12
  28:7, 9
  29:17
  36:23
  79:20,
22
  123:18
longer
  40:17,
19
  79:25
  80:24
  123:15
look
  81:24
  85:19
  116:1
  121:20
  124:18
  125:19,
24
looked
  92:17
looking
  20:21
  91:12
  92:20
  112:21
looks
  82:1
LUCAS
  1:6, 13
  3:4
  8:16
  132:16
  133:2, 20
L-U-C-A-S

  8:16

< M >
M&T
  27:19
ma'am
  44:11
  59:4
  62:22
Madam
  30:2
  33:10
  69:8
  82:14
  93:23
  94:19
  115:17
MAD-ATB
  1:5
magazine
  67:15
  71:6
man
  98:24

Management
  4:6
  84:17
  85:24
  87:3
managing
  86:17
mandatory
  88:24
  89:5, 14,
18   90:4,
10, 13, 15
Manual
  4:6
  84:17,
20
  85:23

107:6, 8,
15, 17, 19
March
  13:4
  15:9
  25:21
  26:24
  31:18
  32:4, 11
  33:16,
21
  34:23
  35:7
  42:13
  44:13
  48:22
  51:20
  52:2
  55:22
  63:9
  64:12,
22
  65:18
  66:1
  68:6
  72:21
  93:16
  116:12,
23
  117:16,
21
  119:11,
19
mark
  85:14
marked
  81:17,
19, 22
  85:12,
16, 18
  96:8
  115:20,
22, 25

124:12,
15
marking
  13:25
mass
  12:1
Matt
  102:10
matter
  7:23
  39:20
  107:3
mattered
  39:25
MATTHEW
  1:7
mbanas@bsk
.com
  2:24
MCO
  113:5,
10, 13,
15
  114:25
  119:15,
16
  128:13
mean
  22:20
  25:8
  32:15
  39:23
  47:4
  64:23
  75:19
  76:23
  104:5
  119:16
  126:20
means
  102:5
  119:23

meant
  7:24
medical
  18:15
  19:17
  75:13
  78:14
member
  63:6
  117:24

memorandum
  4:6
  116:12
  118:2, 3,
4, 8
MENARD
  1:7
  2:8
  37:19,
23
  38:10,
11, 12,
22   39:1
  40:7
  54:11
  61:5
  82:8
  97:19
  102:10,
11
mental
  15:5, 11
  16:2, 3,
11, 15,
18, 20,
21, 23
  17:12,
25   18:2,
3, 9, 21,
24, 25
  19:22
  20:6, 18

```
21:22          Mm-hmm          15:16          52:21          90:7
28:16,         125:12          16:17          53:5, 7,       91:16,
19  29:3,      Mobile          17:15,         10, 22         23  92:2,
12, 20          47:21,         21  18:1,       54:25         14, 19
31:4, 8        22  48:2        11, 18          55:5, 11,     93:20
32:6, 16       105:6          19:2, 5,        16             94:18
47:14          112:15,        8, 13, 23       56:12          95:10,
49:4, 13       20             20:15,          57:3, 11,      16  96:3,
78:21          118:20,        25  21:2,       23  58:7,      25
82:11,         24             7, 14, 17       10, 15,        97:13,
16             119:1, 5       22:3, 23        19, 22         16  98:7,
105:6          mom            23:3, 25        59:18,         13, 18,
112:11         127:24         24:7           22  60:7,       22  99:4,
113:21,        monitor        25:4, 11,       15, 17        13, 20
23              54:7          24  26:2        61:2           100:6,
114:22         monitoring     28:18,          63:11         10, 13,
115:6, 10       54:11         23, 25          65:8, 14      16
mentally        63:24         29:4, 8,        66:7, 15,      101:20
14:23                         15, 22          25  68:4,      103:4,
115:7          Montgomery     30:3, 7         7  69:5       17, 23
mentioned       2:17          31:5, 12,       71:4, 23       104:24
27:25          months         14  32:7,       73:13,         105:13,
met             11:4          21  33:1,       16, 19,       18, 22
26:23           79:23,        17              24             106:12,
metal          25            34:11           74:19,         15, 22,
78:18           80:24, 25     35:9, 14        23             25
middle         morning        36:3, 16        75:16,         107:11,
8:17            7:21          38:6           20  76:1,       16, 18,
52:16          mother         39:21          9, 17, 19,     22
mind            49:18         40:2           25  77:3,       108:2, 8,
28:2            50:3          41:17,         6, 9, 14,       21
31:3           moved          21  42:5,       22, 24         109:5
47:6            102:16        7, 14           78:16,         110:1
93:15          moving         44:2, 4,        23             112:1, 6,
minute          95:22         8, 18, 22       79:16          24
100:4, 7       MULLIN         45:2, 25        80:1           113:25
minutes         2:13          47:2           83:2           115:2,
6:5             5:5           48:16           84:15         14
66:9            7:3, 5,       49:6, 14,       86:7, 12       116:15,
107:3, 5       8  9:20        20, 23         87:9, 19,      25
MITCHELL        13:7          50:5, 7,       22  88:3,       117:7,
2:24            14:6          19  51:1,       6, 10, 25     10, 17
                              6, 10, 24       89:9, 20       118:5
```

121:*15,*
*18*
  122:*15,*
*25*
  123:*11,*
*22*
  124:*4*
  125:*1, 6,*
*11, 22*
  126:*7,*
*10, 16,*
*20, 24*
  127:*6,*
*10*
  128:*2,*
*11, 15*
  129:*2, 6,*
*20   130:2*
Mulroy
  2:*17*
multi-
agency
  35:*21*
  36:*10*
  86:*20*
  125:*16*
multiple
  36:*19,*
*24   37:9*
  54:*12,*
*13, 25*
  55:*5*
  73:*13*
  86:*17,*
*18, 19*
  90:*1, 19*
  91:*2, 5,*
*8   96:24*
  97:*3*
  112:*24*
myriad
  99:*10*

< N >
name
  7:*21*
  8:*15*
  48:*5*
  110:*12*
narrative
  103:*2,*
*13, 21,*
*22*
  104:*13,*
*20   106:5*
near
  104:*22*
nearest
  68:*12,*
*18, 19,*
*21   70:4*
necessaril
y   19:*3*
  31:*7*
  89:*3*
necessary
  21:*14*
need
  16:*3*
  22:*25*
  30:*3*
  87:*23*
  114:*7*
needed
  86:*15*
  89:*22*
  129:*15*
needs
  16:*20*
negotiate
  22:*25*
negotiatin
g   110:*16*
negotiatio
n   21:*25*

  22:*5, 20,*
*21   23:13*
negotiatio
ns
  110:*5,*
*22*
  114:*11*
  120:*11*


negotiator
  22:*1, 17*
  23:*9*
  109:*21,*
*22, 24*
  110:*4, 9,*
*11, 15*
  111:*18*
  114:*18*
neither
  56:*23*
never
  114:*18,*
*19*
NEW   1:*1,*
*18   2:5,*
*12, 18,*
*23*
  43:*24*
  55:*13*
  58:*5, 9*
  64:*18,*
*19, 20*
  65:*19*
nobody's
  114:*6*
nonlethal
  120:*21*
non-
lethal
  121:*5*
  122:*5, 7,*
*8, 9, 11*

non-
lethals
  120:*25*
  121:*4,*
*23   122:3*
non-
marking
  14:*1*
nonrespons
ive
  112:*8*
  121:*17*
nonsensica
l   77:*21*
normal
  30:*20*
NORTHERN
  1:*1*
northwest
  104:*22*
Notary
  1:*20*
  131:*4,*
*21*
  132:*23*
  133:*24*
note
  29:*16*
  75:*20*
  76:*25*
  78:*16*
  79:*16*
  87:*9*
noted
  34:*13*
  133:*19*
notes
  4:*5*
  10:*16*
  82:*1*
  131:*13*

notified
  24:*2*
  120:*18*
notify
  81:*4, 8,*
*10*
NUMBER
  1:*21*
  8:*9*
  12:*4*
  35:*11*
  36:*13*
  40:*24*
  46:*21*
  52:*24*
  85:*19*
  86:*3, 14*
  105:*9*
  124:*16*
Numerous
  14:*21*
  35:*21*
NYSP
  125:*14*

< O >
oath
  131:*7*
Object
  13:*7*
  14:*6*
  15:*16*
  16:*17*
  17:*15,*
*21   18:1,*
*11, 18*
  19:*2, 23*
  20:*15,*
*25   21:2,*
*7   22:3,*
*23   23:3,*
*25   25:4,*
*11, 24*

28:*18*,
*23, 25*
 29:*4, 15,*
*22*  31:*5,*
*12, 14*
 32:*7*
 33:*17*
 34:*11*
 35:*9, 14*
 36:*3, 16*
 40:*2*
 41:*21*
 42:*5, 7,*
*14*  44:*4,*
*8, 18, 22*
 45:*2*
 47:*2*
 48:*16*
 49:*6, 14,*
*20, 23*
 50:*5, 7*
 51:*1, 6,*
*10, 24*
 52:*21*
 53:*5, 7,*
*22*
 54:*25*
 55:*5, 11,*
*16*
 56:*12*
 57:*11,*
*23*  58:*7,*
*10, 15,*
*19, 22*
 59:*18,*
*22*
 60:*15,*
*17*  61:*2*
 63:*5, 20*
 64:*5, 13*
 65:*8, 14*
 66:*7, 15,*
*25*  68:*4,*

7  69:*5*
 71:*4, 23*
 74:*19,*
*23*
 75:*16*
 80:*1*
 83:*2*
 84:*15*
 86:*7, 12*
 88:*25*
 91:*16,*
*23*
 92:*14,*
*19*
 93:*20*
 94:*18*
 96:*25*
 97:*13,*
*16*  98:*7,*
*13, 18*
 99:*4, 13,*
*20*
 100:*6*
 101:*20*
 103:*4*
 106:*12,*
*15, 22,*
*25*
 107:*11,*
*16, 18*
 108:*2, 8,*
*21*
 109:*5*
 110:*1*
 113:*25*
 115:*2,*
*14*
 116:*15,*
*25*
 117:*17*
 118:*5*
 121:*15*
 122:*15*

 123:*11*
 124:*4*
 125:*1, 6*
 127:*6*
 128:*2,*
*11, 15*
**objecting**
 19:*14*
**objection**
 7:*10, 15*
 21:*11*
 29:*16*
 41:*17*
 44:*2*
 49:*1*
 58:*8*
 63:*10,*
*11*  64:*7*
 75:*20,*
*24*
 76:*25*
 77:*17*
 78:*16*
 79:*16*
 87:*9, 12*
 105:*13*
 112:*25*
 125:*4*
 127:*10*
 128:*3*
 129:*2, 4*
**objectiona
ble**
 55:*18*
 64:*14*

**objections**
 6:*7*
 7:*11*
 13:*11*
 21:*12,*
*15*
 77:*21*

 124:*24*
 125:*2, 7*
 131:*9*
**observatio
n**  18:*16*
 66:*2*
**observatio
ns**
 30:*19,*
*24*  31:*1*
**observe**
 19:*18*
 43:*11,*
*12, 20*
 67:*25*
 91:*7*
 113:*15*
**observed**
 61:*25*
 66:*3*
 91:*5*
 105:*1*
 120:*2*
**obtain**
 46:*19*
**obtained**
 46:*21*
 111:*25*
**obviously**
 39:*23*
 46:*14*
 74:*21*
 75:*1*
**occasions**
 27:*4*
**occur**
 34:*16*
**occurred**
 27:*2*
 67:*8*
 71:*3*
 72:*20*
 74:*5, 8*

 75:*4*
 78:*22*
 79:*6*
 96:*8*
 119:*24*
**occurring**
 35:*7*
 41:*25*
**Office**
 72:*6, 16,*
*19, 24*
 73:*10, 12*
**officer**
 5:*5, 14*
 9:*16*
 11:*18*
 14:*13*
 16:*16*
 24:*6*
 25:*7, 22*
 30:*20*
 33:*15*
 39:*17,*
*18*
 40:*25*
 42:*3, 12,*
*18*  43:*4*
 44:*16*
 48:*14,*
*21*
 49:*12*
 64:*6, 19*
 68:*5*
 80:*13*
 83:*10,*
*25*  92:*1,*
*5, 6, 9,*
*12, 13,*
*22*  93:*2,*
*5, 6, 11,*
*17, 18,*
*19*
 94:*10,*

| | | | | |
|---|---|---|---|---|
| *16* | *15*  16:*4*, | 52:*5, 23* | *12* | **operationa** |
| 97:*18* | 7, 21 | 53:*1, 11,* | 107:*4* | **l**  128:*8* |
| 99:*21* | 17:*3, 18,* | *19, 24* | 109:*9*, | **operator** |
| 101:*1,* | *24*  18:*4,* | 54:*7* | *18, 25* | 109:*19* |
| *14, 18* | *8, 15, 20,* | 56:*14,* | 110:17 | **opinion** |
| 104:*3, 9* | *24*  19:*4,* | *17, 21,* | 111:*8* | 28:*16* |
| 105:*10* | *14, 19* | *23* | 113:*9* | 29:*18* |
| 110:*11,* | 20:*20* | 59:*20* | 115:*4* | 30:*17* |
| *12, 14* | 22:*7* | 61:*23* | 116:*5, 8,* | 32:*5* |
| 114:*3* | 23:*7, 18,* | 62:*5* | *22* | 33:*19* |
| 128:*9* | *22* | 65:*25* | 118:*23* | 121:*18* |
| **officers** | 24:*14,* | 66:*5, 19* | 119:*13,* | **opportunit** |
| 40:*22,* | *19*  27:*1,* | 67:*16,* | *18* | **y**  28:*10* |
| *24*   41:*3* | *4, 7, 12,* | *22, 25* | 121:*10* | 99:*22* |
| 57:*9, 14* | *15, 18,* | 69:*2, 22* | 122:*21* | 123:*2* |
| 59:*1* | *20*  28:*3,* | 70:*4, 22* | 126:*3,* | **opposed** |
| 71:*19* | *10*  32:*2* | 71:*1, 7* | *24* | 61:*1* |
| 94:*4, 6* | 34:*8, 19* | 72:*5* | 127:*2* | **options** |
| 98:*16* | 35:*6, 12,* | 76:*23* | 128:*6* | 14:*2* |
| 102:*3* | *18, 20* | 78:*6, 8,* | **once** | **Order** |
| 103:*1, 3* | 36:*14* | *11, 14,* | 16:*10* | 4:*6* |
| 109:*8* | 37:*2, 4,* | *20*  79:*4,* | **one-on-** | 7:*1* |
| **Oh** | *11, 14,* | *19*  80:*7,* | **one** | 15:*23,* |
| 38:*11* | *18, 20,* | *24*  81:*8,* | 64:*23* | *25*  16:*1,* |
| 126:*14* | *23* | *11*  82:*6,* | **one-page** | *11, 14,* |
| 130:*1* | 38:*15,* | *9, 24* | 79:*6* | *15, 18,* |
| **okay** | *25*  39:*2* | 84:*10,* | **ONONDAGA** | *22, 25* |
| 7:*6, 7* | 40:*10,* | *22*  85:*1,* | 1:*7* | 17:*12* |
| 8:*2, 12,* | *13, 19,* | *8, 11* | 2:*15, 16* | 18:*2, 25* |
| *13, 19,* | *21* | 86:*3* | 35:*22* | 19:*5, 7,* |
| *21, 25* | 41:*16* | 87:*16* | 55:*15* | *10, 11,* |
| 9:*7, 12,* | 42:*21,* | 91:*4, 18,* | 63:*2, 6,* | *12, 17* |
| *17, 25* | *24* | *25* | *19*  64:*3,* | 20:*13* |
| 10:*10,* | 43:*18,* | 92:*11* | *11* | 85:*23* |
| *13, 15,* | *21* | 93:*6* | 65:*22* | 89:*17* |
| *20, 24* | 45:*11* | 94:*2, 7* | 72:*6* | 91:*2* |
| 11:*5, 9* | 46:*10,* | 95:*11,* | 95:*25* | 112:*21,* |
| 12:*18,* | *13, 16,* | *17*  97:*5,* | 96:*5* | *22* |
| *22, 24* | *24* | *8*  98:*11* | **on-scene** | 119:*11,* |
| 13:*4* | 47:*11,* | 101:*4* | 86:*25* | *12* |
| 14:*11,* | *24*  48:*2,* | 102:*8,* | **open** | **orders** |
| *14, 18* | *5, 8, 11* | *25* | 89:*16* | 16:*5* |
| 15:*4, 7,* | 51:*15* | 103:*11,* | 105:*3* | 17:*4* |

organizational
86:9
Organize
105:10
original
59:14

originated
63:15
originating
16:1
outside
27:10, 19

< P >
p.m
1:15
100:17
115:23
130:4
PAGE
3:3
4:2
5:3, 8,
12
90:22,
23    92:4
117:5
125:11,
12
126:20,
21    133:4
Paragraph
86:13
125:14,
19
126:4, 5,
10, 15, 17

paragraphs
126:25
127:1

paralegal
124:9
paren
89:16
part
22:8
34:6
46:1
84:23
87:24
116:13
participated
16:7

particular
41:3
56:2
parties
6:3, 11
102:18
109:4
131:15
parts
24:19
party
104:12
patrol
9:16, 24
patrolled
34:4
PAUL
2:13
PAVESE
2:7
38:10
64:15
90:22,
24
102:10
129:24
pellet
50:11

penalties
133:18
pending
8:11
78:1
100:9
people
14:23
15:11
24:23
47:10
62:15
68:24
95:3
106:18
127:19
people's
46:7
perceived
67:11
97:14
perimeter
45:5, 8,
10, 12,
15, 18
129:15,
16
period
79:19
128:9
perjury
133:18
person
16:2
17:25
23:1
27:14
64:20
93:11
100:25
102:5
122:13,
16

personal
30:19
47:13

personally
31:25
personnel
5:4
23:16
24:1, 3,
5    95:2,
3, 13, 20,
21, 22
96:16
102:20
105:11
106:1, 9
120:18
pertained
48:22

pertaining
5:14
80:8, 13
Pertinent
128:17
phone
51:17
123:8
phones
102:3
physical
12:6, 8
75:21
picked
35:15
pick-up
15:23,
25    16:4,
14, 15,
22, 25
17:4, 12
18:24

19:10,
11, 17
20:12
112:21,
22
119:11,
12
place
10:21
109:22
110:22
131:6
132:11
placing
75:21
plainly
72:10
Plaintiff
1:4    2:2
Plaintiff's
85:15,
19    96:8
116:1
plan
104:16,
18
play
20:14, 19
please
5:6, 10
8:14
15:2
23:15
24:8
25:20
29:22
32:21
34:14
50:19
61:3
67:7
85:20
89:10

92:3
96:4
103:17
112:1, 3
116:2
123:22
126:23
**pleasure**
73:24
**PLLC**
2:3, 19
**pmullin@su**
**garmanlaw.**
**com**    2:13
**point**
31:13
36:6, 18
39:21
61:5
65:25
66:22,
24    67:4
87:15,
17
92:25
93:10
94:9, 14
97:10,
11, 15,
22    98:1,
17
99:17,
21
107:1
111:11
114:2
116:22
120:16
128:7
129:12,
14
**Police**
8:24

9:3, 6,
15, 23
10:21,
24    11:6,
11, 17,
18
12:13
14:13
16:5, 16
21:21
22:8, 15
23:2
25:6, 7
26:8
30:20
33:15,
22    34:6
35:23
43:3, 24
44:16
55:10,
14
57:21
58:9
59:1
62:15,
18    64:6,
19, 21
65:19
72:4
73:11
80:6
81:5
96:1, 5
100:24
102:2
108:24
109:1, 2,
12
116:14
117:24
118:14
119:20

120:2
123:9,
13, 15
125:3, 4
**policies**
21:20
84:19
85:9, 11
116:13
117:6
**Policy**
86:14
89:22
117:15
**populated**
68:11
**portion**
33:12
54:15
59:6
62:24
69:9
78:3
82:15
90:4, 13
93:24
94:15,
21
100:12
115:18
**portions**
89:6, 11
**posed**
110:24
127:21
**position**
12:12
16:5
34:25
106:14

**possession**

53:2
127:23
**possibilit**
**ies**
114:13
**Possibly**
17:17
**post**
43:1, 5,
8, 15
57:18
83:16
98:5
99:3, 19,
23
100:1, 2
**potentiall**
**y**    14:4
32:6, 8
39:16,
19    40:1
50:18,
23    53:4,
6    66:23
**practice**
14:15
**practices**
117:6, 9
**prepared**
82:3
**presence**
6:3
102:22
123:13
**present**
91:5
120:8
122:5
123:3
**presented**
123:3

**pretty**
9:22
12:13
**prevent**
102:17

**previously**
26:14
124:15
**primary**
91:11
**prior**
9:6, 15
10:10,
22    11:6
13:4
15:9
17:5
18:13,
22    20:3
22:8
25:21
26:24
31:17,
20    32:4
36:21,
23, 24
37:7, 10
41:23,
24    42:6,
12    50:8,
24
51:15
62:8, 11,
19, 25
63:3
65:19
66:17
111:21
112:11,
14, 23
113:17
114:19,

*23*
115:7,
*12*
116:11
119:10
129:16
**probably**
10:*8*
78:*9*
**problem**
11:*2*
24:18
**Procedure**
6:*10, 12*
85:*2*
87:25
88:15
89:*24*

**procedures**
21:20
84:*19*
116:13
**Proceeding**
**s**    130:4
131:5
**profession**
**al**
16:20
19:18
**profession**
**als**
105:*6*
**promoted**
9:25
10:*1, 2,*
*4, 5*
**promotion**
10:*6*
**property**
87:*3*
**protect**
87:*3*

**protocol**
117:*15*
125:15
**protocols**
116:24
117:*1, 6,*
*9*
**provide**
7:*2, 3*
42:21
43:*24*
71:16
86:*8*
119:*2*
**provided**
6:*9, 11*
17:*13,*
*19*
45:*24*
46:*2, 4,*
*20, 25*
47:7, *14*
71:25
72:*3*
80:*7*
82:*6*
119:*5*
**provider**
16:*2*
**providers**
114:23
**provides**
16:*11*
**psychiatri**
**st**    78:*22*
**PT**    12:*5,*
*6, 7*
**Public**
1:*20*
22:11
102:*17*
127:*21*
129:*13*

131:*4,*
*21*
132:23
133:*24*
**purpose**
75:11
86:4, *5,*
*8*    91:*11*
**purposes**
6:*9*
26:*14, 16*
**pursue**
61:*8, 12*
**pursued**
53:17
56:*11*
101:17
111:12
124:*2*
**pursuing**
52:*19*
**pursuit**
53:*20*
54:*10*
59:*2*
**put**
69:*2*
109:22
131:7
**putting**
69:22

**< Q >**
**question**
8:*11*
9:*21*
13:*12*
14:7
19:*24*
26:*3, 23*
29:*1*
30:*5, 11*
31:*15*

33:*11*
34:14
36:18
37:7
42:*8, 10*
44:*9*
45:*18*
46:*1*
48:*11*
49:*2, 24*
55:17
64:*9*
65:22
69:7
76:*2, 8*
77:*14,*
*25*
78:24
79:13
82:13
83:*18*
87:*19*
89:*18,*
*20*
90:14
93:22
95:*9*
96:*3*
97:*1*
98:*21*
99:7
100:*9,*
*10, 13*
101:*21*
105:*17*
107:*21*
109:*6*
112:*6*
114:*16,*
*17*
115:*16*
116:*16*

122:*2*
123:*1*
**questionin**
**g**    77:*1*
**questions**
7:*23, 24*
21:*13*
26:*3*
28:*11*
43:*8*
44:*5, 11*
48:*17*
49:*6*
51:25
55:*1, 6*
60:*18*
65:*9*
66:25
67:*1*
68:*13*
69:*6*
71:24
73:*13*
75:*2, 16*
76:*15*
89:*1*
93:*21*
94:*12*
103:*20*
112:*4,*
*24*
113:7
115:*15*
118:*6*
122:*15*
124:*8,*
*10*
128:*16*
129:*19,*
*23, 25*
**quickly**
66:*5*

quite
  69:*19*

< R >
radio
  35:*10*
  36:*5, 7*
  38:*24*
  47:*9*
  61:*21*
  63:*14,*
  *21, 23,*
  *24*
  65:*13*
  82:*22,*
  *24, 25*
  83:*3*
  94:*8*
  96:*20,*
  *23*   102:*4*
radioed
  66:*3*
  105:*3*
rails
  100:*8*
raise
  67:*10*
raised
  67:*10*
range
  14:*12*
rank
  37:*24*
rapid
  128:*21,*
  *22*
rapidly
  128:*23*
rapidly-
evolving
  123:*6*
  128:*18*

reach
  47:*19*
  87:*15,*
*17*
  105:*5*
  119:*15*
reached
  81:*13*
read
  6:*5*
  30:*2*
  33:*10,*
  *12*   59:*4,*
  *6*   62:*24*
  69:*9*
  77:*25*
  78:*3*
  82:*15*
  87:*10*
  93:*24*
  94:*19,*
  *21*
  100:*12*
  115:*17,*
  *18*
  124:*22*
  125:*19,*
  *24*
  126:*1,*
  *11, 12,*
  *15, 17,*
  *22*
  127:*5*
  133:*18*
reading
  92:*2*
  126:*16*
ready
  116:*4*
real
  61:*1*
reality-
based

12:*25*
  14:*10*
really
  27:*22*
  28:*21*
re-ask
  49:*25*
reason
  19:*18*
  59:*20,*
  *24*   60:*4*
  133:*4*
recall
  14:*20*
  15:*12,*
  *19*   16:*9*
  23:*21*
  24:*25*
  25:*12,*
  *13, 15*
  27:*3*
  28:*1*
  35:*12,*
  *15, 18*
  40:*10,*
  *12, 13,*
  *16*   41:*3,*
  *5*   42:*20,*
  *23*   44:*3,*
  *20, 25*
  45:*3*
  47:*16*
  48:*20*
  49:*17,*
  *19*   52:*4,*
  *5, 11, 17*
  54:*1, 16,*
  *18*   56:*4*
  62:*6*
  64:*10,*
  *17, 21*
  65:*3, 5,*
  *21, 24*

69:*1*
  71:*9, 11,*
*20*
  72:*22,*
  *23*   73:*2*
  74:*3, 15*
  75:*5, 10*
  79:*6, 22,*
*24*
  80:*10,*
*16*
  113:*3, 4,*
  *8*   115:*3,*
  *4, 19*
  116:*7*
  118:*22,*
*23*
  123:*18*
receipt
  6:*5*
receive
  11:*9*
  12:*19,*
*22*
  16:*25*
  17:*3*
  39:*11*
  44:*15*
  78:*14*
  118:*2, 3*
received
  11:*25*
  13:*5, 14*
  14:*24*
  15:*10,*
  *20*   22:*7,*
  *9*   23:*16*
  24:*15*
  25:*5*
  44:*20*
  47:*3*
  66:*22,*
*24*

82:*20*
  83:*25*
receiving
  53:*13*
  63:*13*
  87:*8*
recognize
  41:*6*
recollecti
on
  11:*24*
  31:*25*
record
  7:*9*
  8:*15*
  44:*11*
  59:*11*
  81:*20*
  100:*17*
  115:*23*
  124:*11*
  130:*3*
recorded
  131:*10*
recording
  27:*21*
  28:*4, 5*
refer
  82:*11*
  119:*16*
Referee
  6:*3*

references
  82:*16, 18*
referring
  39:*22*
refers
  84:*11*
refuse
  72:*18*
refusing
  88:*1*

regard
12:20
13:5
14:23,
25
15:10
21:21
25:6
34:9
37:24
39:23
43:8, 18
46:3
48:14
53:20
72:7, 21
74:4
78:22
84:17
85:9
96:7
105:7
106:1
118:1
125:4
regarding
33:18
34:16
71:25
regulation
s    34:9,
16
relative
131:14
Relax
126:20,
21
relay
32:11,
16    33:18
relayed
33:14

62:3, 5
128:17
relieved
79:10,
14, 20
reload
67:16
remaining
46:1
remember
11:2
46:14,
17    65:6
removal
5:14
80:8, 13
remove
80:4
rep
81:4, 8
repeat
62:21
64:9
69:7
rephrase
19:25
29:1
34:14
50:1
55:7
87:22
88:7
report
4:9
10:14
41:15
42:18
71:25
72:3
79:3, 5
126:17,
19

reported
49:18
50:3
Reporter
1:20
7:1, 6
30:2
33:10
69:8
81:23
82:14
124:15
131:3, 16

REPORTER'S
131:1
represent
7:22
represente
d    81:6
reprimand
25:9, 10,
16
reprimande
d    25:14

reprimands
5:10
25:19
reproducti
on    86:1
request
5:4, 9,
13    24:4
25:17
72:19
73:7, 9
80:11,
12    94:7
95:1, 12,
13, 17,
20
96:15

97:5, 9
102:19,
23, 24,
25
103:7,
12
121:3,
23    122:3
Requested
33:12
59:6
62:24
69:9
78:3
82:15
93:24
94:21
96:20
100:12
103:3
115:18

requesting
43:12
103:14
required
34:25
35:3
reserved
6:7
residence
60:22
104:22
111:10
118:19

residences
46:6, 7
70:15

resolution
86:5, 9
107:9,

10, 14
108:1, 3,
7, 11, 13,
18, 20,
23, 25
Resources
4:8
95:2, 3,
13, 24
96:15,
16
102:20,
25
103:3
116:10,
18, 23
117:19,
20
118:9,
12
119:15
respect
6:13

respective
6:3
respond
21:21
30:12
37:14,
21
38:23
39:2
40:21
55:9
56:9
102:24
responded
35:10,
22
37:11,
13
38:13,

28

16    39:1,
6    40:7,
9    56:7
91:7, 11
**responder**
128:12

**responders**
54:2
57:21

**responding**
9:19
35:17
46:23
54:23
58:4
61:22
94:4, 5
95:18
98:15
119:20
**response**
35:21
36:11
50:8, 9
90:2, 20
91:12
94:20
**responses**
28:13, 15
**responsibi
lities**
9:14
**responsibi
lity**
41:14
86:19
**responsibl
e**    99:19
**rest**
125:24

**restate**
42:10
**result**
5:14
79:15
80:14
119:23
**results**
110:5
**retained**
4:2
**returned**
80:18, 19
**returning**
80:16
**review**
10:10,
13, 18
**reviewed**
10:16
124:22

**Ridiculous**
77:5, 8,
10
**right**
5:4
8:6
9:25
11:14,
16    12:6,
18
18:25
19:1
20:3
24:5
28:20
29:21
30:20,
21, 24
31:1, 18,
23
33:22

36:2, 9
53:4, 6
55:10
58:21
60:4
64:25
69:18,
19, 20
73:18
74:10
76:5
83:6
84:14
86:11
89:24
90:1
92:4, 18
94:17
105:20
113:10,
24
121:19
123:19
125:9,
13
127:14
**rights**
6:11
**Road**
34:1
37:12,
13
111:10
**role**
22:17
**roll**
41:1
**room**
77:7
**round**
13:25
70:23

71:2, 12,
15
**rounds**
14:1
26:15
67:15,
17, 18,
19, 24
68:1
69:23
70:19
71:5, 8,
9
**rule**
8:10
**Rules**
6:10, 11,
12    8:5
34:9, 16,
19, 23
35:1
73:17

< S >
**safety**
129:13
**saying**
8:7
60:5
74:7
90:17
92:25
**says**
86:4, 8,
14, 15,
21, 23
87:4, 24
88:15,
17, 18,
20    89:8,
13, 22,
24, 25
90:3, 5,

10, 18
91:1, 25
104:8,
21
105:10
106:6
107:5
117:5, 7,
8, 13
125:17
**scenario**
14:12, 15
**scenario-
based**
13:2
15:3
**scenarios**
14:11
**scene**
33:15
35:22
37:11
38:16
39:7, 8,
15    40:8,
15, 23
42:3, 17,
22, 24
44:1, 13,
17
45:23
46:25
47:6, 20,
24    48:9,
15
52:25
53:14
54:3
55:9
56:7
57:10
58:6, 14,
21, 25

65:18
71:19
75:7
87:13,
16    91:5,
7, 13
92:5, 6,
12, 13,
21, 23
93:3, 7,
12, 19
94:1
95:22
97:17,
18
100:4
104:4,
10, 11,
12
109:10,
24
111:12
112:16,
20
113:11
114:15,
25
120:24,
25
123:13,
15    124:2
SCHOENECK
2:19
schooling
11:11
schools
12:1, 3,
4
scratch
78:4, 8,
9, 11, 15,
18

Second
1:17
2:12
10:6
27:24
33:1
71:2, 12,
15
126:21
Section
86:3
87:10
90:24,
25    126:8
sections
6:12
Security
12:2
see    9:1
16:20
57:14
62:8
65:25
78:21
82:10
86:14
87:4
88:15,
18, 21
89:15
90:18
109:16,
17
117:3, 4,
13
119:11,
12
125:17
129:22
seeing
116:7
seek
81:11

seen
46:5
47:12
116:6
124:19,
21
senior
37:23
seniority
38:4
sent
16:18
sentence
86:14
89:16
separate
51:25
70:19
Sergeant
7:21
10:1, 3,
6, 8
serious
34:10,
17
84:14
115:10
service
23:5
26:6
56:15,
18    60:1,
24
65:20
66:6
67:4
68:9, 22,
25    69:3
71:2, 11
75:14
110:18
115:13

services
22:19
set
43:5
57:18
107:14,
19    131:6
seventh
78:2
sharing
86:18
sheet
124:16
Sheriff's
35:23
55:15
63:2, 7,
19    64:3,
11
65:23
95:25
96:6
shoot
70:7, 11
119:10
120:22
shooting
17:5, 20
18:5, 9
25:22
36:21,
23    37:8,
10
39:24
41:23,
25
62:25
63:4
66:17
71:18
74:5
78:20
79:2, 5

85:5
110:3
111:22
112:12,
19, 23
shorthand
131:13
shot
60:13
68:16,
19    69:4,
24    70:5,
16
78:17
115:5
124:2
shots
69:18
70:22
show
25:2
81:22
85:12,
18
115:25
124:14
showing
48:8
sic
51:21
87:3
SICKINGER
2:18
7:13
63:5, 10,
20    64:5,
7, 13
129:23
side
25:2
sign    6:5
signature
133:18

significant 13:5
signify
16:16
similar
85:2
simpler
90:14
simplified
129:10
Sims
13:15, 17
S-I-M-S
13:15
Simunition
13:20, 24
Simunition
s 14:9
single
55:4
86:18
Sir
8:14, 17,
21 10:4,
7, 10, 13,
19, 20,
25 11:5
12:19,
22
13:14,
23 14:8,
22
15:17,
22, 25
17:10,
11
18:12,
16
20:12,
17 21:3,
10, 20

22:4
23:4, 14,
18
24:15
25:21
26:6, 21
29:21
30:10
32:9, 13,
25
33:20,
21 34:8,
15, 19
35:6, 13,
20, 25
36:15
37:14,
18 38:1,
12, 20
39:5, 11
40:5, 13
41:2, 9,
10, 19
42:11,
16
44:20
45:4, 21,
22
46:19,
24
47:17
48:11,
13, 25
49:3, 7,
11, 16,
17 52:2,
7, 13, 18,
23
53:24
54:2
55:17,
21 56:5,
6 57:17

58:3
59:8, 13
60:11
61:9, 14,
24 62:7,
14
63:22
64:16
65:4, 17
66:19
67:3, 13
68:3, 9
70:18
71:10,
14 72:3,
18 74:2
75:6, 12
78:6, 20
79:1, 7
81:16,
22 82:9,
19, 21
83:12,
21, 24
84:3, 6,
7, 16
85:1, 8,
18 86:1,
3, 13
87:6, 13,
17, 21
88:15,
23 89:4,
15 90:3,
8, 14
91:4, 14,
25
92:25
93:10,
15 94:7
95:12
96:7, 19
97:25

98:9
100:4,
19
102:14
103:6,
16, 24
104:2,
13, 20,
25
105:5,
25
106:14,
21
107:13
108:12
109:9
110:13
111:1
112:10,
14
115:12,
25
116:6
117:3,
13
118:2,
16, 17
119:9,
18
120:13
121:22
123:10
124:1, 7,
14
125:8
126:2, 4
127:4, 9,
14
128:14
129:1, 18
sit
44:25
48:20

54:17
71:7
73:2
74:15
89:5
101:10
sitting
88:10
situation
22:2
35:7
49:4
92:17
98:10,
11
99:23
106:16
107:12
123:7, 8
128:8,
18, 20
129:11
six
11:4
76:19
80:24, 25
skimmed
124:23
slow
26:2
small
78:9
somebody
22:22,
25 25:3
37:15,
17
51:12
100:2, 5
121:4, 5

somebody's

25:2

son    50:4

sorry
 38:1
 42:10
 45:25
 49:25
 51:23
 57:3
 59:3
 60:20
 61:3
 62:21
 63:22
 64:9
 68:13
 69:7
 70:8
 79:12
 82:13
 85:4
 90:21
 93:22
 94:12
 101:22
 114:16

sources
 46:22
 63:17

South
 2:4
 46:8
 82:23
 95:22

southbound
 110:24
 111:7

southerly
 46:8

southern
 46:8

sparsely
 68:11

speak
 47:19,
 22
 62:11
 65:18
 66:13
 71:18
 112:10
 113:6, 9
 114:12,
 22

speaking
 22:10
 64:10
 72:23
 113:15
 118:23

special
 118:2

specialize
d    11:9,
 10, 19,
 25
 12:19
 13:14
 14:22, 24

specific
 5:13
 22:5
 23:8, 12
 48:21
 53:24
 54:14
 80:12
 83:9
 94:1
 106:4

specifical
ly
 15:21
 17:6

25:1
 49:15
 54:16
 83:1
 96:18
 103:5
 112:18
 119:12

specified
 132:11

speculate
 37:3
 40:18
 66:11
 80:2, 3

speculatio
n    40:20

speech
 77:15,
 22    78:1

speeches
 77:16

split
 7:2, 3

spoke
 30:14
 47:20
 48:3
 113:4,
 12
 114:19

spoken
 26:23
 62:15
 110:4

St    17:4
 18:17
 47:20,
 22    75:8,
 9
 112:15
 118:24

119:1, 5,
 16

stabilizin
g    87:2

Stacey
 110:14,
 18

staging
 43:8, 18,
 22
 83:18, 19

stand
 8:19

standardiz
ed    86:24

standoff
 22:21, 24

START
 1:15
 8:14
 11:23
 126:4

started
 118:19

starts
 125:14
 126:8

state
 8:14
 35:23
 43:24
 55:13
 57:21
 58:5, 9
 64:18,
 19, 20
 65:19
 96:1, 5
 100:23
 109:12
 125:4

stated
 84:20

statement
 71:22
 72:6, 15
 79:4

statements
 72:17
 79:1
 127:5, 8

STATES
 1:1

status
 110:21

stemming
 29:19
 31:7

stenograph
ically
 131:10

steps
 85:1, 5
 91:9, 14,
 21
 94:11
 102:14

STIPULATED
 6:1, 3,
 7, 9, 11

STIPULATIO
NS    6:1

stop
 77:4, 18,
 20
 105:19,
 21
 114:2
 127:14

stopping
 107:22

straight
 65:11

Street
  1:17
  2:4, 11,
  17
strike
  16:12
  26:5
  44:10
  48:11
  49:2
  55:2
  61:4
  65:10
  75:17
  87:7
  110:8
  114:17
  118:7
struck
  60:22
  67:19
structure
  84:13
  86:16
  89:23
  129:17
subordinate
  105:10
  106:1, 9

Subscribed
  132:19
  133:22

Subsection
  90:20,
  25   104:8

subsequent
  67:22, 23
Subsequently

71:21
80:17
substance
  46:16
  62:1
  65:7
  71:20
substantiated
  19:21

successful
  86:5, 9
  107:8,
  10, 14,
  25
  108:3, 7,
  11, 13,
  17, 19,
  22, 25
Sugarman
  1:15
  2:8
suggest
  57:1
suicide
  115:11
Suite
  2:4, 22
sum
  46:16
  62:1
  65:6
summary
  96:7
superior
  39:2
  42:19
  43:4
  48:14,
  21   49:5,
  12   56:2

57:2, 5
83:10, 25
supervising
  83:10
  92:9, 22
  93:2, 4,
  11, 17,
  19
  94:15
  101:14,
  18
  105:9
  114:3

supervisor
  39:17,
  18
  104:3, 9
support
  120:1, 5,
  8   123:24
supposed
  14:14
  21:16
  48:15
  53:20
  108:15
sure
  17:23
  25:8
  26:15
  33:5
  47:4
  48:4, 5,
  19, 23
  59:19
  63:1
  68:15
  73:1, 23
  74:3
  81:1
  82:5
  92:24

surrounding  68:10
  69:16
suspect
  29:3
  82:23
  91:17
  94:1
  95:5, 8
  102:16,
  17, 23
  104:18
  121:12
  127:20
  128:19
  129:12,
  15
suspected
  20:5
  28:22

suspicious
  27:13
swear
  77:11
swearing
  77:7
switch
  54:22
sworn
  7:18
  132:5,
  19
  133:22
Syracuse
  1:18
  2:5, 12,
  18
system
  83:13
  84:8, 11
  86:24
  87:6

88:17,
20
89:16
90:12

< T >
tailing
  34:12
take
  8:9, 12
  56:10
  59:9, 13
  66:1
  81:23
  85:1, 6,
  19
  87:21,
  24
  89:25
  91:9, 14,
  21
  92:22
  94:10
  100:7
  101:9
  102:14
  104:3
  116:1
  124:18
taken
  110:22
  131:5, 13
takes
  41:14
talk
  32:14
  65:12
  109:22
  124:9
talked
  10:20
  109:25
  110:18

111:*2, 3, 13, 18*
talking
120:*16*
Taser
56:*20*
Team
112:*15*
tear
124:*16*
Technicall
y  76:*22, 23*

techniques
12:*20*
13:*16*
21:*25*
telephone
102:*1*
tell
9:*9*
11:*23*
15:*2*
23:*19*
27:*20*
50:*2, 6*
57:*1, 5*
66:*8*
78:*13*
79:*19*
81:*1*
84:*10*
85:*22*
102:*23*
127:*8*
telling
50:*10*
51:*7*
106:*2*
tells
13:*13*

temporaril
y   80:*9*
ten
23:*22*
testified
7:*18*
75:*23*
76:*4*
127:*15*
testify
132:*6*
testimony
73:*4*
74:*18*
92:*16*
106:*9, 11*
131:*8*
132:*6, 10*
tetanus
78:*17*
Thank
5:*6*
15:*22*
17:*10*
21:*10, 18*
23:*14*
24:*8*
26:*21*
32:*9, 13*
33:*20*
35:*25*
39:*5*
40:*5*
41:*9*
42:*16*
45:*4, 21*
47:*17*
49:*11, 16*
51:*19*
52:*7, 13,*

*18*
55:*21*
56:*5*
57:*8, 13*
59:*8*
60:*10*
61:*14*
62:*7*
65:*1, 4*
67:*3*
70:*18*
71:*10, 14*   72:*2*
75:*6*
77:*22*
79:*9*
81:*15*
84:*6*
88:*12*
96:*19*
97:*25*
98:*23*
100:*15, 16*
103:*6, 23*
105:*22*
117:*10, 12*
118:*16*
119:*9*
122:*24*
124:*7*
125:*8*
129:*18*
thanks
76:*21*
98:*24*

therapists
78:*22*
therapy
12:*6*

thereto
6:*13*
thing
7:*8*
9:*22*
45:*13*
114:*7*
things
9:*17*
12:*4, 16*
26:*13*
107:*5*
114:*13*
121:*8*
think
7:*9*
10:*8*
11:*6, 16*
38:*20*
62:*22*
100:*23*
107:*7*
118:*17*
third
44:*9*
thirty
66:*9, 10*
thousand
21:*13*
threat
67:*11*
68:*18*
110:*25*
127:*21*
threatened
115:*11*
threats
102:*17*
Three
9:*8*
26:*3*
31:*20*

54:*5, 7, 18*
76:*15*
79:*23, 25*
126:*25*
tickets
9:*17*
TIME
1:*15*
6:*8*
8:*9*
9:*9*
15:*10*
17:*9, 19*
18:*5, 9*
24:*2*
30:*4*
32:*2*
36:*25*
37:*6*
38:*20*
39:*6, 15*
40:*10, 13, 14*
41:*18*
42:*3*
44:*14*
45:*22, 23*
46:*25*
47:*5*
52:*19*
54:*8*
55:*23*
56:*18*
58:*14, 17*
59:*14, 15, 25*
60:*11, 23*   61:*3*
67:*21*

68:*9*, *19*
76:*18*,
*20*    78:*2*
79:*20*
80:*17*
93:*9*
94:*8, 9,*
*23, 24*
95:*1, 4,*
*12*    98:*1*
101:*10,*
*16*
105:*17*
106:*19,*
*23*
107:*23*
110:*2, 3,*
*17, 22*
112:*19*
114:*15*
115:*7*
120:*21*
128:*9*
129:*9,*
*12*
131:*6, 9*
132:*11*
**times**
14:*21*
16:*7*
23:*18,*
*20, 22*
67:*9, 12*
69:*4*
**timing**
36:*14*
**today**
7:*24*
44:*25*
48:*20*
54:*17*
71:*7*
73:*2*

89:*5*
92:*16*
106:*9,*
*11*
127:*15*
**told**
19:*8*
39:*16,*
*18*
46:*11,*
*12*
50:*15*
51:*4, 12*
66:*20*
67:*9*
74:*21*
100:*23*
106:*10*
122:*6*
127:*24*
**tomorrow**
129:*22*
**tool**
14:*9*
118:*9,*
*11*
122:*20,*
*21*
**top**
11:*1*
15:*12*
16:*9*
27:*6*
92:*4*
**totality**
31:*23*
46:*10, 12*
**touch**
94:*17*
**TOWN**
1:*6*
2:*8*
8:*24*

10:*2*
25:*7*
28:*2*
34:*8*
72:*4*
116:*18*
**traffic**
63:*25*
**trained**
21:*24*
118:*1*
**training**
9:*4*
11:*3, 10,*
*12, 17,*
*19    12:8,*
*14, 19,*
*22, 23,*
*25    13:1,*
*2, 5, 15,*
*17, 20*
*14:2, 9,*
*10, 18,*
*22, 24*
*15:3, 6,*
*10, 19*
*22:7, 8,*
*9    26:13,*
*16*
110:*16*
118:*2*
**trainings**
11:*25*
12:*5, 9*
15:*8*
**transcribe
d**    131:*11*
**transcript**
6:*5, 6*
7:*1*
76:*14*

131:*12*
132:*9, 10*
**transfer**
97:*11,*
*15    98:1*
104:*2, 6,*
*8, 14*
**transferre
d**    97:*17,*
*19, 22*
104:*11*
**transmissi
on**
35:*13*
36:*6*
63:*25*
82:*24*
**transmissi
ons**
35:*10,*
*16    36:8*
38:*24*
63:*14,*
*21, 24*
65:*13*
82:*22,*
*25    83:3*
**transporte
d**    97:*21*
**travel**
47:*10*
62:*4*
69:*18*
95:*8*
122:*6*
127:*21*
**traveling**
46:*8*
106:*7*
110:*24*
111:*7*
**treatment**
78:*14*

**trial**
6:*8*
**trick**
7:*25*
77:*13*
**tried**
96:*15*
120:*19*
**Trooper**
50:*3, 10*
51:*4, 7*
58:*3, 4,*
*5    127:24*
**true**
131:*12*
132:*10*
133:*19*
**truth**
132:*6*
**try**
60:*13*
99:*24,*
*25    100:1*
**trying**
17:*7*
19:*24*
65:*11*
77:*13*
105:*3*
112:*21*
**turn**
23:*6*
81:*16*
**Twenty**
66:*9, 10*
**two**    8:*9*
27:*6, 25*
29:*2*
30:*11*
31:*2, 17,*
*22*
37:*20*
44:*5*

51:*15,*
*25*
70:*19*
71:*8, 9*
79:*23*
113:*17*
122:*15*
126:*25*
type
13:*23*
14:*12*
21:*24*
109:*11*
types
24:*14*
Typical
24:*16*
typically
101:*1, 3*

< U >
Uh-uh
35:*19*

ultimately
101:*10*
undersigne
d    117:*5,*
*8*

understand
13:*12*
17:*18*
19:*13,*
*24*    21:*6*
29:*21*
54:*13*
56:*1*
58:*23*
60:*9*
66:*12*
73:*18*
81:*3*

83:*5*
106:*8*
108:*9*
113:*1*
120:*20*
122:*10*
123:*4*
128:*24,*
*25*
understand
ing    4:*6*
41:*10*
100:*19*
116:*10,*
*13*

understood
29:*25*
30:*6*
underwent
14:*18*
Unified
86:*15,*
*16*    89:*22*
union
81:*4, 5,*
*6, 8*
union-
provided
81:*13*
Unit
47:*21,*
*23*    48:*3*
112:*16,*
*20*
118:*20,*
*24*
119:*1, 5*
123:*5*
UNITED
1:*1*
units
35:*11,*

17
46:*23*
61:*22*
95:*18*
96:*1, 6*
97:*3*
102:*23,*
*24*
105:*4, 6*
updated
46:*25*
47:*4*
upset
25:*3*
use
13:*15*
14:*2, 3,*
*4*    24:*23*
25:*1*
53:*24*
54:*14*
55:*4*
57:*1, 5,*
*14*
83:*13*
102:*3, 4*
114:*13*
121:*8*
122:*10,*
*19, 22,*
*23*    123:*2*
uses
55:*10*
102:*4*
usually
7:*5*
utilize
118:*11*
123:*3*
utilized
6:*9*
14:*1*
54:*6*

86:*16*
89:*23*
90:*12*
118:*10*
121:*25*
122:*1*

< V >
valid
75:*24*
77:*17*
various
24:*19*
63:*17*
vehicle
37:*16*
38:*13*
verbal
8:*5*
25:*10*
105:*2*
Video
28:*5*
view
129:*11*
Village
9:*5*
violates
74:*20*
visual
66:*1*
voice
33:*2*
volley
70:*24*
71:*3, 12,*
*15*
volleys
70:*19*
71:*8, 9*
vs    1:*5*

< W >

Wait
9:*20*
105:*20*
waived
6:*3, 6,*
*12*
walked
107:*7*
walkthroug
h    4:*5*
82:*2*
wall
23:*8, 10*
want
8:*1*
16:*12*
40:*18*
66:*11*
73:*1, 21*
77:*17*
80:*2*
126:*21*
Warren
2:*4*
waste
30:*3*
way
7:*25*
8:*1*
22:*12*
24:*18*
66:*14*
68:*24*
69:*3*
76:*8*
77:*13*
79:*10,*
*14*
82:*25*
87:*14*
121:*19*
126:*13,*
*14*

**weapon**
25:*23*,
*25*    26:7,
*18*
36:25
40:15
42:*4, 13*
44:15
45:23
50:24
51:*11,
21*    52:3,
*8, 10, 14*
53:3
56:15
58:*14,
18*
59:16
60:1, *24*
65:20
66:6
67:5, *11,
12*    68:*6,
10, 22,
25*    69:*4*
71:*2, 11*
75:14
110:*18*
114:*20,
23*
115:*8,
13*
116:*11*
**weapons**
12:*1, 16*
51:*16*
57:15
**Wednesday**
1:*14*
**weeks**
11:*12*
**WEISBERG**
2:3

**welcome**
77:*23*
103:*24*
**well**
14:*1*
22:11
25:*2*
52:24
53:*10*
74:19
76:1
81:13
91:10
105:*20*
107:*16*
120:*25*
**went**
10:*21*
61:*20*
75:*8*
76:*4*
120:*18*
**we're**
8:*7*
31:*21*
59:*9*
75:*21*
120:*16*
**West**
1:*17*
2:*11*
105:*1*
**whatnot**
78:*10*
**Wickes**
110:*11,
14, 19*
111:*15*
114:*11,
19*
**WITNESS**
1:*13*
6:*5*

7:*17*
32:*22,
24*
50:*20,
22*    53:*8*
78:*4*
100:*14*
103:*18,
19*
112:*2, 3*
124:17
125:*21*
126:14
127:*2*
131:7, *8*
**wooded**
106:*7,
10, 14*
**woods**
61:*6, 12,
17, 20,
25*    62:*8,
11*    66:*4*
68:*16*
70:*10,
12*
104:*21*
124:*2*
**word**
11:*16*
57:*4*
77:*11*
88:*23*
89:*4, 15*
90:*15*
**words**
84:*7*
89:*4*
96:*9*
**work**
8:*23*
9:*7*
87:*1*

108:*24*
109:*1, 2*
**worked**
9:*5*
10:*21*
85:7
91:*17*
121:*12,
24*
**working**
33:*21*
34:*20,
22*    35:*2,
4*    84:*21,
23*
94:*24*
117:*19*
128:*18*
129:*11*
**written**
25:*10*
80:*7*

**< Y >**
**Yeah**
7:*4, 13*
9:*19*
11:*13*
12:*8*
28:*6, 19*
30:*8*
34:*21*
49:*9*
91:*1, 9*
95:*6*
96:*12*
**year**
15:*13,
15*
80:*19,
23*    81:*2,
3*

**years**
9:*2, 8*
13:*3*
33:*22, 23*
**YORK**
1:*1, 18*
2:*5, 12,
18, 23*
43:*24*
55:13
58:*5, 9*
64:*18,
19, 20*
65:*19*
**young**
8:*6*

**< Z >**
**ZUKHER**
2:*3, 5*
3:*5*
5:*4, 9,
13*    7:*4,
14, 20,
22*    19:*6,
9, 15*
21:*11,
15, 18,
19*    24:*4,
10*
25:*17*
29:*10,
16, 24*
30:*5, 8,
9*    32:*23*
33:*5, 8,
13*
34:*13*
39:*23*
44:*10,
12*
50:*21*
51:*3*

| | | | | |
|---|---|---|---|---|
| 53:*9, 11*<br>55:*18*<br>59:*4, 9,*<br>*12*  60:*9*<br>62:*22*<br>64:*14,*<br>*25*  65:*2*<br>69:*8*<br>73:*15,*<br>*18, 22,*<br>*25*  74:*1*<br>75:*23*<br>76:*3, 11,*<br>*12, 14,*<br>*20*  77:*2,*<br>*5, 8, 10,*<br>*12, 16,*<br>*23*  78:*2,*<br>*5, 25*<br>80:*11*<br>81:*17,*<br>*21*<br>82:*14*<br>85:*14,*<br>*17*<br>87:*11,*<br>*20, 23*<br>88:*1, 5,*<br>*9, 12, 14*<br>92:*4*<br>93:*23*<br>94:*19,*<br>*22*<br>95:*11*<br>98:*20,*<br>*23*  99:*1,*<br>*6*  100:*9,*<br>*15, 18*<br>103:*19,*<br>*24*<br>104:*1*<br>105:*16,*<br>*20, 24* | 107:*20,*<br>*23, 24*<br>112:*3, 8,*<br>*9*<br>115:*17,*<br>*20, 24*<br>117:*12*<br>121:*17,*<br>*19, 21*<br>124:*8,*<br>*13*<br>125:*12*<br>126:*8,*<br>*12, 18,*<br>*23, 25*<br>127:*3*<br>129:*4, 8,*<br>*18, 22*<br>130:*1* | | | |