**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**ESTATE OF JLA,**

**Plaintiff,**

    **vs.**

**COREY FIKE,**

**Defendant.**

**5:22-cv-00287**
**(MAD/MJK)**

---

**APPEARANCES:**                          **OF COUNSEL:**

**WEISBERG & ZUKHER, PLLC**               **DAVID E. ZUKHER, ESQ.**
109 South Warren Street, Suite 711        **KARLA R. PAVESE, ESQ.**
Syracuse, New York 13202
Attorneys for Plaintiff

**BOND, SCHOENECK & KING, PLLC**          **RYAN P. KELEHER, ESQ.**
22 Corporate Woods Boulevard, Suite 501
Albany, New York 12211
Attorneys for Defendant

**BOND, SCHOENECK & KING, PLLC**          **MITCHELL J. BANAS, JR., ESQ.**
Avant Building, Suite 900
200 Delaware Avenue
Buffalo, New York 14202
Attorneys for Defendant

**BOND, SCHOENECK & KING, PLLC**          **COLLIN MICHAEL CARR, ESQ.**
One Lincoln Center
Syracuse, New York 13202
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiff, the Estate of JLA, commenced this action in New York state court on February 28, 2022.  Dkt. No. 2.  The case was removed to this Court on March 25, 2022.  Dkt. No. 1. Initially, Plaintiff named multiple municipalities, a town police department, a county sheriff's department, and four law enforcement officers as defendants.  Dkt. No. 2 at 1.  However, at this stage, only one defendant remains: New York State Trooper Corey Fike in his individual capacity ("Defendant").  Dkt. No. 75; *see also* Dkt. No. 57.

The initial complaint alleged nine causes of action, the following of which were brought against Defendant: (1) assault; (2) battery; (3) wrongful death; (4) intentional infliction of emotional distress ("IIED"); (5) negligent infliction of emotional distress ("NIED"); and (6) excessive use of force under 42 U.S.C. § 1983.  Dkt. No. 2.  After Plaintiff voluntarily dismissed the other defendants from the case, it filed an amended complaint against Defendant on October 14, 2024.  Dkt. No. 75.  Therein, Plaintiff reiterates its original claims and adds a cause of action for negligence.  *Id.*

On April 22, 2025, Plaintiff filed a motion for partial summary judgment on the issue of Defendant's negligence liability.  Dkt. No. 79.  Defendant responded to that motion on June 6, 2025, Dkt. No. 85, more than a month after filing its own summary judgment motion on April 28, 2025, Dkt. No. 80.  Plaintiff filed an opposition to Defendant's motion.  Dkt. No. 86.  Both motions are presently before the Court.

## II. BACKGROUND

**A.    JLA's Mental Health Struggles**

The events giving rise to this action—the deadly police shooting of a teen in crisis—occurred on March 4, 2021.[1]  Dkt. No. 79-1 at ¶ 3; Dkt. No. 85 at ¶ 3; *see also* Dkt. No. 79-14. The parties do not dispute that JLA, a seventeen-year-old boy living in Jamesville, New York, suffered from mental health issues.  Dkt. No. 80-20 at ¶ 1; Dkt. No. 86-3 at ¶ 1; *see also* Dkt. No. 79-7 at 3.  JLA had received inpatient psychiatric treatment for paranoid delusions through the St. Joseph's Hospital Comprehensive Psychiatric Emergency Program ("CPEP") in Syracuse, New York.  Dkt. No. 79-1 at ¶ 1; Dkt. No. 85 at ¶ 1; Dkt. No. 80-20 at ¶ 1; Dkt. No. 86-3 at ¶ 1.  CPEP discharged JLA on March 2, 2021, and its mobile crisis outreach ("MCO") team made a follow-up visit to his home on March 3, 2021, after his mother reported that his condition had not improved.  Dkt. No. 79-1 at ¶¶ 1-2; Dkt. No. 85 at ¶¶ 1-2; Dkt. No. 80-20 at ¶¶ 2-3; Dkt. No. 86-3 at ¶¶ 2-3; *see also* Dkt. No. 80-5 at 4:17-25.  After the March 3 visit, another appointment was scheduled for the next day.  Dkt. No. 79-1 at ¶ 2; Dkt. No. 85 at ¶ 2.

## B.    JLA's Departure and His Mother's 911 Call

On March 4, 2021, after MCO personnel arrived at JLA's home for the scheduled visit, JLA got in his car and drove away because he did not want to return to CPEP.  Dkt. No. 79-1 at ¶ 3; Dkt. No. 85 at ¶ 3; Dkt. No. 80-20 at ¶ 4; Dkt. No. 86-3 at ¶ 4.  In doing so, he struck his mother's car, which was parked behind his vehicle in the driveway.  Dkt. No. 80-20 at ¶ 4; Dkt. No. 86-3 at ¶ 4.  JLA's mother called 911 and requested that the New York State Police find JLA so he could be transported to CPEP.  Dkt. No. 79-1 at ¶ 4; Dkt. No. 85 at ¶ 4; Dkt. No. 80-20 at ¶ 6; Dkt. No. 86-3 at ¶ 6.  The parties agree that a member of the MCO team contacted St. Joseph's

---

[1] For some factual allegations, the parties dispute only the correctness of the provided record citations, not the allegations themselves. *See, e.g.*, Dkt. No. 85 at ¶ 3; Dkt. No. 86-3 at ¶ 8. Where necessary, the Court located support for the undisputed factual allegations elsewhere in the record.

Hospital for a "pick-up order," which would request that law enforcement officers transport JLA to the hospital for treatment, but the parties dispute whether the pick-up order was actually issued before or after JLA's killing. Dkt. No. 79-1 at ¶ 7; Dkt. No. 85 at ¶ 7; Dkt. No. 80-20 at ¶ 5; Dkt. No. 86-3 at ¶ 5; *see also* Dkt. No. 80-18.

JLA's mother notified the 911 dispatcher that JLA owned airsoft guns and had previously threatened "suicide by cop." Dkt. No. 79-1 at ¶ 5; Dkt. No. 85 at ¶ 5; Dkt. No. 80-20 at ¶ 7; Dkt. No. 86-3 at ¶ 7. When the dispatcher asked whether JLA had an airsoft gun with him, JLA's mother said she was not sure. Dkt. No. 79-1 at ¶ 5; Dkt. No. 85 at ¶ 5; Dkt. No. 80-20 at ¶ 7; Dkt. No. 86-3 at ¶ 7. Dispatch sent multiple units (the parties dispute whether five or six units were sent) and advised law enforcement that JLA had threatened suicide by cop (the parties dispute whether dispatch clarified that those threats had happened on past occasions, rather than on that specific day). Dkt. No. 79-1 at ¶ 6; Dkt. No. 85 at ¶ 6.

Defendant received the dispatch and was the first responding officer to arrive at JLA's home. Dkt. No. 79-1 at ¶ 8; Dkt. No. 85 at ¶ 8; Dkt. No. 80-20 at ¶ 8; Dkt. No. 86-3 at ¶ 8. There, JLA's mother told Defendant that her son was experiencing paranoid delusions and believed people were out to get him. Dkt. No. 79-1 at ¶ 11; Dkt. No. 85 at ¶ 11. The parties do not dispute that the New York State Police were the "lead agency" for this call. Dkt. No. 79-1 at ¶ 9; Dkt. No. 85 at ¶ 9. The parties also agree that between twenty and thirty minutes after Defendant's arrival at the home, Channel 1 became the designated radio frequency for all responding officers to use. Dkt. No. 80-20 at ¶ 10; Dkt. No. 86-3 at ¶ 10. Members of the Onondaga County Sheriff's Office and Dewitt Police Department also responded to the call. Dkt. No. 79-1 at ¶ 10; Dkt. No. 85 at ¶ 10.

**C.     Law Enforcement's Response to the 911 Call**

After Defendant finished speaking with JLA's mother, he walked to the end of the driveway, where he was approached by a Department of Transportation ("DOT") or construction worker. Dkt. No. 80-20 at ¶ 11; Dkt. No. 86-3 at ¶ 11. The worker told Defendant that he saw someone fitting JLA's description holding what appeared to be a handgun and walking along the railroad tracks behind some nearby homes. Dkt. No. 79-1 at ¶¶ 12-13; Dkt. No. 85 at ¶¶ 12-13; Dkt. No. 80-20 at ¶¶ 11-12; Dkt. No. 86-3 at ¶¶ 11-12. Defendant then saw JLA near the railroad tracks, and JLA jogged away. Dkt. No. 80-20 at ¶ 13; Dkt. No. 86-3 at ¶ 13.

Defendant and an Onondaga County sheriff's deputy convened in a parking lot behind the nearby DOT facility. Dkt. No. 80-20 at ¶ 15; Dkt. No. 86-3 at ¶ 15. From there, Defendant saw JLA again and tried to speak with him. Dkt. No. 80-20 at ¶ 16; Dkt. No. 86-3 at ¶ 16. The parties do not dispute that Defendant saw JLA holding what appeared to be a black semiautomatic firearm.[2] Dkt. No. 80-20 at ¶ 17; Dkt. No. 86-3 at ¶ 17. Over his radio, Defendant reported that JLA had a gun. Dkt. No. 80-20 at ¶ 18; Dkt. No. 86-3 at ¶ 18. A certified hostage negotiator from the Dewitt Police Department arrived at the DOT parking lot, where she tried to calm JLA down and convince him to drop his weapon.[3] Dkt. No. 80-20 at ¶ 19; Dkt. No. 86-3 at ¶ 19. JLA did not point or shoot his weapon at any law enforcement officers; rather, he insisted he wanted to be left alone and departed the parking lot on foot. Dkt. No. 80-20 at ¶¶ 21-22, 25; Dkt. No. 86-3 at ¶¶ 21-22, 25 (taking issue with Defendant's characterization of JLA's movement as "fle[eing]," and instead alleging that JLA "simply walked away in another direction"). Plaintiff notes that JLA stated his desire to be left alone after he asked Defendant whether he was under arrest, and

---

[2] As described below, JLA was holding a pellet gun that was visually indistinguishable from a deadly firearm.

[3] The Court uses the term "weapon" because pellet and BB guns can cause severe bodily harm, even if not typically regarded as deadly weapons.

Defendant said he was not.  Dkt. No. 86-3 at ¶ 21.  By this point, neighbors had called 911 to report a person with a gun in the area.  *Id.* at ¶ 26; Dkt. No. 80-20 at ¶ 26.

After JLA left the DOT parking lot, Defendant returned to JLA's home and asked JLA's mother whether he owned any firearms.  Dkt. No. 79-1 at ¶ 14; Dkt. No. 85 at ¶ 14; Dkt. No. 80-20 at ¶¶ 27-28; Dkt. No. 86-3 at ¶¶ 27-28.  JLA's mother told Defendant that JLA owned a BB, pellet, or airsoft gun, and that he sometimes used it for target practice in the backyard.  Dkt. No. 79-1 at ¶ 15; Dkt. No. 85 at ¶ 15; Dkt. No. 80-20 at ¶ 28; Dkt. No. 86-3 at ¶ 28.  The parties do not dispute that JLA's mother said to Defendant, "It's an [a]ir[s]oft gun.  I told 911 this," Dkt. No. 80-20 at ¶ 29; Dkt. No. 86-3 at ¶ 29, although the record suggests she actually told the 911 dispatcher she was unsure whether JLA had his airsoft gun with him, Dkt. No. 79-1 at ¶ 5; Dkt. No. 85 at ¶ 5; Dkt. No. 80-20 at ¶ 7; Dkt. No. 86-3 at ¶ 7; *see also* Dkt. No. 80-5 at 12:21-13:5.  Furthermore, the parties agree that Defendant did not relay this latest remark from JLA's mother to dispatch or any other officer.  Dkt. No. 79-1 at ¶ 16; Dkt. No. 85 at ¶ 16 (clarifying that JLA's mother's earlier statements about the airsoft gun were relayed to dispatch and responding officers).

Separately, at some point after JLA left the DOT parking lot, former defendants Officer Lucas Byron and Investigator Matthew Menard followed JLA into a wooded area.  Dkt. No. 80-20 at ¶ 30; Dkt. No. 86-3 at ¶ 30.  Officer Byron ordered JLA to drop his weapon and not to raise the weapon.  Dkt. No. 80-20 at ¶ 32; Dkt. No. 86-3 at ¶ 32.  Officer Byron also communicated JLA's location over his radio.  Dkt. No. 80-20 at ¶ 31; Dkt. No. 86-3 at ¶ 31.  Defendant caught up with the other officers in the wooded area as Officer Byron was attempting to speak with JLA.  Dkt. No. 80-20 at ¶ 33; Dkt. No. 86-3 at ¶ 33.  The parties agree that at this point, Defendant

began calling out to JLA, asked him multiple times to drop his weapon, and said the officers wanted to help him.  Dkt. No. 80-20 at ¶ 34; Dkt. No. 86-3 at ¶ 34.

**D.    Defendant and Other Law Enforcement Officers Shoot and Kill JLA**

At around 1:25 P.M., in the wooded area, JLA raised his weapon at Officer Byron and Investigator Menard.  Dkt. No. 79-1 at ¶ 20; Dkt. No. 85 at ¶ 20; Dkt. No. 80-20 at ¶ 36; Dkt. No. 86-3 at ¶ 36.  In response, Defendant, Officer Byron, Investigator Menard, and former defendant Sergeant Amy Bollinger fired their service weapons at JLA.  Dkt. No. 79-1 at ¶ 20; Dkt. No. 85 at ¶ 20; Dkt. No. 80-20 at ¶¶ 36-37; Dkt. No. 86-3 at ¶¶ 36-37 (not disputing that JLA raised the gun, but disputing Defendant's characterization of the gun as a "weapon").  The parties do not dispute that the officers believed JLA was about to use deadly physical force.  Dkt. No. 80-20 at ¶ 37; Dkt. No. 86-3 at ¶ 37.

The initial shots knocked JLA to the ground, but he sat up and raised his weapon at the officers again.  Dkt. No. 80-20 at ¶ 38; Dkt. No. 86-3 at ¶ 38.  The four officers fired again, then approached JLA to render first aid.  Dkt. No. 79-1 at ¶ 21; Dkt. No. 85 at ¶ 21; Dkt. No. 80-20 at ¶¶ 39-41; Dkt. No. 86-3 at ¶¶ 39-41.  At 1:45 P.M., a Jamesville Fire Department paramedic pronounced JLA deceased.  Dkt. No. 79-1 at ¶ 22; Dkt. No. 85 at ¶ 22.  Thereafter, an inspection of JLA's weapon revealed that it was a pellet gun closely resembling a Glock semiautomatic pistol and without any markings to distinguish it from a deadly firearm.  Dkt. No. 80-20 at ¶¶ 42-43; Dkt. No. 86-3 at ¶¶ 42-43.

**E.    Disputes Regarding Applicable Policies and Procedures**

The parties disagree considerably over the policies and procedures that did or did not apply to this situation.  For example, the parties dispute whether the New York State Police Field Operations Guide and Incident Command System ("ICS") should be interpreted as rigid

requirements or flexible guidance.  Dkt. No. 79-1 at ¶ 26; Dkt. No. 85 at ¶ 26.  They also dispute whether the ICS even applied to this specific circumstance.  Dkt. No. 79-1 at ¶ 34; Dkt. No. 85 at ¶ 34.

Additionally, while the parties agree that the New York State Police Members Manual says "[c]ommand is established by the first Member on scene" and assigns all decision-making at the scene of an incident to the Incident Commander, they disagree on whether Defendant acted appropriately as the first responding officer and whether he was the Incident Commander.  Dkt. No. 79-1 at ¶¶ 23, 28, 31-32; Dkt. No. 85 at ¶¶ 23, 28, 31-32.  Plaintiff argues that Defendant was the Incident Commander, and was therefore required to establish a perimeter, direct other officers "as to location assignments or job duties," and establish a command post and staging area.  Dkt. No. 79-1 at ¶¶ 35-36, 38-39.  Defendant, while acknowledging that no "formal perimeter," command post, or staging area was established, maintains that "JLA was under near-constant observation in a known area and, as such, the function of a perimeter was served."  Dkt. No. 85 at ¶¶ 35, 38-39.  Furthermore, Defendant claims he briefed other responding officers.  *Id.* at ¶ 36.

### III. DISCUSSION

**A.    Standard of Review**

"A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried[,]" and that the undisputed facts "warrant judgment for the movant as a matter of law."  *Grant v. Fischer*, No. 9:14-CV-1382, 2017 WL 1180866, *1 (N.D.N.Y. Mar. 29, 2017) (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted)).  In a summary judgment analysis, the Court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* (quoting *Chambers*, 43 F.3d at 36).  "Moreover, . . . a party opposing a motion for summary judgment may not simply rely on the

assertions in its pleadings." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56).

When assessing the record to determine the existence of material factual disputes, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Id.* (citing *Chambers*, 43 F.3d at 36); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the nonmovant does not respond to the motion or does not dispute the movant's statement of material facts, the Court "must be satisfied that the citations to evidence in the record support the movant's assertions." *Grant*, 2017 WL 1180866, at *1 (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)).

"Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quotation omitted). However, to defeat summary judgment, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 554 (quoting *Anderson*, 477 U.S. at 252). Thus, "nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, . . . and they may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (quotations omitted).

## B. Plaintiff's Summary Judgment Motion

Plaintiff has moved for summary judgment "on the issue of liability." Dkt. No. 79-16. Because the motion only discusses the elements of negligence, the Court construes the motion as seeking summary judgment on just the negligence claim asserted in the amended complaint.

### 1. Statute of Limitations and Relation Back

Preliminarily, Defendant asserts that Plaintiff's motion must fail as a matter of law because the negligence claim is untimely.  That claim was not explicitly asserted until October 2024, when the amended complaint was filed.  Dkt. No. 76 at ¶ 88; Dkt. No. 85-1 at 8; Dkt. No. 75.  Under New York law, a plaintiff must bring its negligence claim within three years of accrual.  N.Y. C.P.L.R. § 214.  New York does recognize tolls on statutes of limitations, such as where infancy, insanity, or incapacity prevented a plaintiff from filing its action soon enough, *see* N.Y. C.P.L.R. § 208, but Plaintiff has not alleged any grounds where a toll would be appropriate.

The Federal Rules of Civil Procedure sometimes allow an otherwise untimely claim to "relate back" to the date of the original complaint and thereby "benefit from the timeliness of the original pleading . . . ."  *Guerrero v. Albany Med. Health Sys.*, 1:24-cv-01344, 2025 WL 2645540, *4 (N.D.N.Y. Sept. 15, 2025) (citing Fed. R. Civ. P. 15(c)).  "An amendment to a complaint may relate back to the date of the original complaint when it 'asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.'"  *Id.* (citing Fed. R. Civ. P. 15(c)(1)(B)).  "Alternatively, relation back is allowed where the law providing the statute of limitations permits it."  *Id.* (citing Fed. R. Civ. P. 15(c)(1)(A)).  On this issue, the Second Circuit has stated that "[t]o relate back, an amendment must concern the general fact situation alleged in the original pleading."  *Goldman v. Barrett*, 733 Fed. Appx. 568, 570 (2d Cir. 2018) (citing *Rosenberg v. Martin*, 478 F.2d 520, 526 (2d Cir. 1973)) (internal quotation marks omitted).  By extension, an amended complaint that attempts to set forth completely new facts may not relate back to the original complaint.  *Id.* (citations omitted).  The facts alleged in the original pleading must have been sufficient to put the defendant on notice of the conduct that the new claim challenges.  *See id.*; *Sims v. Goord*, 151 Fed. Appx. 12, 14 (2d Cir. 2005).

In the amended complaint, Plaintiff alleges that Defendant was negligent because he owed a duty to JLA and the public, and that Defendant breached his duty by "failing to properly follow police procedure . . . ."  Dkt. No. 75 at ¶¶ 46-47.  Furthermore, Plaintiff alleges that Defendant's negligent failure to follow procedure caused JLA "pain, suffering, degradation and humiliation, [and] permanent physical injuries, including wrongful death[,]" and that JLA's wrongful death adversely affected his family.  *Id.* at ¶ 50.  Although the negligence claim itself was not asserted as a standalone cause of action until October 2024, more than three-and-a-half years after JLA's death and outside the limitations period, the claim appears to be based on the same conduct alleged in Plaintiff's original complaint.  For example, the original complaint, which was filed in state court less than a year after JLA's death, asserted that Defendant owed a duty to JLA and the general public, breached that duty by "carelessly, negligently, and/or recklessly proximately causing [JLA's] death," and failed to take numerous actions that could have mitigated the situation (such as using de-escalation techniques, establishing "a proper chain of command," and communicating properly to avoid shooting JLA).  Dkt. No. 2 at ¶¶ 20-22.

Defendant characterizes these respective arguments as asserting two different duties and two separate theories of negligence.  Dkt. No. 80-19 at 23; *see* Dkt. No. 85-1 at 8-9.  Accordingly, Defendant argues the relation back doctrine does not apply.  *See* Dkt. No. 80-19 at 23.  However, in deciding whether to allow relation back, the Court must look at the factual allegations in both the original and amended complaints.  Plaintiff does not appear to make unrelated factual allegations against Defendant in the amended complaint.  Rather, Plaintiff attempts to add specificity to its allegations in the original complaint: that Defendant allegedly owed a duty to JLA (based in part on documented New York State Police procedures), failed to

take actions required of him as a New York State Trooper and the first responding officer (examples of which are outlined in the original complaint), and caused JLA's death.

Though it would have behooved Plaintiff to expressly allege negligence in its initial complaint, the negligence claim added by amendment appears to arise from the same "conduct . . . attempted to be set out . . . in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Accordingly, the new claim relates back to the original complaint that was timely filed in 2022, and is not barred by the statute of limitations.

### 2. *The Merits of Plaintiff's Negligence Claim*

Turning to the merits, New York law requires a negligence plaintiff to prove: (1) "a duty owed to the plaintiff by the defendant"; (2) "a breach of that duty"; and (3) "injury proximately resulting therefrom." *Moore Charitable Found. v. PJT Partners, Inc.*, 40 N.Y.3d 150, 157 (2023). However, there are significant limitations on tort liability of municipal officers, "and governmental defendants 'unquestionably continue to enjoy . . . a significant measure of immunity.'" *Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 308 (2022) (quoting *Haddock v. City of New York*, 75 N.Y.2d 478, 484 (1990)). To be entitled to judgment as a matter of law, the undisputed material facts must show that Plaintiff has satisfied all three of these elements and a reasonable jury could not conclude otherwise. If a reasonable jury could find that Plaintiff failed to meet any of the elements, summary judgment for Plaintiff is improper.

Here, there is clearly some dispute over whether a duty was established, and if so, whether it was breached. Under New York law, the type of duty owed differs based on whether the municipal defendant was acting in a "governmental" or "proprietary" role when the cause of action arose. *Id.* at 308-09. However, because Plaintiff must satisfy each negligence element to be entitled to judgment as a matter of law, the Court can resolve the question of summary

judgment by looking solely at the causation prong.  In its motion, Plaintiff argues that the affidavit of Plaintiff's expert, private investigator and former New York State Trooper Robert Faynor, establishes that Defendant's "failure to follow the [New York State Police] Rules resulted in the injury to Plaintiff's Decedent."  Dkt. No. 79-16 at 10-11.  Defendant counters that Faynor's opinion is inadmissible, and the record evidence does not support a finding of proximate cause. Dkt. No. 85-1 at 20-27.

In New York, "[p]roximate or legal cause is defined as that 'which in a natural sequence, unbroken by any new cause, produces th[e] event and without which that event would not have occurred.'"  *Caraballo v. United States*, 830 F.2d 19, 22 (2d Cir. 1987) (quoting *Rider v. Syracuse Rapid Transit Ry. Co.*, 171 N.Y. 139, 147 (1902)).  Furthermore, "[w]here the actual cause of the injury is undisputed, the question of whether the defendant's negligence was the proximate cause of [the] plaintiff's injury is a question of law for the court."  *Id.* (citing *Rivera v. City of New York*, 11 N.Y.2d 856, 857 (1962)).  If the plaintiff's conduct intervenes between the defendant's conduct and the ultimate injury, "the defendant is liable in negligence only when the intervening acts are a normal and foreseeable consequence of [the] defendant's conduct."  *Id.* (citation omitted).

For example, in *Caraballo v. United States*, the Second Circuit (applying New York law) found that the plaintiff's conduct was a superseding cause of harm and shielded the defendant from liability.  In that case, the 39-year-old plaintiff dove into shallow water at a federally owned recreation area, hit his head, and suffered quadriplegic paralysis.  *Id.* at 20-21.  He sued the federal government for negligence, and the district court held that the government was thirty percent at fault because it failed to sufficiently warn the public about the risks of diving into the shallow water.  *Id.* at 21.  Likewise, the district court found the plaintiff seventy percent at fault. *Id.*  On appeal, the government argued that the plaintiff's "reckless conduct was the sole

proximate cause of his injury . . . ." *Id.* The Second Circuit agreed. *Id.* at 22-23. Because the plaintiff had "been swimming many times before" and the water's shallowness was clearly visible to the plaintiff, the Second Circuit concluded that "it was not the government's failure to post signs or its failure [to] adequately patrol that caused [the] plaintiff's injury." *Id.* at 23. By extension, "[t]he proximate cause of [the] plaintiff's injury was his own act . . . ." *Id.*

A similar conclusion is warranted here. Plaintiff alleges that Defendant's failure to follow the directives in the New York State Police Members Manual and Field Operations Guide (the interpretations of which are greatly disputed by the parties) proximately caused JLA's death. Dkt. No. 79-16 at 10-11. To support that contention, Plaintiff proffers expert testimony from Mr. Faynor, who provides an interpretation of the Members Manual and Field Operations Guide.[4] *Id.* However, this argument does not account for the fact that JLA raised his pellet gun, which was completely indistinguishable from a real gun on appearance alone, at law enforcement officers. As Defendant explains in its opposition to Plaintiff's motion, the record evidence does not show that strict adherence to the Members Manual or Field Operations Guide would have prevented JLA from raising his gun and subsequently being shot. Dkt. No. 85-1 at 21-22. The record evidence does show that Defendant discharged his service weapon only after JLA raised his weapon. *See, e.g.*, Dkt. No. 79-12 at 84:10-86:2. Again, although JLA's mother had informed Defendant that JLA owned an airsoft gun, Defendant had no way of knowing for certain that the

---

[4] The Court acknowledges Mr. Faynor's expert affidavit, wherein he asserts repeatedly that Defendant's failure to follow New York State Police procedures actually and proximately caused JLA's death. *See* Dkt. No. 79-3 at ¶¶ 39, 52, 61, 74, 83. Although an expert witness may testify to certain facts, he may not testify to a legal conclusion. *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Accordingly, Mr. Faynor's assertions regarding causation cannot be used to prove that element of Plaintiff's negligence claim.

weapon in JLA's hand was that airsoft gun.  *See* Dkt. No. 79-7 at 20, 23, 26 (showing the visual similarity between JLA's gun and a Glock pistol).

Furthermore, the Supreme Court has recognized that "[w]here [an] officer has probable cause to believe that [an individual] poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable" for the officer to respond with deadly force. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612-13 (2015).  Importantly, "the question [of] whether an officer has used excessive force 'requires careful attention to the facts and circumstances of each particular case, including . . . whether the suspect poses an immediate threat to the safety of the officers or others . . . .'" *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396).

Although JLA made no verbal threats against Defendant or the other officers, the weapon he pointed at them looked like a real gun with the capacity to kill.  From the perspective of a reasonable officer in that situation—as opposed to in hindsight—Defendant was legally justified in using deadly force to protect Officer Byron and Investigator Menard from what reasonably appeared to be an imminent use of deadly force by JLA.  It follows that even if the New York State Police procedures were interpreted as an enforceable duty of care that Defendant breached, JLA's sudden pointing of the gun at the officers would be a superseding cause of the shooting. Accordingly, Plaintiff is not entitled to judgment as a matter of law, and its motion for summary judgment is denied.

## C.    Defendant's Summary Judgment Motion

Less than one week after Plaintiff filed its summary judgment motion, Defendant filed a summary judgment motion seeking judgment as a matter of law and dismissal of all the claims in Plaintiff's amended complaint.  Dkt. No. 80.

### 1.  *Negligence Claim*

Turning to Defendant's motion for summary judgment on Plaintiff's negligence claim, Defendant argues that the negligence claim must be dismissed "for a [h]ost of [p]rocedural and [s]ubstantive reasons."  Dkt. No. 80-19 at 22.  Defendant contends, *inter alia*, that he is entitled to judgment as a matter of law on this claim because the undisputed material facts show that Plaintiff cannot prevail on the merits.  *See id.* at 24.  He also argues entitlement to immunity on this claim.  *Id.* at 28-29.

The Court again concludes that the undisputed material facts do not support the establishment of causation, even when all reasonable inferences are drawn in Plaintiff's favor. Again, even if the New York State Police procedures rose to the level of a cognizable duty, and even if Defendant breached that duty, the Court agrees with Defendant that "any alleged failure of Trooper Fike to follow police procedures was not a proximate cause of JLA's death."  *Id.* at 26.  In making this argument, Defendant emphasizes that there is no evidence suggesting JLA would not have raised his weapon at the officers if Defendant had strictly adhered to the police procedures. *Id.* at 27.  Similarly, Defendant argues that JLA's raising the pellet gun "is the singular fact that resulted in the outcome here."  *Id.*

As already described, a person's intervening conduct can break the chain of proximate causation between a defendant's conduct and an ultimate injury.  The chain may remain unbroken if "the intervening acts are a normal and foreseeable consequence of [the] defendant's conduct." *Caraballo*, 830 F.2d at 22 (citation omitted).  Here, the undisputed material facts show that at the

time JLA raised his weapon at the officers, Defendant and others were telling JLA to drop the weapon and trying to explain that they were there to help him. It follows that JLA's conduct was not a "normal and foreseeable" result of that conduct, and his conduct was therefore the proximate cause of his shooting death. Accordingly, the Court agrees with Defendant that the undisputed factual record shows Plaintiff's failure to establish the causation element of its negligence claim, which therefore must fail on the merits.

However, even if Plaintiff's negligence claim could be meritorious, Defendant is likely entitled to immunity under New York's Mental Hygiene Law. The Mental Hygiene Law states:

> [P]olice officers . . . who are taking into custody and transporting a person to a hospital . . . shall not be liable for damages for injuries alleged to have been sustained by such person or for the death of such person . . . unless it is established that such injuries or such death was caused by gross negligence . . . .

N.Y. MENTAL HYG. LAW § 9.59. In his summary judgment motion, Defendant argues that he is entitled to this defense because he was attempting to pick up JLA for transportation to St. Joseph's Hospital. Dkt. No. 80-19 at 29. In turn, Defendant correctly argues that Plaintiff has not pled or proven that Defendant was grossly negligent. *Id.*; *see also Strobridge v. City of Elmira*, 20-CV-1125, 2022 WL 597464, *10 (W.D.N.Y. Feb. 28, 2022) (defining "gross negligence" as "reckless disregard of the transported person's rights or intentional wrongdoing"); *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823-24 (1993) ("[G]ross negligence differs in kind, not only degree, from claims of ordinary negligence. It is conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing"). Accordingly, Defendant is entitled to summary judgment on this claim.

### 2. Fourth Amendment Excessive Force Claim

Defendant also asserts numerous reasons why Plaintiff's Fourth Amendment excessive force claim should be dismissed. First, Defendant argues that Plaintiff's claim must fail on the merits because the undisputed material facts show that Defendant's use of force in shooting JLA was objectively reasonable under governing Fourth Amendment law. Dkt. No. 80-19 at 13-19. Additionally, Defendant argues that even if Plaintiff could win on the merits, Defendant is protected by qualified immunity, which necessitates summary judgment in Defendant's favor and dismissal of the claim. *Id.* at 19-20.

"Qualified immunity is an affirmative defense and, as such, Defendant[] bear[s] the burden of proving that the privilege of qualified immunity applies." *Frantz v. City of Oswego*, 5:15-CV-1192, 2017 WL 4737258, *3 (N.D.N.Y. Oct. 19, 2017) (citing *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012)). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (quoting *Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 60-61 (2d Cir. 2009)); *see Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, the Court "must consider whether the facts, construed in favor of the party asserting the injury, 'demonstrate a violation of a constitutional right.'" *Frantz*, 2017 WL 4737258, at *3 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court must also decide whether Defendant's "actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006)). The Court may decide these issues in either order. *See Pearson v. Callahan*, 555 U.S. 223, 243 (2009). Ultimately, "[a] qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it

was objectively reasonable for the defendant to believe that his action did not violate such law." *Frantz*, 2017 WL 4737258, at *3 (quoting *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)). "A plaintiff can successfully defeat the defense of qualified immunity on summary judgment by raising a genuine issue of material fact." *Id.* (citations omitted).

"A right is clearly established if its 'contours' are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The Court may treat a right as clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue . . . ." *See Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (citations and internal quotation marks omitted). The existing cases need not be exactly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). To put this rule into the context of this case, qualified immunity would be unavailable if Defendant violated JLA's clearly established Fourth Amendment rights.

Overall, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court has stated that "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742). In other words, the inquiry is highly fact specific. "Such specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* (quoting *Saucier*, 533 U.S. at 205).

The Fourth Amendment protects individuals against unreasonable search and seizure by government actors, and the Supreme Court has recognized that police officers' use of deadly force is subject to the Fourth Amendment. *See Garner*, 471 U.S. at 7. As is relevant here, Fourth Amendment excessive force claims are subject to a reasonableness test, which asks whether the defendant's conduct was "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *See Frantz*, 2017 WL 4737258, at *6 (quoting *Graham*, 490 U.S. at 397). Again, the Court must apply the reasonableness test from the viewpoint of an officer on the scene, not in hindsight. *See Graham*, 490 U.S. at 396.

As discussed already, Defendant only shot JLA after the teen raised his weapon at Officer Byron and Investigator Menard, which the parties do not dispute. There is also no dispute that to the officers on the scene, JLA's gun was visually indistinguishable from a deadly firearm. The law is clear that a police officer's use of force must be reasonable under the circumstances, based upon the perspective of an officer in that situation.

In *Fortunati v. Campagne*, the Second Circuit affirmed a district court's decision that two defendant police officers had qualified immunity after they fatally shot a man who pulled a gun on law enforcement during a mental health crisis. *See Fortunati v. Campagne*, 681 F. Supp. 2d 528, 536-40 (D. Vt. 2009), *aff'd*, *Fortunati v. Vermont*, 503 Fed. Appx. 78 (2d Cir. 2012). The district court acknowledged the importance of several factors in its reasonableness analysis, such as whether the man "was attempting to escape the officers, what his suspected crime was, and whether he was threatening the police or bystanders with harm." *Id.* at 536. Critically, "the controlling factor [was] whether [the man] was threatening the police with immediate harm at the moment [the police] shot him." *Id.* The court determined that the undisputed facts showed that

the man "grabbed his gun and appeared ready to shoot." *Id.* at 537.  Because the facts indicated "an imminent threat of harm" to the police, the court held that the officers' actions were reasonable under the Fourth Amendment and entitled them to qualified immunity.  *Id.* at 539-40.

It follows that the same outcome is warranted here, even when the facts are construed in the light most favorable to Plaintiff.  Although JLA's apparent weapon was only a pellet gun, it appeared to be a deadly firearm.  JLA pointed the pellet gun at the officers as if to shoot, even after being repeatedly instructed to drop the weapon and attempts to de-escalate the situation failed.  As emphasized repeatedly, both parties acknowledge that the pellet gun was visually indistinguishable from a real gun.  Further, although Defendant knew that JLA owned at least one airsoft gun, the weapon that JLA raised was not readily identifiable as an airsoft gun.  Thus, based upon the controlling legal standards in this circuit, Defendant acted reasonably in shooting JLA and did not violate a clearly established right under the Fourth Amendment.  As such, Defendant is entitled to qualified immunity from this constitutional claim, and the claim is dismissed.

### 3.  *Assault and Battery Claims*

In addition to the constitutional claim of excessive force, Plaintiff predicates claims of assault and battery upon Defendant's shooting of JLA.  Dkt. No. 75 at ¶¶ 15-26.  These are intentional torts under state law, which differentiate them from Plaintiff's negligence claim and the Fourth Amendment excessive force claim.  Nevertheless, as Defendant points out in his summary judgment motion, similar standards apply.

Under New York law, "[a] 'battery' is an intentional wrongful physical contact with another person without consent . . . ."  *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 263 (N.D.N.Y. 2014) (quoting *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001)).  The contact may be made by personally touching someone or through "means of an instrumentality."  *Id.*

(quoting *Aberbach v. Biomedical Tissue Servs., Ltd.*, 48 A.D.3d 716, 718 (2d Dep't 2008)). Likewise, "[u]nder New York law, an 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact." *Girden*, 262 F.3d at 203 (internal quotation marks and citation omitted). "To succeed on an assault or battery claim in the law enforcement context, a plaintiff must demonstrate that [the] defendant['s] conduct was not reasonable within the meaning of the New York statute concerning justification for law enforcement's use of force in the course of performing their duties." *Marcano*, 38 F. Supp. 3d at 263 (citations and internal quotation marks omitted). Ultimately, this Court has recognized that "[e]ssentially, the Fourth Amendment excessive force standard applies to assault and battery claims against a police officer under New York law." *Id.* (citing *Humphrey v. Landers*, 344 Fed. Appx. 686, 688 (2d Cir. 2009)).

Accordingly, based on the discussion above, the Court agrees with Defendant that Plaintiff's assault and battery claims must fail. Because the undisputed facts show that Defendant's shooting of JLA was justified under the circumstances—and therefore legally reasonable—it cannot support causes of action for assault or battery. Furthermore, the Court acknowledges Plaintiff's assertion of *res ipsa loquitur* to advance both of these claims. Dkt. No. 75 at ¶¶ 17, 23. Because *res ipsa loquitur* is a negligence doctrine, *see Stone v. Courtyard Mgmt. Corp.*, 353 F.3d 155, 157 (2d Cir. 2003) (citation omitted), and assault and battery are intentional torts, *see Martin v. United States*, 605 U.S. —, 145 S. Ct. 1689, 1695 (2025), the Court declines to examine any application of *res ipsa loquitur* to JLA's shooting.

### 4. *Wrongful Death Claim*

Plaintiff's amended complaint also includes a wrongful death cause of action, which Defendant argues must be dismissed because "Trooper Fike's use of force was reasonable under the circumstances . . . ." Dkt. No. 80-19 at 21; *see* Dkt. No. 75 at ¶¶ 27-31. Relevant to this issue

is the maxim that "[w]rongful death is not itself an independent tort." *DiGennaro v. Town of Gates Police Dep't*, No. 07-CV-6426, 2013 WL 3097066, *11 n.20 (W.D.N.Y. June 18, 2013). "Rather, '[t]his cause of action may be maintained only to the extent that a cognizable *underlying* tort is pleaded under . . . the [New York] Estate Powers and Trusts Law.'" *Id.* (citations omitted); *see, e.g.*, *Quinn v. United States*, 946 F. Supp. 2d 267, 277 (N.D.N.Y. 2013) (quoting *Chong v. N.Y.C. Transit Auth.*, 83 A.D.2d 546, 547 (2d Dep't 1981)) (listing among the elements of a New York wrongful death claim: "[a] wrongful act, neglect[,] or default of the defendant by which the decedent's death was caused").

In the amended complaint, Plaintiff appears to predicate its wrongful death claim on Defendant's alleged negligence. *See* Dkt. No. 75 at ¶ 28 ("As a direct and proximate result of Defendant's negligence, JLA, after experiencing significant conscious pain and suffering, ultimately died from [his] injuries"). As already discussed, Plaintiff's negligence claim fails as a matter of law because the undisputed material facts in the record cannot satisfy the causation element. Thus, the undisputed material facts in the record do not establish an underlying negligence claim, and the wrongful death cause of action must also fail as a matter of law if based on that claim.

Plaintiff's amended complaint does not appear to claim that either of Defendant's alleged intentional torts—assault or battery—form the basis for the wrongful death claim. However, even if Plaintiff alleged as much, the wrongful death claim would still fail because the assault and battery claims are similarly unsupported by the factual record. As already described, the assault and battery claims in this case are subject to essentially the same test as the Fourth Amendment excessive force claim. By extension, as also previously discussed, the intentional tort claims fail because Defendant's shooting of JLA was objectively reasonable under the governing Fourth

Amendment standard.  Accordingly, even if assault or battery were used to support the wrongful death claim, the latter must still be dismissed as a matter of law.

### 5. *IIED and NIED Claims*

Finally, Plaintiff asserts that Defendant is liable for IIED and NIED based on his shooting of JLA and purported failure to follow New York State Police procedures.  Dkt. No. 75 at ¶¶ 32-44.  Defendant, in his summary judgment motion, argues that the IIED and NIED claims must be dismissed as "duplicative of Plaintiff's Fourth Amendment excessive use of force claim."  Dkt. No. 80-19 at 29.

"In general, NIED and IIED claims are 'not allowed if essentially duplicative' of another cause of action."  *Wright v. Belafonte*, 687 Fed. Appx. 1, 2 (2d Cir. 2017) (quoting *Wolkstein v. Morgenstern*, 275 A.D.2d 635, 637 (1st Dep't 2000)); *see Buoniello v. Ethicon Women's Health & Urology*, No. 2:19-cv-4021, 2020 WL 5802276, *4 (E.D.N.Y. Sept. 29, 2020).  A claim may be "duplicative" if the "[p]laintiff does not provide any argument as to why the claim is distinct" from its other claims.  *Buoniello*, 2020 WL 5802276, at *4; *see Woods v. Szakacs*, No. 5:15-CV-027, 2017 WL 11567918, *1-2 (N.D.N.Y. May 25, 2017).

Here, in its opposition to Defendant's motion, Plaintiff contends that "although [the IIED and NIED claims] rely on the same facts [as the other causes of action], they represent different causes of action."  Dkt. No. 86-5 at 29.  Plaintiff adds, "The emotional suffering and fear that JLA endured while being pursued in the manner in which he was stands on it[s] own, and should therefore not be dismissed as duplicative."  *Id.*  Other than the foundational *prima facie* elements of the offenses, the Court cannot discern from Plaintiff's amended complaint or opposition papers any claimed differences between the causes of action.

24

Other courts in this circuit have granted summary judgment to IIED and NIED defendants where the challenged conduct "and any resulting emotional damage [were] entirely subsumed by" other claims. *Caravalho v. City of New York*, No. 13-cv-4174, 2016 WL 1274575, *23 (S.D.N.Y. Mar. 31, 2016) (granting summary judgment to the defendants because the plaintiff's IIED and NIED claims were based on the same conduct as claims of assault, battery, and Fourth Amendment excessive force); *see Crews v. Cnty. of Nassau*, 996 F. Supp 2d 186, 214 (E.D.N.Y. 2014) (quoting *Deronette v. City of New York*, No. 05-CV-5275, 2007 WL 951925, *5 (E.D.N.Y. Mar. 27, 2007); and then citing *Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005)) (granting the defendant summary judgment on an IIED claim because it was duplicative of assault and battery claims based on the same facts, and on an NIED claim because "traditional tort remedies" were available instead).  In short, without "allegations of injuries that may not be redressed" through Plaintiff's other asserted causes of action, the IIED and NIED claims are duplicative and must be dismissed. *Druschke*, 359 F. Supp. 2d at 316.

Because Plaintiff's IIED and NIED claims rely on the same conduct underlying Plaintiff's other claims, and because Plaintiff does not allege any additional conduct supporting IIED or NIED that is not redressable through Plaintiff's other causes of action, the Court holds that the IIED and NIED claims are duplicative of those other claims.  Indeed, the IIED and NIED claims rely upon the same allegations of negligent failure to follow police procedures while pursuing JLA and the intentional shooting of JLA.  As the Court has explained in detail, redress was available to Plaintiff through its excessive force, assault, battery, and negligence claims.  However, as discussed, each of those claims fails as a matter of law.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Plaintiff's motion for summary judgment (Dkt. No. 79) is **DENIED**; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 80) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 10, 2025
      Albany, New York

Mae A. D'Agostino
U.S. District Judge